## KCSC #25-2-00725-1 SEA

## Docket #1 – Complaint

1

2

**FILED**
2025 JAN 09 09:00 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 25-2-00725-1 SEA

RECEIVED
JAN 10 2025
PROSECUTING ATTORNEY
FOR SNOHOMISH COUNTY
CIVIL DIVISION
TIME_____

3

4

5

6

7

8

**SUPERIOR COURT OF WASHINGTO N**
**FOR KIN GCOUNTY**

9

10

PE G CY HA N CHETT, in her personal capacity
and as the Personal Representative for the Estate

11

of SE A NHA N CHETT,

NO. _____

**COMPLAINT**

12

Plaintiff,

**JURY DEMANDED**

Snohomish County Auditor

JAN 9 '25 PM 3:26

ROUD DCC

13

v.

14

SN CHO MISH COUNTY, a political
subdivision of the State of Washington;

15

ADA MFORTN EY, in his personal capacity;
IA N HURI, in his personal capacity; JAMIE

16

KANE, in his personal capacity; ALONZO
DOWNING, in his personal capacity;

17

JACQUELINE BEERS, in her personal
capacity, OMAR SANTOS-CRUZ, in his

18

personal capacity; STUART ANDREWS, MD,
in his personal capacity; LESLIE GREENE,

19

MD, in his personal capacity.
AMANDA RAY, in her personal capacity; and

20

JANE/JOHN Does 1-10,

21

Defendants.

22

        COMES NOW the above-named Plaintiff, by and through attorney Ryan D. Dreveskracht,

23

of Galanda Broadman, PLLC, and by way of claim alleges upon personal knowledge as to herself

24

and her own actions, and upon information and belief upon all other matters, as follows:

25

COMPLAINT - 1

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1

## I.    INTRODUCTION

2      1.    PEGGY HANCHETT, in her personal capacity and as the Personal Representative

3 for the Estate of SEAN HANCHETT, a pre-trial detainee at all times relevant to this action, brings

4 this action against all Defendants pursuant to 42 U.S.C. § 1983, to redress the deprivation under

5 color of law of his rights, privileges, and immunities secured by the Constitution of the United

6 States. Plaintiffs allege the denial and inadequate provision of medical care and conscious-shocking

7 conditions of confinement, which violates the Fourteenth Amendment to the United States

8 Constitution. Plaintiffs seek monetary damages to redress and remedy the deprivation of the

9 decedent's constitutional rights as a pretrial detainee, the loss of parental, familial relations, and

10 punitive damages as available by law. Plaintiff prays also for relief against the Defendants caused

11 by the policies, as well as the behaviors and practices of SNOHOMISH COUNTY by way of its

12 jail deputies and medical staff as violative of the Federal Constitutional guarantees and rights of the

13 Plaintiffs, and all other pretrial detainees who have, are, or will be subjected to the totality of

14 conditions and practices of SNOHOMISH COUNTY by way of its jail facility's deputies and

15 medical staff. In addition, the Plaintiff invokes the pendent jurisdiction of this Court over related,

16 ancillary, and pendent State law claims. Finally, the Plaintiff seeks an award of attorney's fees and

17 costs pursuant to 42 U.S.C. § 1988.

18

## II.    PARTIES

19      2.    PEGGY HANCHETT is an adult residing in Kitsap County, Washington.  Peggy is

20 SEAN HANCHETT's mother and is the Personal Representative of her late son's Estate. This is an

21 action arising from Sean Hanchett's easily preventable death and the Defendants' negligence, gross

22 negligence, and deliberate indifference to his serious medical condition.  The claims herein include

23 all claims for damages available under Washington and federal law.

24

25
COMPLAINT - 2

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    3.    Defendant SNOHOMISH COUNTY is a municipal corporation responsible for

2  administering the SNOHOMISH COUNTY Jail ("Jail").  The Jail is an adult corrections facility

3  that is required to provide proper custody, control, and supervision for county, state, and federal

4  inmates in Snohomish County.  SNOHOMISH COUNTY is, and was at all times mentioned herein,

5  responsible for the actions or inactions, and the policies, procedures, and practices/customs of all

6  health services relating to the Jail, including the provision of medical treatment at outside facilities

7  when necessary.

8    4.    Defendant ADAM FORTNEY is the SNOHOMISH COUNTY Sheriff.  He

9  supervised, administrated, and managed all SNOHOMISH COUNTY employees and corrections

10  facilities at the time of Sean's injuries and was responsible for ensuring the presence and

11  implementation of proper policies, procedures, and training.  Defendant FORTNEY was also

12  responsible for the training, supervision, and discipline of SNOHOMISH COUNTY employees

13  and/or agents, including the below individually named Defendants.  He has ratified the acts and

14  omissions of the employees described below by affirming that he approves his subordinates'

15  decisions, acts, and omissions, and the basis for them.  He is sued in his personal capacity only.

16    5.    Defendant IAN HURI is the SNOHOMISH COUNTY Undersheriff.  He supervised,

17  administrated, and managed all SNOHOMISH COUNTY employees and corrections facilities at

18  the time of Sean's injuries, and was responsible for ensuring the presence and implementation of

19  proper policies, procedures, and training.  Defendant HURI was also responsible for the training,

20  supervision, and discipline of SNOHOMISH COUNTY employees and/or agents, including the

21  below individually named Jailer Defendants.  He has ratified the acts and omissions of the

22  employees described below by affirming that he approves his subordinates' decisions, acts, and

23  omissions, and the basis for them.  He is sued in his personal capacity only.

24

25
COMPLAINT - 3                                                    **Galanda Broadman PLLC**
                                                                 8606 35th Avenue NE, Ste. L1
                                                                 Mailing: P.O. Box 15146
                                                                 Seattle, WA 98115
                                                                 (206) 557-7509

6. Defendant JAMIE KANE is the Chief of SNOHOMISH COUNTY's Corrections Bureau. He supervised, administered, and managed all SNOHOMISH COUNTY employees and corrections facilities at the time of Sean's injuries, and was responsible for ensuring the presence and implementation of proper policies, procedures, and training. Defendant KANE was also responsible for the training, supervision, and discipline of SNOHOMISH COUNTY employees and/or agents, including the below individually named Defendants BEERS and Santos-Cruz. He has ratified the acts and omissions of the employees described below by affirming that he approves his subordinates' decisions, acts, and omissions, and the basis for them. He is sued in his personal capacity only.

7. Defendant ALONZO DOWNING is a Major of SNOHOMISH COUNTY's Corrections Bureau. He supervised, administered, and managed all SNOHOMISH COUNTY employees and corrections facilities at the time of Sean's injuries, and was responsible for ensuring the presence and implementation of proper policies, procedures, and training. Defendant DOWNING was also responsible for the training, supervision, and discipline of SNOHOMISH COUNTY employees and/or agents, including the below individually named Jailer Defendants. He has ratified the acts and omissions of the employees described below by affirming that he approves his subordinates' decisions, acts, and omissions, and the basis for them. He is sued in his personal capacity only.

8. Defendants FORTNEY, HURI, KANE, and DOWNING shall be referred to collectively as "SUPERVISORY DEFENDANTS." At all material times, each County Supervisory Defendant acted under color of law and was a state actor.

9. Upon information and belief, Defendant STUART ANDREWS, MD, and/or Defendant LESLIE GREENE, MD, is/are the Responsible Physician at the Jail. Together with the Health Services Administrator, the Responsible Physician is responsible for "arranging for all levels

COMPLAINT - 4

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

of health services, assuring the quality of all health services, identifying lines of medical authority for the inmate health program and assuring that inmates have access to all health services." The Responsible Physician is "responsible for establishing an annually reviewing clinical protocols to ensure consistency with the National Clinical Practice Guidelines," including, without limitation, "written medical protocols on detoxification symptoms necessitating immediate transfer of the inmate to a hospital or other medical facility, and procedures to follow if care within the facility should be undertaken." These Defendants are sued in their personal capacities only.

10.    Upon information and belief, Defendant AMANDA RAY is the Health Services Administrator at the Jail. The basic function of the Health Services Administrator is "to plan, implement, direct, and evaluate operations of the SNOHOMISH COUNTY Sheriff's Office Corrections Bureau Health Services for the incarcerated jail population." The Health Services Administrator "manages overall medical and mental health programs and services" at the Jail. They are sued in their personal capacity only.

11.    Defendants ANDREWS, GREENE, and RAY shall be referred to collectively as "POLICYMAKING DEFENDANTS." At all material times, each Policymaking Defendant acted under color of law and was a state actor.

12.    Defendants JACQUELINE BEERS and OMAR SANTOS-CRUZ are SNOHOMISH COUNTY employees. These County Defendants are persons who knew that Sean was in need of medical care. In spite of this knowledge, these County Defendants took no steps to provide any semblance of care to prevent Sean's death. These County Defendants are sued in their personal capacities only.

## III.    JURISDICTION AND VENUE

13.    On October 3, 2023, Plaintiffs filed a standard tort claim with the Snohomish County Risk Management, pursuant to Chapter 4.96 RCW.  More than sixty (60) days have elapsed since

COMPLAINT - 5

1    the claim was filed. The notice of claim provisions required by RCW 4.96.020 have been satisfied.

2        14.    The Superior Court of King County, Washington, has jurisdiction over this matter

3    pursuant to RCW 2.08.010.

4        15.    Venue is proper in King County pursuant to RCW 36.01.050.

5                            **IV.    FACTS**

6        16.    The Jail has not been accredited or certified by the National Commission on

7    Correctional Health Care ("NCCHC") as providing medical care and health services that meet the

8    standards for health services in jails as promulgated by the American Medical Association and

9    adopted by the NCCHC.

10       17.    SNOHOMISH COUNTY, by and through its SUPERVISORY DEFENDANTS and

11   POLICYMAKING DEFENDANTS, despite knowledge of the recent deaths, pain and suffering,

12   and serious medical emergency experiences by pre-trial detainees caused by the antiquated physical

13   condition, understaffing, and ill-trained staff at its Jail, has failed to, and continues to refuse to, take

14   any steps to ameliorate, correct, or remedy the deplorable conditions and practices of the Jail, or to

15   relieve the unnecessary suffering and punishment experienced by pretrial detainees.

16       18.    Defendant SNOHOMISH COUNTY has also failed to, and refused to, appropriate

17   and/or distribute adequate funds for the staffing of the Jail, as well as budgets for the medical and

18   health care for the inmate population of the Jail. The refusal of SNOHOMISH COUNTY to so act

19   is and was in derogation of its duty to appropriate and provide necessary funds to keep its Jail

20   properly staffed, and in a safe and suitable condition.

21       19.    The failure and omissions of the SNOHOMISH COUNTY, by and through

22   SUPERVISORY DEFENDANTS and POLICYMAKING DEFENDANTS, were intentional,

23   reckless, willful, and in callous disregard to the constitutional rights of not only its pretrial

24   detainees, but also have acted with similar disregard to the working conditions of Jail deputies, who

25   COMPLAINT - 6

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1   as a result of understaffing are subjected to a mandatory overtime protocol, which in turn affects

2   the totality of the behaviors, practices, and condition at the Jail. As a direct and proximate result of

3   this mandatory overtime protocol, pretrial detainees including Sean have been subjected to cruel

4   and unusual punishment, pain and suffering, and there have been increased occurrences among the

5   inmate population of attempted suicides, actual suicides, tension, inmate disturbances, medical

6   negligence, injury, and death.

7        20.    SNOHOMISH COUNTY, by and through SUPERVISORY DEFENDANTS and

8   POLICYMAKING DEFENDANTS, has been advised on a routine basis that the conditions and

9   practices of the Jail are dangerous and inherently likely to lead to injury or death; non-compliance

10  of the Jail with Washington State Law and the Jail's own policy; and the need to correct the

11  deplorable conditions, practices, underfunding and understaffing of the Jail.

12       21.    The Jail deputies and medical staff named herein failed to heed or respond to Sean's

13  obvious physical suffering, and furthermore, the defendants deliberately ignored and failed to

14  adequately safeguard Sean from his pain and suffering resulting from his medical conditions; the

15  defendants were also deliberately indifferent to Sean's medical needs, suffering, physical condition,

16  and pleas for relief.

17       22.    The Jail deputies and medical staff named as defendants herein knew and should

18  have known that Sean, as a result of his medical conditions, was suffering, and had no or little

19  ability to cope with his conditions. Despite this knowledge, the defendants named herein refused

20  and did not and failed to promptly or reasonably procure competent medical treatment for Sean,

21  and further exacerbated his suffering by not transporting him to an off-site advanced practitioner

22  within a reasonable amount of time to be treated for his conditions. Furthermore, the defendants

23  named herein knew of the risks of harm, injury, pain, and suffering to which the Plaintiff was

24  exposed by defendants' deliberate indifference.

25
COMPLAINT - 7

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
M aling  P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    23.    Sean was booked into the Jail at 12:11 a.m. on December 10, 2022.

2    24.    Before being booked, the arresting Edmonds Police Department officer took Sean

3 to Swedish Hospital, Edmonds, for a fit for jail screening, due to a wound on his leg. His diagnoses

4 there included: "in police custody," "opioid use disorder," "leg edema," and "wound drainage." He

5 was given a prescription for buprenorphine-naloxone (Suboxone), a medication for the treatment

6 of opioid use disorder. The after-visit summary and prescription were provided to the Jail when

7 Sean was booked.

8    25.    At booking, Sean indicated that he would likely be withdrawing from opioids, which

9 he ingested daily. A urinalysis confirmed that Sean did indeed have high levels of fentanyl and

10 methamphetamine in his system.

11    26.    Sean's opioid use disorder was severe and substantially affected limited his major

12 life activities such that it was a disability. Because of his disability, Sean had difficulty regulating

13 his behavior, working, communicating, sleeping, concentrating, and decision-making; and when he

14 was in withdrawal from opioids, Sean's disability affected his physical health in extreme ways such

15 as causing seizures, which prevented him from performing any major life activities.

16    27.    Sean's opioid use disorder was known to the Jail not only because of the diagnosis

17 provided at his fit-for-jail examination, but because of his prior history at the Jail. Medical records

18 from Sean's previous bookings at the Jail indicate that Sean had a history of experiencing seizures

19 as a withdrawal symptom from his opioid use disorder. The booking nurse who examined him and

20 determined he was fit for jail noted that he experiences seizures as a withdrawal symptom, but failed

21 to include the Suboxone prescription, which the Jail never administered to Sean.

22    28.    At 12:45 a.m., Sean was put on Medical/Detox Watch for "Fentanyl + Benzo"

23 withdrawal:

24

25
COMPLAINT - 8

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing P.O. Box 15146
Seattle, WA 98115
(206) 557-7509



It is unclear why Sean was said to be withdrawing from "Benzo," since the urinalysis was positive for fentanyl and methamphetamine, not benzodiazepines.

29.     Because Sean was allegedly combative during booking—a symptom caused by his disability—he was classified as a "max" inmate and housed in the max/overflow module, a solitary confinement unit. In other words, because of his disability, he was placed in solitary confinement, a housing condition that has long been understood by correctional and medical professionals to exacerbate risks of harm associated with opioid use disorder, and he was placed in a cell with insufficient monitoring rather than being given access to his prescribed medications, or assessed for an appropriate accommodation such as housing that offered frequent (more often than once per hour) medical monitoring and safety checks.

30.     Sean's status as a medical detox patient was prominently noted on his cell door **yet he did not receive monitoring by trained or qualified health care professionals**:

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

31.    Per Snohomish County's written Policy, Medical/Detox Watch consists of observation by corrections staff "[a]t least once every 60 minutes." During these observations, corrections staff, who are not qualified health care professionals, are instructed to "remain alert to signs of . . . withdrawal, which include, but are not limited to, sweating, nausea, abdominal cramps, anxiety, agitation, tremors, hallucinations, rapid breathing and generalized aches and pains." This policy is **obviously** out of step with national standards—which require observation by corrections staff at least once every 30 minutes—and puts inmates at risk of serious harm. That Snohomish County's policy would put detoxing inmates at a substantially increased risk of harm or death, in other words, would have been obvious to any corrections or medical professional exercising his or her professional judgment.

32.    This policy is also out of step with national standards that require inmates who screen positive for opioid withdrawal to receive withdrawal assessments by trained health professionals. For example, detox protocol guidelines from NCCHC state that: (1) "All who screen positive should be assessed for substance dependence and acute withdrawal by trained health professionals using standard diagnostic criteria, such as the DSM-5, and validated withdrawal assessment instruments[;]" and (2) "[t]hose who screen positive should receive a complete medical and psychiatric evaluation to assess for and treat physical and mental health comorbidity . . . hydration, and nutritional status (that can complicate management of withdrawal) and a review of current medications." That   Snohomish County's policy would put detoxing inmates at a substantially increased risk of harm or death, in other words, would have been obvious to any corrections or medical professional exercising his or her professional judgment.

33.    While Snohomish County's written policy recognizes that withdrawal "can be a life-threatening medical condition requiring professional medical intervention," it lacks in form and function, provides no effective guidance, and equates to no policy at all. It instead instructs

COMPLAINT - 10

1    corrections staff, who are not qualified health care professionals, to "remain alert to signs of drug

2    and alcohol overdose and withdrawal" and "ensure that a qualified health care professional is

3    promptly notified" when said signs are identified. The written policy then relies upon "[t]he

4    Responsible Physician [to] develop written medical protocols"—upon information and belief, these

5    written medical protocols have not been developed—and gives complete discretion to staff to

6    determine how and when to assess and treat an inmate suffering from withdrawal symptoms. That

7    such a policy would put detoxing inmates at a substantially increased risk of harm or death, in other

8    words, would have been obvious to any corrections or medical professional exercising his or her

9    professional judgment.

10    34.    Upon information and belief, corrections staff at the Jail, who are relied upon to

11    monitor detoxing inmates, are not trained to perform physical or behavioral health assessments on

12    inmates in withdrawal, or recognize the potential symptoms and severity of withdrawal symptoms.

13    That such a failure to train would put detoxing inmates at a substantially increased risk of harm or

14    death, in other words, would have been obvious to any corrections or medical professional

15    exercising his or her professional judgment.

16    35.    To provide just one example of how Snohomish County's written policy and

17    protocols are lacking: they are silent as to Clinical Opiate Withdrawal Scale ("COWS")

18    assessments. The applicable standard of care, however, requires that patients experiencing opioid

19    withdrawal receive COWS assessments at least every four hours and that vitals be taken at that

20    time. That Snohomish County's widespread failure to implement COWS assessments would put

21    detoxing inmates at a substantially increased risk of harm or death, in other words, would have been

22    obvious to any corrections or medical professional exercising his or her professional judgment.

23    36.    It comes as no surprise that Snohomish County's insufficient written policies were

24    authored by Lexipol. Lexipol was founded in 2003 by Bruce Praet and Gordon Graham, two former

25

COMPLAINT - 11

law enforcement officers who later became attorneys.[1] In the ensuing years, Lexipol "has quietly become one of the most influential forces in policing across the country."[2] "The key to Lexipol's commercial success appears to be its claims to reduce legal liability in a cost-effective manner. . . . In fact, Lexipol's promotional materials assert that departments using Lexipol have fewer lawsuits filed against them and pay less to resolve the suits that are filed."[3] Lexipol accomplishes this by utilizing "vague or permissive rules that meet bare-minimum legal requirements."[4] Whereas many experts believe that policies should be used "as a tool to constrain officer discretion and to improve officer decisionmaking, . . . Lexipol, in contrast, promotes its policies as a risk management tool that can reduce legal liability."[5] According to UCLA College of Law professors Ingrid Eagly & Joanna Schwartz, "Lexipol's focus on liability risk management" has caused it "to draft policies that maximize officer discretion" in order to reduce government liability.[6] In fact, Lexipol fails to account for recent decisions by Washington courts and explicitly encourages officers to violate the

---

[1] Scott Morris, *Police Policy for Sale*, The Appeal, Feb. 13, 2019, *available at* https://theappeal.org/lexipol-police-policy-company/.

[2] Greg Moran, *A Little Known Private Company Has an Outsize Role Writing Policies for Police Departments*, San Diego Union Tribune, Nov. 8, 2020, *available at* https://www.sandiegouniontribune.com/news/public-safety/story/2020-11-08/an-unknown-provate-company-has-an-outside-role-writing-policies-for-police-departments.

[3] Ingrid V. Eagly & Joanna C. Schwartz, *Lexipol: The Privatization of Police Policymaking*, 96 Tex. L. Rev. 891, 895 (2018), *available at* https:// texaslawreview.org/wp-content/uploads/2018/04/Eagly.pdf.

> Lexipol constantly warns its potential customers that without Lexipol they are at risk of having their outdated policies turn up downstream in litigation and make the day for plaintiff's lawyers. . . . Lexipol does not outline the precise ways in which updated policy manuals will reduce liability risk, but it does report that its products have in fact helped public safety agencies across the country reduce risk and avoid litigation.

*Id.* at 917 (quotation omitted).

[4] Madison Pauly, *Meet the Company That Writes the Policies That Protect Cops*, Mother Jones, Oct. 2020, *available at* https:// www.motherjones.com/crime-justice/2020/08/lexipol-police-policy-company/. For instance, while the "use of 'shall'" is often "geared to constrain officer discretion," Lexipol founders have advocated against adopting that language "because plaintiffs' attorneys would highlight that type of language as a way of showing that officers had violated policy." Eagly, *supra*, at 926. According to Lexipol founder Bruce Praet:

> The need to shield officers from liability is why Lexipol policy clearly defines the difference between "shall" and "should" and cautions against the unnecessary use of "shall." . . . Policy language that definitively prohibits an action will inevitably result in a situation where an officer violates the policy under reasonable circumstances, which in turn can create issues that must be dealt with if litigation results.

*Id.* at 926–27 (quotation omitted).

[5] *Id.* at 896.

[6] *Id.* at 929.

COMPLAINT - 12

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing  P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

law.[7] Professors Eagly and Schwartz have concluded that courts should "more rigorously evaluate the . . . constitutionality of Lexipol policies and trainings without being influenced by its untested marketing claims or its market dominance."[8]

37.     Consistent with Snohomish County's deficient policies, Sean was initially observed a mere once per hour by corrections staff from 12:45 a.m. on December 10th until 1:06 a.m. on December 11th.

38.     While records show that Jailer Defendants BEERS and SANTOS-CRUZ, neither of whom are medically trained, had regularly entered the unit over the next fifteen hours—Defendant BEERS even observed Sean vomiting that morning—neither officer conducted a Medical/Detox assessment. As such, and consistent with Snohomish County Policy, despite the fact that his withdrawal symptoms were obvious and worsening, no COWS assessment was ever conducted. No medical attention was rendered. Instead, Sean was "medically supervised" by Jail corrections officers with no medical training. In other words, Sean was consistently denied adequate medical care as a matter of Snohomish County policy and established practice.

39.     At 3:45 p.m., Sean was found "expired" next to a puddle of vomit:



---

[7] University of Washington, Center for Human Rights, *Don't Ask, Do Tell: Local Law Enforcement Collaboration with ICE/CBP*, Sept. 25, 2017, *available at* https://jsis.washington.edu/humanrights/2017/09/25/dont-ask-do-tell/.
[8] Eagly, *supra*, at 954.

COMPLAINT - 13

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    40.    By the time Sean was found "expired," he was cold to the touch. It takes roughly 12

2  hours for a human body to be cold to the touch after death.

3    41.    By the time Sean was found "expired," *rigor mortis* had set in. *Rigor*

4  *mortis* commences roughly three hours after death.

5    42.    By the time Sean was found "expired," lividity had set in:



13  Lividity is not observable by the human eye until at least two hours after death.

14    43.    The "medical supervision" supplied by Snohomish County, in other words, was so

15  deficient that employees and subcontractors charged with making sure that Sean was kept safe and

16  alive not only let him die on their watch, but they also kept watch over Sean's **dead body** for

17  anywhere from two to twelve hours *minimum.*

18    44.    When subsequently asked how long Sean had been "down" for, Defendants BEERS

19  and SANTOS-CRUZ answered that they were "unsure."

20    45.    Prior to his death, Sean attended Edmonds-Woodway High School, where he

21  excelled as a pitcher on the baseball team. Sean was known for his big heart and his love of animals.

22  Friends and family described him as always lending a helping hand. Sean is survived by his mother,

23  Plaintiff Peggy Krause.

24

25  COMPLAINT - 14

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509



## V.    CLAIMS

**A.    FIRST CAUSE OF ACTION – NEGLIGENCE, GROSS NEGLIGENCE, AND MEDICAL NEGLIGENCE – SNOHOMISH COUNTY**

46.    Snohomish County had a duty to care for inmates and provide reasonable safety and medical care.

47.    This duty is an affirmative one under both Washington State and federal law because prisoners, by virtue of incarceration, are unable to obtain medical care for themselves.

48.    In fact, municipalities and local governments, such as Snohomish County, have a long-standing and special duty to keep jail inmates healthy and safe. This duty requires officials to consider what is the safest and most humane means of incarceration of their prisoners and what is most conducive to their health, well-being, and safety, despite the costs. As a matter of law, Washington courts have long recognized a jailer's special relationship with inmates, particularly the duty to ensure health, welfare, and safety. This heightened duty is derived from the special relationship between custodians and the individuals entrusted to their care. Inmates rely completely on the government to make decisions as to their safety and health care, similar to students relying on schools, guests on innkeepers, and patients on hospitals. Contributory negligence has no place in such a scheme, and Snohomish County is therefore responsible for the negligence of all

COMPLAINT - 15

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
M ailing  P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

Defendants described herein, as well as any responsible subcontractors or third-party providers.

49.     Snohomish County is vicariously liable for the breaches of duty of its employees and agents.

50.     Snohomish County breached its duty, and was negligent, when it failed to adequately treat Sean's medical needs.  Indeed, because Sean's obvious medical needs were entirely ignored, Snohomish County was grossly negligent.

51.     Snohomish County breached its duty, and was negligent, when it failed to have and follow proper training, policies, and procedures on the provision of reasonable and necessary medical care, treatment of inmates, and the internal sharing of inmate information.

52.     Snohomish County breached its duty, and was negligent, when it failed to ensure adequate and proper staffing at the Jail.

53.     Snohomish County breached its duty, and was negligent, when it failed to ensure that Sean was properly supervised and/or that cell checks were conducted in a safe, timely, and consistent manner.

54.     Snohomish County breached its duty, and was negligent, when it failed to ensure that Sean received the necessary medication.

55.     Snohomish County breached its duty, and was negligent, when it ignored notification and developing evidence of Sean's serious medical condition.

56.     Snohomish County breached its duty, and was negligent, when it failed to properly assess and treat Sean.

57.     As a direct and proximate result of the breaches, failures, and negligence of Defendants, as described above and in other respects as well, Sean experienced extreme pain, suffering, embarrassment, terror, and death.

COMPLAINT - 16

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
M ailing  P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

58.     As a direct and proximate result of Defendant Snohomish County's breaches of duty, Plaintiff Peggy Hanchett, in her personal capacity and as a statutory beneficiary, has sustained economic and non-economic damages, including those allowed by RCW 4.20 et seq., and which include without limitation, past and future medical expense, past and future lost income or earning capacity, loss of consortium, emotional distress, grief, loss of enjoyment of life, inconvenience, mental anguish, the destruction of child-parent relationships, and pain and suffering and in amounts to be proven at trial.

59.     As a direct and proximate result of the Defendant Snohomish County's wrongful acts and/or omissions, the Estate of Sean Hanchett has sustained damages including, without limitation, the loss of the accumulation of income and incurred medical, funeral, and burial expenses, and the conscious pain, suffering, anxiety and fear of impending death experienced by the decedent, in such amounts as will be proven at the time of trial together with interest thereon at the statutory rate from the date of death or the date the expenses were incurred.

**B.    SECOND CAUSE OF ACTION – 42 U.S.C. § 1983 – SNOHOMISH COUNTY AND ALL INDIVIDUALLY NAMED DEFENDANTS**

60.     The acts and failure to act described above were done under color of law and are in violation of 42 U.S.C. § 1983, depriving Sean Hanchett of his civil rights.

61.     At the time Sean was detained by Snohomish County, it was clearly established in the law that the Fourteenth Amendment imposes a duty on jail officials to provide humane conditions of confinement, including adequate medical and mental health care, and to take reasonable measures to guarantee the safety of inmates.

62.     Being subjected to unnecessary physical pain and suffering is simply not part of the penalty that criminal offenders pay for their offenses against society, nor is it an acceptable condition of confinement for a pre-trial detainee, who is presumed innocent of the crime(s) for which he is held.  As a result, municipalities, Jail officials, and subcontractors are liable if they

COMPLAINT - 17

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Mailing P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1  know that an inmate or inmates face a substantial risk of serious harm and callously disregard that

2  risk by failing to take reasonable measures to abate it.

3        63.    Here, Defendants knew that Sean faced a substantial risk of pain and anguish—he

4  had a documented medical history of opioid use disorder and having seizures due to withdrawal

5  from opioids—yet callously disregarded that risk by failing to take reasonable measures to abate it.

6        64.    Snohomish County and its Supervising Defendants knew of and callously

7  disregarded the excessive risk to inmate health and safety caused by their inadequate formal and

8  informal policies, including a lack of training, funding, and supervision.

9        65.    Snohomish County and its Supervising Defendants knew of this excessive risk to

10  inmate health and safety because it was obvious and because numerous other inmates had been

11  injured and/or killed as a result of these inadequacies in the past.

12        66.    Snohomish County and its Supervising Defendants were responsible for a policy,

13  practice, or custom of maintaining longstanding constitutionally deficient safety and medical care

14  policies, and training thereon, which placed inmates like Sean at substantial risk.

15        67.    Snohomish County and its Supervising Defendants had an unwritten policy of

16  understaffing and indifference to inmate supervision that was maintained with deliberate

17  indifference.  Snohomish County and its Supervising Defendants know that the Jail is understaffed,

18  that Jail staff are undertrained, and that their Jail personnel often have trouble completing all of

19  their duties as a result.  Yet these Defendants failed to take any steps to correct these inadequacies.

20        68.    Defendants' deliberate indifference to Sean's serious medical needs shocks the

21  conscious—Sean was dead for *hours* lying in a pool of his own vomit before any staff even noticed

22  he had "expired."

23        69.    Snohomish County and its Supervising Defendants had a policy, procedure, or

24  custom of inadequate communication and coordination between staff.  The Jail had no clear

25

COMPLAINT - 18

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing  P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    demarcation of responsibilities between corrections and medical staff with respect to, at least, but

2    not limited to, the assessment of inmate medical needs, integration of care between departments,

3    and regularity of inmate chart/records review. This policy of inadequate communication and

4    coordination contributed to and caused Sean's pain, suffering, and death, and constituted deliberate

5    indifference to Sean's serious medical needs.

6          70.     That Snohomish County's withdrawal policy and established practices would put

7    withdrawing inmates at risk of serious harm was known to Snohomish County and its Supervisory

8    Defendants.

9          a.     Experts have confirmed that the dangerousness of Snohomish County's withdrawal

10        policy and established practices discussed above would have been obvious to any

11        corrections professional exercising his or her professional judgment.

12          b.     In 2014, Lindsay Kronberger died from severe electrolyte imbalance due to opiate

13        withdrawal while in Defendants' custody. In 2018, Judge Lasnik found evidence that Ms.

14        Kronberger's death was caused by Defendants' policies not meeting "the level of

15        monitoring and assessments that substance abusers require when taken into custody."

16        *Gohranson v. Snohomish Cnty.*, No. 16-1124, 2018 WL 5921012, at *2 (W.D. Wash. Nov.

17        13, 2018). In 2022, the Kronberger incident was highlighted by the U.S. Department of

18        Justice as an example of what happens when a withdrawal management policy is not

19        "available to and understood by all staff . . . and by third-party medical providers."

20        Exhibit C.

21          c.     In 2009, Judge Coughenour found similar evidence in *Heggem v. Snohomish Cnty.*,

22        No. 09-0311, 2009 WL 2406318, at *1 (W.D. Wash. Aug. 4, 2009).

23          d.     The Jail is populated with roughly 1,200 inmates. Incarcerations at the Jail are short,

24        typically spanning just several days. Yet the Jail has *consistently* experienced the most per

25

COMPLAINT - 19

capita in-custody deaths of any similarly populated jail in the State of Washington. The large majority of these deaths have involved either insufficient medical care or a lack of medical care and involve complications from substance use.

e.      As Judge Lasnik noted in 2018, the physician hired by Snohomish County, Dr. Stewart ANDREWS, had not updated relevant policies, had not modernized the medical records system, did not evaluate Ms. Kronberger or her medical records at any point, and did not consult on her care. *Gohranson*, 2018 WL 5921012, at *3. The same was true in 2022 regarding Sean. Dr. ANDREWS, in fact, served as a physician for Snohomish County in name only. He was only at the Jail one day per week and generally did not see patients. He also has a known reputation and history of failing to provide constitutionally sufficient care to inmates. *See, e.g., Cooper v. Whatcom Cnty.*, No. 20-1196, 2023 WL 157572, at *22 (W.D. Wash. Jan. 11, 2023). Dr. ANDREWS had no interaction with Sean and would not have as a matter of Snohomish County's policy and established practice.

f.      Notably, Dr. ANDREWS' contract with Snohomish County did not require him to operate within the bounds of national standards, such as the NCCHC. This type of contractual provision is standard corrections medical contracting, but was not included by Snohomish County.

g.      In 2013, the U.S. Department of Justice ("DOJ") conducted an assessment of the medical practices at the Snohomish County Jail and found the County's "lack of evidence-based health care policy and procedure" to be of "significant concern." *See* Exhibit A. In addition, DOJ found that "[h]ealth care staffing levels are simply undersized to ensure adequate assessment and care of inmate medical and mental health needs" and that "authorized correctional staffing levels appear inadequate to ensure consistent and timely access to health care services." DOJ also found that corrections medical assessments were

COMPLAINT - 20

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
M ailing  P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

"seriously inadequate because custody staff is not trained to adequately assess inmate health needs." DOJ recommended the development of "health care policies, procedures, and protocols into a single, comprehensive, and unified policy manual." Snohomish County did not heed DOJ's advice. Snohomish County does not have such a policy manual, and the problems identified by DOJ a decade ago persist.

h.    In 2019, Columbia Legal Services issued a report that highlighted the danger that Snohomish County's withdrawal policy and established practices put inmates at serious risk of harm and death, concluding "that serious problems continue." *See* Exhibit B.

i.    On September 16, 2020, 34-year-old Christopher Hankins passed away in the Jail, prompting a lawsuit that put Snohomish County on notice, once again, that its policies and established practices regarding the medical care that it provided to intoxicated and withdrawing inmates were dangerous and resulted in pain, suffering, and death.

j.    The trend continues to present day. In September of 2023, two inmates died due to insufficient medical care or a lack of medical care within a period of four days. *See* Daisy Zavala Magaña, *Man Dies in Snohomish County Jail, Is Second In-Custody Death in a Week*, Seattle Times, Sept. 13, 2023. Another inmate died due to insufficient medical care or a lack of medical care on October 26, 2023; another on January 15, 2024; another on May 20, 2024; another on July 23, 2024; and another on July 24, 2024. Over half of these deaths occurred in the Jail's medical detox unit, and each of them would have been prevented with constitutionally adequate withdrawal policy and established practices.

k.    Although the Jail is a larger facility, holding around 1,200 inmates at any given time, comparable facilities, such as the Pierce County Jail, have experienced roughly half as many deaths in the past 10 years.

COMPLAINT - 21

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

71.    With the exception of the Supervising Defendants, all individually-named Defendants were subjectively aware that Sean was in dire need of treatment for his deteriorating medical condition.  Indeed, a quick glance at Sean—who was at all times either pale, sweating, agitated, anxious, nauseous, or dead—obviously revealed his immediate serious need for medical care.  From this evidence, reasonable and sufficiently trained jail personnel would have been compelled to infer that a substantial risk of serious harm existed.  Indeed, Defendants did infer that a substantial risk of serious harm existed—Sean was placed on Medical/Detox watch—yet failed to take any steps to alleviate this risk.  Sean experienced extreme pain, suffering, and death as a result.

72.    SNOHOMISH COUNTY and its Supervising Defendants have consistently failed to attend to the serious medical needs of inmates, including withdrawal. SNOHOMISH COUNTY and its Supervising Defendants knew that there were numerous instances of under-treatment and a failure to properly evaluate inmates, and that there were relatively inexpensive prevention measures available. Yet these Defendants did not employ any of these measures. In addition, these Defendants knew that their employees were not providing adequate medical care, but they continued to employ them nonetheless.

73.    As a direct and proximate result of the deliberate indifference of Defendants, as described above and in other respects as well, Sean experienced extreme pain, suffering, anxiety, terror, emotional distress, and death.

74.    These Defendants have shown reckless and callous disregard and indifference to inmates' rights and safety and are therefore subject to an award of punitive damages to deter such conduct in the future.

COMPLAINT - 22

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    **C.    THIRD CAUSE OF ACTION – 42 U.S.C. § 12132 – SNOHOMISH COUNTY**

2        75.    The Americans with Disabilities Act ("ADA") provides in its relevant part that "no

3    qualified individual with a disability shall, by reason of such disability, be excluded from

4    participation in or be denied the benefits of the services, programs, or activities of a public entity,

5    or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A failure to reasonably

6    accommodate a person's disability is an act of discrimination under the ADA. Per 28 C.F.R.

7    § 35.130(b)(7): "A public entity shall make reasonable modifications in policies, practices, or

8    procedures when the modifications are necessary to avoid discrimination on the basis of disability,

9    unless the public entity can demonstrate that making the modifications would fundamentally alter

10    the nature of the service, program, or activity."

11        76.    SNOHOMISH COUNTY incarcerates significant numbers of individuals with

12    disabilities, as that term is defined in the ADA and the Rehabilitation Act ("RA"), as discussed

13    below. SNOHOMISH COUNTY fails to provide inmates with disabilities with basic reasonable

14    accommodations to ensure equivalent access to all of the programs, activities, and services offered

15    at the Jail. SNOHOMISH COUNTY's failure to accommodate prisoners with disabilities not only

16    denies them access to prison programs and services, but also substantially increases the risk that

17    they are injured in an emergency or are the victim of violence or abuse from other prisoners.

18    Moreover, SNOHOMISH COUNTY's refusal to accommodate prisoners with disabilities results

19    in the provision of inadequate mental health care.

20        77.    For years, SNOHOMISH COUNTY has executed systemic and willful

21    discrimination against and failure to provide reasonable accommodations in programs, services,

22    and activities to, inmates in the Jail who have, or are perceived to have, disabilities.

23        78.    During his incarceration at the Jail, Sean, for instance, either had or was perceived

24    by Jail staff to have, present physical impairments that qualified as disability—as alleged above, he

25    COMPLAINT - 23

1  had a long-standing history of substance use disorder, the disorder substantially limited his major

2  life activities, and he exhibited behaviors consistent with such a diagnosis.

3      79.    Sean was denied access to services, including but not limited to, appropriate health

4  care services; and he was denied reasonable accommodations for his disabilities, including but not

5  limited to, additional safety checks, medical monitoring, or other security, medication-assisted

6  withdrawal treatment that was already prescribed to him, and regular medical assessments, because

7  of his actual or perceived substance use disorder.

8      80.    SNOHOMISH COUNTY lacks adequate policies and practices for identifying and

9  tracking prisoners with disabilities and the accommodations those prisoners require.

10      81.    This systemic failure to accommodate inmates with disabilities results in the

11  widespread exclusion of prisoners with disabilities from many of the programs, services, and

12  activities offered by SNOHOMISH COUNTY, including health care services, exercise, religious

13  services, sleeping, and educational programs.

14      82.    Moreover, SNOHOMISH COUNTY's lack of adequate policies and procedures

15  makes inmates with disabilities vulnerable to exploitation by other inmates and increases their risk

16  of serious injury or death.

17      83.    SNOHOMISH COUNTY has an affirmative obligation to create and maintain a

18  system to identify and track individuals with disabilities and the accommodations they require.

19  SNOHOMISH COUNTY, however, lacks adequate policies and practices for identifying

20  individuals with disabilities and the reasonable accommodations they require.

21      84.    Upon information and belief, the officers who are responsible for conducting

22  medical assessments are not adequately trained by SNOHOMISH COUNTY regarding how to

23  identify and track individuals with disabilities, and therefore, frequently fail to identify inmates

24  with disabilities or the accommodations they need to access Jail programs and services.

25  

COMPLAINT - 24

**Galanda Broadman PLLC**
8606 35th Avenue NE, Ste. L1
Maling P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

85.     SNOHOMISH COUNTY's failures to accurately identify inmates' disabilities and needed accommodations result in the denial of accommodations mandated by federal law, placing inmates at risk of discrimination, injury, and/or exploitation.

86.     For example, during the last hours of Sean's incarceration, his serious medical condition was obviously worsening. During this time, he was observed by corrections officers who entered the unit to be profusely sweating, pale, and vomiting, yet no Medical/Detox observation was conducted, no referral to a trained health care professional was made, nor was there any effort to provide him with his prescribed medication or place him on a more frequent monitoring schedule. This resulted in a lack of accommodations for his disability, to wit, health care services necessitated by his vulnerability. And he died as a result.

87.     SNOHOMISH COUNTY failed to adequately train custody and health care staff in how to provide appropriate and timely accommodations to prisoners with disabilities.  The lack of training is evident from the *numerous* failures to accommodate prisoners with disabilities, discussed above, and excludes prisoners with disabilities from equal access to programs, services, and activities they offer, and places these prisoners with disabilities at risk of injury, exploitation, and death.  As a result of a lack of adequate training, custody and health care staff do not, among other failings, identify and track individuals with disabilities and the accommodations they require, or provide equal access to Jail services and programs.

**D.     FOURTH CAUSE OF ACTION – 29 U.S.C. § 701 – SNOHOMISH COUNTY**

88 .     Like the ADA, Section 504 of the RA, 29 U.S.C. § 701, *et seq.*, also requires the recipients of federal funds to reasonably accommodate persons with disabilities.  The Jail is believed and, therefore alleged to receive federal funds.

COMPLAINT - 25

Galanda Broadman PLLC
8606 35th Avenue NE, Ste. L1
Mailing: P.O. Box 15146
Seattle, WA 98115
(206) 557-7509

1    89.    As described above, SNOHOMISH COUNTY failed to institute adequate policies

2    and procedures or train its employees on how to accommodate individuals with disabilities, such as

3    Sean.

### VI.    JURY DEMAND

5    90.    Plaintiffs hereby demand a trial by jury.

### VII.    AMENDMENTS

7    91.    Plaintiffs hereby reserve the right further to amend this Complaint.

### VIII.    RELIEF REQUESTED

9    92.    Damages have been suffered by Plaintiffs, and to the extent any state law limitations

10    on such damages are purposed to exist, they are inconsistent with the compensatory, remedial,

11    and/or punitive purposes of federal law, and therefore, any such alleged state law limitations must

12    be disregarded in favor of permitting an award of the damages prayed for herein.

13    93.    WHEREFORE, Plaintiffs request a judgment against all Defendants:

14        (a)    Fashioning an appropriate remedy and awarding economic and noneconomic

15        damages, including damages for pain, suffering, terror, loss of consortium, loss of familial

16        relations, and loss of society and companionship pursuant to 42 U.S.C. §§ 1983 and 1988,

17        in an amount to be determined at trial;

18        (b)    Punitive damages;

19        (c)    Awarding reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988,

20        or as otherwise available under the law;

21        (d)    Declaring the defendants jointly and severally liable;

22        (e)    Awarding any and all applicable interest on the judgment; and

23        (f)    Awarding such other and further relief as the Court deems just and proper.

24    Respectfully submitted this 8th day of January, 2025.

25
COMPLAINT - 26                                        **Galanda Broadman PLLC**
                                                      8606 35th Avenue NE, Ste. L1
                                                      Mailing: P.O. Box 15146
                                                      Seattle, WA 98115
                                                      (206) 557-7509

1

2

GALANDA BROADMAN, PLLC

3

*s/ Ryan D. Dreveskracht*

Ryan D. Dreveskracht, WSBA #42593
Attorney for Plaintiff

4

P.O. Box 15146 Seattle, WA 98115
(206) 557-7509 Fax: (206) 299-7690

5

Email: ryan@galandabroadman.com

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMPLAINT - 27

# EXHIBIT A

*Snohomish County, WA Correctional Facility*



**United States
Department of Justice**
Washington, DC

*National Institute of Corrections*

# Assessment of Correctional Health Care

## Policy & Practice

## "Options & Opportunities"

Medical, Mental Health, Suicide Prevention

**Technical Assistance Report**

Number 13J1075    Sept. 23-25, 2013

**ASSESS        ANALYZE        ACTUALIZE**



*Kenneth A. Ray, M.Ed.
DOJ / NIC Technical Consultant*



**U.S. Department of Justice**

National Institute of Corrections

_Washington, DC 20534_

## <u>DISCLAIMER</u>

RE: NIC Technical Assistance No. 13J1075

This technical assistance activity was funded by the Jails Division of the National Institute of Corrections. The Institute is a Federal agency established to provide assistance to strengthen State and local correctional agencies by creating more effective, humane, safe and just correctional services.

The resource person who provided the onsite technical assistance did so through a cooperative agreement, at the request of the Snohomish County, WA Sheriff and through the coordination of the National Institute of Corrections. The direct onsite assistance and the subsequent report are intended to assist the agency in addressing issues outlined in the original request and in efforts to enhance the effectiveness of the agency.

The contents of this document reflect the views of Mr. Kenneth Ray. The contents do not necessarily reflect the official views or policies of the National Institute of Corrections.

## CONSULTANT QUALIFICATIONS
### Kenneth A. Ray, M.Ed., LMHC, NCC

The United States Department of Justice National Institute of Corrections assigned Kenneth A. Ray this short-term technical assistance project at the specific request of Snohomish County officials following a review of prospective qualified consultants.

Ken is a national expert in correctional administration, policy, and operations with more than 35 years of experience in law enforcement, corrections, security, criminal justice administration, behavioral health and consulting. He retired from county government administration in 2005, following a very successful and productive 29-year career serving in many professional and community roles including deputy sheriff, police officer and supervisor, law enforcement administrator and director, criminal justice academy director, emergency management director, jail administrator and director of medium and large county jail systems, community leader and volunteer. His professional and community contributions earned several local, state, and national accolades in the areas of public safety, criminal justice, academic, community and youth wellness. Ken is also a licensed mental health primary care provider and Board Certified by the National Board for Certified Counselors.

His expertise in jail mental health, suicide prevention practices, and facility design has provided pivotal assistance to numerous jails throughout the United States. Some include Yakima County, WA Department of Corrections (1200 beds), Dallas County, TX (8500 beds), Lake County, IN (1050 beds) St. Croix and Chippewa Counties, WI (500 beds combined) and Orange County, TX (350 beds). Ken has served as the lead compliance consultant to a Federal Jail Civil Rights Settlement Agreement at Lake County, IN since late 2010. As that County's Liaison to the United States Department of Justice Civil Rights Division and compliance assurance coordinator, he leads an interdisciplinary team of national experts in the fields of correctional medicine, suicide prevention, life and fire safety, sanitation, and use of force. Ken also serves as the court appointed Federal Monitor for Golden Grove Correctional Facility, St. Croix, U.S. Virgin Islands.

Ken holds a M.Ed. in Counseling and Human Development, Bachelors and Associates degrees in Criminal Justice and Law Enforcement, and is pursuing a Doctor in Behavioral Health degree at Arizona State University. His work in behavioral health spans the entire time of his professional career including developing and implementing school-based behavioral health services, forensic assessment and counseling, jail-based mental health services, residential and outpatient clinical primary care of individuals, families, children, and groups. He has in excess of 4000 hours professional development training, and has completed academic residencies and internships in metropolitan police administration, community policing, psychiatric prison inmate assessment and treatment, jail-based mental health services, pediatric health diagnosis and treatment, and community mental health. As an adjunct professor at public and private universities in Texas and Washington states, Ken taught graduate and undergraduate courses in criminal justice, business administration, and counseling. He has conducted over 300 professional presentations on various criminal justice, education, law enforcement, corrections, and mental health topics at the local, state, and national levels since 1986.

Ken is married with six children and one grandson, and resides in Ashland, Kentucky.

## ONE PROFESSIONAL PERSPECTIVE

---

*"When you begin to use excuses to justify a bad outcome, whether it be low staffing levels, inadequate funding, physical plant concerns, etc. – issues we struggle with each day – you lack the philosophy...that even one death is not acceptable. If you are going to tolerate a few deaths in your jail system, then you've already lost the battle." (Jail Commander, Orange County, California)[1]*

---

[1] http://www.ncianet.org/suicideprevention/publications/avoidingobstacles.asp

## EXECUTIVE SUMMARY

This short-term technical assistance assessed medical, mental health, and suicide prevention practices at the Snohomish County, WA Correctional Facility. This assessment compared current practices to over 50 important components for providing constitutional and effective correctional health care programming. This study should not be considered an in-depth or comprehensive evaluation. All recommendations herein are provided as pathways to best practices and to assist Snohomish County target and prioritize its plans for improving inmate care. By no means does the report intend to minimize the exceptionally high-level commitment, competence, and professionalism of any Snohomish County official or staff member. To the contrary, this report fully assumes that it is precisely those qualities and attributes that cause the Snohomish County Correctional Facility to be an excellent operation and fully capable of implementing relevant improvements proposed. Furthermore, considering its limited resources, all officials and staff should be commended for their commitment to maintaining a very professional local correctional facility.

This document provides findings and recommendations for all of the health care components assessed. Three common themes became vivid among most areas of care and should be of significant concern. These include: 1) inadequate staffing levels, 2) jail crowding, and 3) lack of evidence-based health care policy and procedure manual.

Health care staffing levels are simply undersized to ensure adequate assessment and care of inmate medical and mental health needs. The jail health care program (medical and mental health) is seriously understaffed for this size jail, its layout, annual admissions and average daily population. Additionally, authorized correctional staffing levels appear inadequate to ensure consistent and timely access to health care services for the same reasons.

Jail crowding continues to exist and poses significant health and personal safety risks for the staff and inmates. Crowding increases environmental stressors that can increase jail violence and medical injuries. Inmates suffering from mental illness are more difficult to manage and care for in crowded conditions. The stress of crowding can also exacerbate mental health symptoms. Communicable disease prevention, management, and control are debilitated where housing units are overpopulated. Adding to these problems is the high level of stress experienced by jail staff and the adverse impact that stress has on their physical, emotional, social health. Relieving the crowded conditions should be considered a top priority.

Current jail health care policies and procedures documents should be considered only as basic guidelines but require comprehensive reform. Policy and procedure development and implementation is a medium-range project (6-12 months) that can be streamlined efficiently by researching, developing, and moving individual or a few policies through the process rather than the entire policy manual.

*Kenneth A. Ray, M.Ed.,*
*DOJ/NIC Technical Assistance Consultant*

## TABLE OF CONTENTS

| SECTION: | | PAGE(S) |
|---|---|---|
| COVER | | X |
| DISCLAIMER | | 1 |
| CONSULTANT QUALIFICATIONS | | 2 |
| ONE PROFESSIONAL  PERSPECTIVE | | 3 |
| EXECUTIVE SUMMARY | | 4 |
| TABLE OF CONTENTS | | 5 |
| I. | INTRODUCTION | 6 |
| II. | PURPOSE OF ASSISTANCE | 7 |
| III. | SCOPE OF WORK | 7 |
| IV. | DOCUMENT REVIEW | 16 |
| V. | METHODOLOGY | 17 |
| VI. | LEGAL FRAMEWORK – INMATE RIGHTS TO HEALTHCARE | 18 |
| VII. | DESCRIPTIONS OF THE SNOHOMISH COUNTY JAIL | 25 |
| VIII. | MEDICAL CARE ASSESSMENT, FINDINGS, & RECOMMENDATIONS | 34 |
| IX. | MENTAL HEALTH CARE ASSESSMENT, FINDINGS, & RECOMMENDATIONS | 55 |
| X. | SUICIDE PREVENTION ASSESSMENT, FINDINGS, & RECOMMENDATIONS | 67 |
| XI. | RELATED ISSUES, FINDINGS, & RECOMMENDATIONS | 97 |
| XII. | CONCLUSION | 100 |

**Technical Assistance Report**
**Inmate Medical, Mental Health & Suicide Prevention**
**& Management Services and Practices**

**Snohomish County Correctional Facility**
NIC Technical Assistance Request No. 13J1075
Kenneth A. Ray, M.Ed.,
DOJ/BOP/NIC Technical Service Provider

## I.    INTRODUCTION

This report is a summary of the observations, document reviews, interviews, discussions, findings and recommendations of Kenneth A. Ray, M.Ed., NIC Technical Services Provider, following the completion of professional technical assistance at Snohomish County Correctional Facility, herein referred to as SCCF.

Short-term technical assistance to assess jail medical, mental health and suicide prevention practices and services was requested in writing to the Department of Justice National Institute of Corrections, herein referred to as NIC, by elected county Sheriff Ty Trenary. Sheriff Trenary selected this technical resource provider to provide this service. This assistance project was approved by Virginia Hutchinson, NIC Jails Division Chief, and coordinated by Panda Adkins, NIC Correctional Program Specialist, Washington, D.C.[2]

---

[2] NIC Technical Assistance Authorization Letter, 2013.

**PURPOSE OF ASSISTANCE**

Snohomish County Sheriff Ty Trenary requested assistance from NIC to assess and evaluate jail medical, mental health, and suicide prevention practices. Technical assistance was specifically requested to focus on the following objectives for medical and mental health services regarding standards of care and services:

## II. SCOPE OF WORK

This technical assistance project includes activities performed prior to the onsite visit.  On-site work was performed September 23-35, 2013. Project activities included pre on-site preparation, on-site assessment, post-visit follow-up, and report writing.

### A. Pre-On-Site Activities Included:

1.  Contact with Sheriff Trenary, Chief Jeff Miller, Major Mark Baird to prepare for and coordinate on-site work. Collection and review of several jail documents including policies and procedures, census reports, and health care reports.
2.  Prepare an agenda for the technical assistance event.
3.  Review all requested and received documents and data.
4.  Prepare a timeline of tasks to be completed while onsite.
5.  Prepare any questions to be resolved prior to the technical assistance onsite visit.

This consultant provided the following information to Snohomish County prior to the onsite visit to give them a general idea about information needed and scope of this assessment.

### Historical Information and Data

Basic information about the existing facilities, construction dates, total bed capacity, basic housing and inmate management designs (direct supervision, linear, indirect podular, etc.).

### Administrative

1.  Jail health care and related policies, procedures, protocols;
2.  Intake health screening and classification documents and electronic screens/templates;
3.  Health care assessment and care assessment, treatment, and discharge documents and forms
4.  Health care budgets (5 years);
5.  Health care charting practices;
6.  Current staff credentialing notebook;
7.  Continuous quality improvement meeting minutes and practices;
8.  Health care provider contracts;
9.  Health care provider contract monitoring reports (if any, 5 years);
10. Health care related grievances, claims, litigation (5 years);
11. Jail state inspection reports (5 years);

12. Major health care related incident reports (5 years);
13. Inmate deaths, suicides, suicide attempts (5 years);
14. Admission, release, ADP data (5 years);
15. Other information and documents deemed relevant to assessment.

## Health Care Service Delivery Components

1. Access to healthcare, responsible health authority, medical autonomy, administrative meetings and reports;
2. Healthcare policies and procedures;
3. Continuous quality improvement program;
4. Emergency response plan;
5. Communication on special needs patients;
6. Privacy of care;
7. Inmate death procedures;
8. Grievance mechanism for healthcare complaints;
9. Federal sexual assault reporting regulation compliance (PREA);
10. Infectious control program;
11. Environmental health and safety;
12. Ectoparasite control;
13. Healthcare staff credentialing, qualification;
14. Clinical performance enhancement program;
15. Continuing education program;
16. Correctional officer training;
17. Medication administration training;
18. Inmate worker training/health assessment;
19. Staffing plan (healthcare organizational structure);
20. Healthcare liaison (after hours support);
21. Corrections orientation for healthcare staff;
22. Pharmaceutical operations (access and administration);
23. Medical services control of medications and access;
24. Clinical space, equipment, and supplies (access, quantity, control and access);
25. Diagnostic services;
26. Hospital and specialty care;
27. Inmate information about healthcare services while incarcerated;
28. Intake healthcare screening (who, how, what, when);
29. Health assessments (who, how, what, when);
30. Mental health screening (who, how, what, when);
31. Oral care services;
32. Non-emergency healthcare requests and services;
33. Emergency services (include afterhours);
34. Health segregated inmates;
35. Patient escorts and movement;
36. Nursing assessment protocols;
37. Continuity of care during incarceration;
38. Discharge planning;

39. Inmate healthcare education and promotion;
40. Nutrition and medical diets;
41. Exercise;
42. Personal hygiene;
43. Use of tobacco;
44. Special needs treatment plans;
45. Management of chronic disease;
46. Infirmary care;
47. Mental health services;
48. Suicide prevention and intervention program;
49. Intoxication and withdrawal;
50. Care of pregnant inmates/counseling;
51. Inmates with substance abuse/addiction problems;
52. Sexual assault prevention and intervention program;
53. Orthoses, prostheses and other impairment aids
54. Hospice care;
55. Health record format and contents;
56. Record / information confidentiality;
57. Access to custody information;
58. Availability and use of health records;
59. Transfer of health records;
60. Retention of health records;
61. Use of restraints and seclusion;
62. Emergency psychotropic medications;
63. Forensic information;
64. End-of-life decision making;
65. Informed consent;
66. Right to refuse treatment;
67. Medical and other research.

## Jail Suicide Prevention Program Components

1. Critical Component #1: Staff Training
2. Critical Component #2: Intake Screening/Assessment
3. Critical Component #3: Communication
4. Critical Component # 4: Housing
5. Critical Component # 5: Levels of Supervision
6. Critical Component #6: Intervention
7. Critical Component #7: Reporting
8. Critical Component #8: Follow-up Mortality Review
9. Critical Incident Debriefing

**Mental Health Services Components**

Minimum care program requirements:  *(Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980)

1. Constitutional Right #1: There must be a systematic program for screening and evaluating inmates in order to identify those needing mental health services.
2. Constitutional Requirement #2: There must be a mental health treatment program that involves more than segregation and close supervision.
3. Constitutional Requirement #3: There must be trained Mental Health Professionals in sufficient numbers to provide the identification and treatment services in an individualized manner to treatable inmates suffering a serious mental disorder.
4. Constitutional Requirement #4: There must be maintenance of accurate, complete, confidential records.
5. Constitutional Requirement #5: Treatment by prescription and administration of behavior- altering medications in dangerous amounts and by dangerous methods or without appropriate supervision and periodic evaluation is an unacceptable method of treatment and must not be present.
6. Constitutional Requirement #6: There must be a suicide identification, treatment and supervision program. There must be a basic program for identification, treatment and supervision of inmates who evidence suicidal tendencies (and mental health problems).

**Additional components of this assessment:**

7. Diversion of selected defendants and offenders with mental illness: As a general rule, a person with serious mental illness is less likely to be dangerous, especially with community support, than a person without mental illness. There are some terrible exceptions. Studies continue to show that non-dangerous people with serious mental illness can and will comply with non-incarceration conditions of release. The costs for diverting a mentally ill defendant or offender from incarceration has also proven to be an effective option for reducing incarceration costs and recidivism among this population.
8. Identification of people with mental illness entering the criminal justice system: An effective system utilizes evidence-based mechanisms to identify and manage this population. In general, jails as a rule cannot meet the needs of seriously mentally ill inmates. Special judicial mechanisms and community involvement have been found to improve both criminal justice and treatment outcomes.
9. Jail-based treatment programs encompass co-occurring / co-morbid mental health conditions: It is likely that most mentally ill inmates have a substance abuse problem, history of severe psycho-emotional trauma (physical and sexual abuse, severe neglect, etc.). Jail-based treatment programs are most effective in affecting good custody and care when these issues are assessed and treated.
10. Training of staff on the signs and symptoms of mental disorders and inmates with specific needs: Pre and in-service training should include topics that help staff recognize, identify, and effectively manage this population from intake through to release.
11. Adequate number of qualified mental health jail staff: This includes licensed and unlicensed care providers, support staff, and custody staff. Staffing levels should be determined by levels of need and required care activities (intake, assessment and

diagnosis, treatment and discharge planning, medication management, and records keeping).

12. Adequate physical resources: There is adequate housing and treatment capacity for this population. Exercise and recreation are considered basic jail requirements and are required to be provided for this population. Areas for individual and group treatment should exist and allow for adequate levels of privacy and confidentiality. Housing options should allow for different levels of care and security based on needs and risk.

13. Access to care: This includes how and when inmates access mental health care services. Are services readily accessible? Is there enough custody staff needed to consistently move inmates to and from care services? Is there enough care staff on-site to meet the needs of the population?

14. Contents of health records: Good health records are the cornerstone to effective care and to the legal requirement of continuity of care. They are instrumental in evidencing care quality of assurance. Records must be complete, thorough, and accurately represent care activities.

15. Medication management: Psychotropic medications can be a first-line of care for treating severe mental illness and can be an extremely expensive treatment. Accurate diagnoses, individual and group therapy, and status monitoring combined have shown to produce the best care outcomes. However, jails tend to use older medications that can cause serious side effects resulting in "inmate zombies" and less-than-effective care. It is important that medications prescribed are indicated by the FDA for the diagnosis or symptoms presented, that there is ongoing monitoring of inmate progress, and medications are changed as indicated. As a rule, it is a very poor practice to change medications of a newly admitted mentally ill inmate simply because the jail does not want to pay for current medication regime.

16. Restorative opportunities: This simply refers to the options and services provided in a jail setting that affects restoration of mental health stability and activities of daily living – self-care.

17. Management information systems: A model MIS should be computerized and used for needs assessment, continuous quality improvement, and tracking. Jail-based electronic health systems should easily interface with the jail management system to ensure data reliability and utility efficiency.

18. Quality assurance program: An ongoing internal survey, evaluation, and feedback system accompanied by a statutory, evidentiary privilege to safeguard such studies from disruptive discovery demands should be part of any system.

19. Data/research on treatment outcomes: Treatment objectives are first determined for this population, then policies, procedures, programs, services, environments, etc. are developed to meet the objectives. The entire care delivery process is data driven.

20. Economy of scare: Administrative and organizational structures should be designed to provide the maximum care for the funds allocated.

21. Policies and procedures: Contemporary, comprehensive, and accessible policies and procedures are developed, implemented, and reviewed by a multidisciplinary team.

22. Discharge planning: Structures and processes should exist to prepare mentally ill inmates for release. This should include assisting them to reactivate financial and community resources to meet basic needs and their treatment needs. All inmates with a serious mental illness should be released with a completed and clear release plan. The release

plan should be coordinated with appropriate criminal justice components, community and personal supports.

**Staffing Levels:**

Staffing (health care, support, and custody) levels are generally assessed in terms of the facility's ability to meet access to and delivery of required medical and mental health services. A general recommendation regarding whether or not additional staffing is necessary to meet required levels of care will be provided in the final report.

**Additional Information and Documents:**

**A) Medical and Mental Health Information:**

1. A mock or blank chart containing all forms used, filed in appropriate order.
2. The infection control policies.
3. The names of inmates who have died in the past year, and access to/or copy of both their records and mortality review.
4. The names of any inmates diagnosed with active TB in the past year and access to/or a copy of their records.
5. To the extent not provided above, the policies and procedures governing medical and mental health care.
6. A staffing roster with titles and status, part time or full time, and if part time, how many hours worked per week.
7. The staffing schedule for the past two (2) months for nursing and providers, including on-call schedules for the same time period.
8. Job descriptions for medical staff and copies of current contracts with all medical care providers, including hospitals, referral physicians, and mental health staff.
9. Inter-local professional services agreements with health care providers, companies, to include health care policies under which those persons and/or entities provide inmate health care.
10. Tracking Logs for consults and outside specialty care services provided, chronic illness, PPD testing, health assessments, and inmates sent to the emergency room or off-site for hospitalization listing where applicable name, date of service, diagnosis and service provided.
11. A list of all persons with chronic illness listing name, location, and name of chronic illness.
12. A schedule of all mental health groups offered.
13. Minutes of any meeting that has taken place between security and medical for the past year.
14. Quality assurance and Medical Administration Committee minutes and documents for the past year.
15. A list of all emergency equipment at the facility.
16. A list of current medical diets.

17. Sick call logs (i.e., lists of all persons handing in requests for non-urgent medical care to include in the log presenting complaint, name, date of request, date triaged, and disposition) and chronic illness appointments for the past two (2) months.
18. A copy of the nursing protocols.
19. To the extent not provided above, a copy of any training documentation for security and medical staff on policies and procedures and emergency equipment.
20. A list of all the inmates housed at the facility by birthdate, entry date, and cell location.
21. To the extent not provided above, external and internal reviews or studies of medical or mental health services including needs assessments and any American Correctional Association and National Commission on Correctional Healthcare reports.
22. List of all inmates placed in restraints, and all inmates receiving mental health treatments, under suicide watch, or taking psychotropic drugs. Current mental health case list including inmate name, number, diagnosis, date of intake, last psychiatric appointment, next psychiatric appointment, and any case lists of inmates followed only by counseling staff with last appointment date and follow-up appointment.
23. Documentation reflecting any training that facility staff has received on suicide prevention, including certificates and training materials.
24. All documents related to the any suicide occurring within the past year.
25. List of all persons on warfarin, Plavix, digoxin.

## B) Suicide Prevention Information:

26. All policies and directives relevant to suicide prevention.
27. All intake screening, health evaluation, mental health assessment, and any other forms utilized for the identification of suicide risk and mental illness.
28. Any suicide prevention training curriculum regarding pre-service and in-service staff training, as well as any handouts.
29. Listing of all staff (officers, medical staff, and mental health personnel) trained in the following areas within the past year: first aid, CPR/AED, and suicide prevention.
30. The entire case files (institutional, medical and mental health), autopsy reports, and investigative reports of all inmate suicide victims within the past three years.
31. List of all serious suicide attempts (incidents resulting in medical treatment and/or hospitalization) within the past year.
32. List of names of all inmates on suicide precautions (watch) within the past year.
33. The suicide watch logs for the past year.
34. Clinical Seclusion logs for the past year.
35. Use of clinical restraint logs for the past three years.
36. Any descriptions of special mental health programs offered.
37. A list of all uses of emergency and forced psychotropic medications in the past year.
38. A list of any use of force associated with the administration of psychiatric medications for the past year.
39. A description of medical and mental health's involvement/input into the disciplinary process and clearance for placement in segregation.
40. List of all inmates referred for off-site psychiatric hospitalization in the past three years.

It is noted that these officials were exceptionally helpful and timely with the pre-visit process and coordination. Though much of the information and data requested was either not available or easily compiled prior to and during the site visit, staff were very knowledgeable about the topics and provided basic information and data needed to complete this assessment.

**B. Underline: On-Site Activities Included:**

1. Meet with Major Mark Baird and other designated staff to discuss the purpose of the technical assistance scope of work.
2. Review the established agenda and discuss any modifications.
3. Review medical/mental health staffing and meet all key personnel
4. Tour the facility including intake and release, classification, initial housing, housing unit(s), segregation, and medical and mental health areas including cells and/or housing units.
5. Review any documentation and contracts not previously received.
6. Review medical care processes.
7. Continue interviews with facility staff, inmates, and other medical, behavioral health and social service administrators as designated by Major Baird.
8. Conduct an exit interview meeting with Sheriff Trenary, Chief Miller, Major Baird, and other designated staff, providing them with observations, preliminary findings and recommendations.

While on-site, this consultant met with several SCCF staff, jail medical and mental health treatment providers, and inmates. Participants in this activity are listed below:

1. Sheriff Ty Trenary
2. Mark Ericks, Deputy County Executive
3. Brent Speyer, Undersheriff
4. Chief Jeff Miller
5. Chief Rob Beidler
6. Major Mark Baird
7. Captain Chris Bly
8. Captain Harry Parker
9. Hillary Graber, County Counsel
10. Keith Mitchell, Risk Manager
11. Michael Held, Deputy Prosecutor
12. Dan Oster, Classification
13. Stuart Andrews, MD, Medical Director
14. Sandra Needham, ARNP
15. Dan Miller, ARNP
16. Tim King, RN
17. Greg White, MS, Lead MHP
18. Elizabeth Bellmer, MHP
19. Edward Dapra, MHP
20. County and Agency Nursing Staff

It is important to note that <u>ALL</u> Snohomish County officials and service providers were exceptionally professional, helpful, motivated, and cooperative in participating in this process. This consultant observed positive, active, and deliberate efforts to develop, provide, and maintain effective inmate medical, mental health and suicide prevention services by all SCCF, County officials and services providers involved in this work.

## C. <u>On-site Activity Agenda</u>:

| PRE VISIT | CONTACT | ACTIVITY |
|---|---|---|
| PRE VISIT | Jeffrey Miller, Chief of Corrections<br><br>Mark Baird, Corrections Admin<br><br>Panda Adkins, NIC | Review TA request; clarify TA objectives, scheduled, activities, and involvement.<br><br>Collect & review pertinent information & documents, discuss data systems, performance tracking method. |

| ON-SITE VISIT | CONTACT / ACTIVITY | PROPOSED ACTIVITY DETAIL |
|---|---|---|
| 09/23/13<br><br>9:00am | Ty Trenary, Sheriff<br>Jeffrey Miller, Chief of Corrections | Meet & Greet with Sheriff and Jail administration and medical leadership; review proposed needs & objectives, special needs, review schedule, & involvement. |
| 10:00am | TBD = Health Care Leadership<br>(Medical, Behavioral Health, Social Services) | Intros, overview of access to and delivery of care model, system, practices. Identify needed data and documents i.e., Policies, procedures, protocols, clinical guidelines, MAR, EMR, credentialing records, CQI and volume data, reports, studies. Concerns, needs, strengths, and challenges. |
| 11:00am | TBD =Facility Tour | Overview tour from Sally Port, intake, classification, initial housing, housing assignment, segregation, medical and mental health areas and cells, etc. |
| 12:00pm | Lunch meeting TBD | Review tour; clarify observations, verify data/information needed for assessment/report. |
| 1:30pm | TBD = Team Interviews | Booking supervisor, Intake medical and mental health screeners, classification supervisor. |
| 2:30pm | TBD = Team Interviews | Medical primary care team, charge nurse, HSA, infectious care program coordinator, chronic care program coordinator, sick call / clinic coordinator, infirmary coordinator, others. Review medical care processes, concerns and needs, clarify collect data, information and documents for review, meeting with jail and community healthcare providers and resources; clarify needs; concerns; challenges; barriers and opportunities, document examination. |
| 4:00pm | Debrief with Corrections Leadership | Debrief: review, clarify, refocus as indicated |
| 5:00pm | Follow-Ups PRN | |
| 09/24/13<br><br>8:00am<br><br>8:30am | Check-in with Admin<br><br>TBD = Team Interviews | Behavioral Heath primary care team, Mental health director, selected primary care providers, DMHPs, other MH team members including correctional officers. Mental health services / suicide prevention services. Discuss and review mental health and suicide prevention care processes, concerns and needs, clarify collect data, information and documents for review, meeting with jail and community healthcare providers and resources; clarify needs; concerns; challenges; barriers and opportunities, document examination. |

| | | |
|---|---|---|
| 11:00am | Corporate Council | Review medical-legal issues and concerns |
| 12:00pm | Lunch Meeting | Discuss CRIPA and jail health care requirements, other. |
| 1:00pm | TBD = Inmate Interviews | GP, segregation, intake holding, suicide/special needs, female/male, other. |
| 3:00pm | TBD = Team Interviews | Training<br><br>Discuss and review initial, pre-service, in-service training program and processes, examine relevant training topics, curricula, certification and credentialing, strengths, limitations, opportunities. |
| 4:00pm | Leave open for document reviews | Focus area: Population health management data, epidemiology, volume, etc. |
| **09/25/13** | | |
| 8:00am | Check-In with Admin | Verify information/data/document collection and clarification. |
| 8:30am | Follow-up Interviews, Tour, Etc. | Overview provisional assessment and findings. |
| 9:30am | Pre-exit Sheriff/Admin Team | General overview of assessment and findings, attendance per Sheriff. |
| TBD | General Exit Meeting | |
| TBD | Late Flight Departure to Chicago | |

## III.   DOCUMENT REVIEW

Numerous documents were provided and reviewed before, during, and following the on-site assessment visit:

1. Jail policies and procedures
2. Professional services agreement for health care services
3. Various general orders
4. Inmate census and charge reports
5. Jail organizational chart
6. Inmate treatment intervention referral procedure
7. Inmate mental health treatment services reports
8. Health care policies, procedures, and protocols
9. Inmate intake forms and related documents
10. Medication administration records (MAR)
11. Suicide risk screening
12. Special Watch Log Forms
13. Inmate Consent for Release of Information
14. One Month Medication Utilization Report
15. Inmate Classification Housing Lists
16. Mental Health Status Exam documents
17. Medical transport forms
18. Health screening and appraisal forms
19. Medical charts
20. Miscellaneous documents

## IV.    METHODOLOGY

A. This short-term assessment was conducted according to NIC jail technical assistance protocols. This included pre-visit communication with client/agency officials, collection and review of relevant document, data and other information provided by the client/agency, coordination of site visit activities and a short-term site visit.

B. The site visit included an initial meeting with key officials to discuss the assessment and to clarify expectations and outcomes. It also included several tours of the facility, meetings, and interviews with key jail and health care staff, interviews with inmates, review of health care charts and other medical records, reviews of agency health care policies, procedures, protocols, staff, training, and other information. An exit meeting with the Sheriff, Jail administrator and other key officials was conducted on the last day of the site visit. This meeting included a discussion of this consultant's general impressions and opinions; issues of concern and risk, and a general discussion of the report and completion timelines.

C. Report writing included a more in-depth review of documents and information provided before, during and following the site visit. Additional research was conducted on salient topics and issues involved in this assessment, consultation with other professionals as needed, follow-up contact with client-agency officials and contractors to clarify specific information and findings, and completion of the report with supporting documents and references.

**Special Note:** Snohomish County officials and staff are to be commended for their involvement in this work. The value of this assessment is a direct result of their commitment to quality and constitutionally sound inmate healthcare at the Snohomish County, WA jail.

The following section provides a brief discussion about the legal framework on which jail health care services are required and provided. This discussion does not assume any facts or findings about health care services at the Snohomish County jail unless specifically stated and explained. This discussion intends to serve as a backdrop of the legal foundation for providing appropriate and constitutional levels of health care services in the jail setting.

## V.    LEGAL FRAMEWORK - INMATE RIGHTS TO ADEQUATE HEALTHCARE

The following discussion lays out a general legal foundation regarding a jail's obligation to provide adequate medical, dental and mental health care to inmates.

### A.    The Civil Rights of Institutionalized Persons Act (CRIPA)[3]

In an effort to stem the tide of prisoner section 1983 litigation and strike a balance between deference to state officials and the rights of the institutionalized, Congress enacted the Civil Rights of Institutionalized Persons Act ("CRIPA") in 1980. Prior to 1980, inmates who wanted to sue in court were not required to exhaust their administrative remedies. CRIPA applied only to section 1983 actions and contained the first exhaustion requirement for prisoner lawsuits. CRIPA did not require mandatory exhaustion, however, and gave judges the power to require plaintiffs to exhaust administrative remedies when "appropriate and in the interests of justice." A judge could continue a case for up to 180 days if he believed that the suit could be resolved using administrative remedies.

This discretionary exhaustion requirement offered [jail] officials the ability to resolve violations in administrative proceedings without involving the courts. The exhaustion provision of CRIPA further limited its own application by mandating that exhaustion could only be required where the administrative remedies had been certified by the Attorney General as meeting certain minimum standards. These standards required that inmates be afforded an advisory role in creating and applying a grievance procedure. The Supreme Court created a balancing test for determining when to require exhaustion under CRIPA, "federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion."

Beyond the exhaustion requirement, CRIPA also gave the Attorney General of the United States authority to sue state and local officials responsible for facilities exhibiting a pattern or practice of flagrant or egregious violations of constitutional rights. CRIPA also set forth guidelines for prison administrative procedures and required that states have their procedure certified by the Attorney General in order to require exhaustion of remedies. Even with this discretionary exhaustion requirement, CRIPA allowed inmates to participate in the formation of the grievance procedures and many states refrained from having their procedures certified because of this requirement. The states' refusal to adopt these provisions and alter their grievance procedures to accommodate inmates' civil rights had the opposite of the intended effect and actually increased the number of prisoner suits filed and contributed to the burden on federal dockets as well as increased costs to prisons caused by defending suits. In response, many legal scholars, politicians and judges supported a change in the system that would reduce the number of frivolous lawsuits.

---

[3] Civil Rights of Prisoners: The Seventh Circuit and Exhaustion of Remedies Under the Prison Litigation Reform Act,  Seventh Circuit Review, Volume 1, Issue 1, Spring 2006 (www.kentlaw.edu/7cr/v1-1/mccomb.pdf)

## B.  The Prison Litigation Reform Act of 1995

The civil rights of inmates were again the subject of Congressional legislation in 1996 with the passage of the aptly named amendment to CRIPA, the Prisoner Litigation Reform Act ("PLRA"). Though the legislative history is minimal, the PLRA was intended to stem the tide of purportedly frivolous prisoner lawsuits and reduce judicial oversight of correctional facilities. The PLRA represented a major change in prison litigation creating barriers such as requiring physical injury in tort claims, forcing even *in forma pauperis* prisoners to pay filing fees, and creating limits on attorney's fees. Most importantly, however, the PLRA drastically modified the CRIPA's exhaustion of administrative remedies provision.

Under the PLRA, inmates are required to exhaust all administrative remedies available, mandating, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal Law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The PLRA's exhaustion requirement was more restrictive and differed from CRIPA in five important ways: First, the PLRA applies to all state, local and federal prisoners in contrast to CRIPA, which did not apply to federal prisoners or juveniles. Second, the exhaustion requirement was broadened to include pretrial detainees as well as convicted prisoners. Third, the PLRA requires dismissal of cases in which administrative remedies were not exhausted. Before the PLRA, courts continued or stayed cases until prisoners had exhausted administrative remedies.

The PLRA lacks the discretionary application of the exhaustion requirement and removes the ability of judges to determine when requiring exhaustion is appropriate. Finally, before a court could require a prisoner to use a prison's administrative grievance process, the process had to meet certain requirements. The PLRA removed the requirements that exhaustion of administrative remedies must be "appropriate and in the interests of justice" or that the administrative remedies be "plain, speedy and effective." The PLRA also removed the five statutory standards for administrative remedies and required only that the remedies be "available." The impact of the PLRA on prisoner lawsuits for constitutional violations was immediate and substantial. In the last year under CRIPA, inmates filed 41,679 civil rights petitions.

In 2000, four years after the passage of the PLRA, the number of civil rights petitions dropped to 25,504 - a reduction of 39%. Specifically, the more comprehensive and automatic exhaustion requirement greatly increased the number of inmate lawsuits that were dismissed for failure to exhaust all available administrative remedies. The Supreme Court, in interpreting the new exhaustion requirement under the PLRA, held that inmates were required to exhaust all available administrative remedies regardless of whether the claims involved general circumstances of incarceration or particular incidents, thus ensuring that the PLRA will govern all prisoner lawsuits in every state.

## C. **Inmate Healthcare**[4]

Jail inmates have the right to receive adequate health care. The Eighth Amendment of the US Constitution guarantees the right to be free from cruel and unusual punishment, which the Supreme Court has determined to include the right of prisoners to have access to health care.[5]
The denial of necessary medical care is a Constitutional violation only if prison officials are "deliberately indifferent" to a "substantial risk of serious harm."[6] Medical, dental and mental health care would fall within the scope of these legal expectations.

In order for an inmate to successfully claim that inadequate medical care violated his constitutional rights, he must prove two things[7] : (1) that the poor treatment resulted in "sufficiently serious"[8] harm (the objective standard), and (2) that the prison official responsible for the harm knew of an excessive risk to inmate health or safety and disregarded that risk by failing to attempt to minimize it[9] (the subjective standard).

*The Objective Standard of Care*: Generally speaking, for an injury to be considered "sufficiently serious," the harm must significantly change the prisoner's quality of life. For example, harm would be considered "sufficiently serious" if it causes degeneration or extreme pain. Some examples of medical needs that the courts have considered "sufficiently serious":

- degenerative, painful hip condition that hindered the inmate's ability to walk
- painful, obviously broken arm
- bleeding ulcer that caused abdominal pain
- inflamed appendix
- shoulder dislocation
- painful blisters in mouth and throat caused by cancer treatment
- pain, purulent draining infection, and 100 degrees or more fever, caused by an infected cyst
- cuts, severe muscular pain, and burning sensation in eyes and skin, caused by exposure to mace
- head injury caused by slip in shower
- substantial back pain
- painful fungal skin infection
- broken jaw requiring jaw to be wired shut for months
- severe chest pain caused by heart attacks

---

[4] http://www.washlaw.org/projects/dcprisoners_rights/medical_care.htm#objectiveStandard
[5] *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).
[6] *Farmer v. Brennan*, 511 U.S. 825 (1994).
[7] Criteria summarized in A Jailhouse Lawyer's Manual (JLM), 5th edition. New York: Columbia Human Rights Law Review , 2000, p. 540.
[8] *Wilson v. Seiter*, 501 U.S. 294, 298, 115 L. Ed. 2d 271, 111 S. Ct. 2321 (1991).
[9] *Martinez v. Mancusi* 443 F.2d 921, 924 (1970). In: JLM, p. 542.

Some examples of medical needs that the courts have determined NOT to be "sufficiently serious":

- sliver of glass in palm that did not require stitches or painkillers
- pain experienced when doctor removed a partially torn-off toenail without using anesthetic
- nausea, shakes, headache, and depressed appetite caused by family situational stress
- "shaving bumps"

*The Subjective Standard of Care*: A jail official cannot be "deliberately indifferent" to a medical need if he is not aware of the medical problem. Thus, an inmate must make sure that jail officials know about his medical needs. If an inmate wants to see medical personnel, he must inform the corrections officers on his block. He must fill out sick call slips and, if these are not honored, he must file grievances. Once an inmate gets in to see a nurse or doctor, he should tell him about his symptoms and any relevant medical history.

While an inmate should do all he can to make sure that medical personnel are aware of his medical problems, medical personnel can also be held responsible for knowing information in addition to what the inmate tells them. Specifically, medical personnel are responsible for information gained by examining the inmate, reviewing the inmate's medical records, and by talking to others familiar with the inmate (guards, other doctors, and family members, for example). If a jail official knows of an inmate's medical problem, he must do what is in his power to address that problem. If a jail official knows of an inmate's substantial medical need and disregards it, he can be held accountable for violating the inmate's constitutional rights. Listed below are some common situations in which courts have held that officials were deliberately indifferent to inmates' medical needs.

*Failure to Treat a Diagnosed Condition*: If a jail doctor diagnoses an inmate with a certain medical condition and then fails to provide that inmate with treatment for this condition, courts are likely to find that that doctor has been deliberately indifferent to inmate's medical needs. If an inmate suffers serious harm as a result of this lack of treatment, jail officials can be held liable for violating the inmate's rights. For example, if an inmate who is diagnosed with HIV receives no drugs to inhibit the virus and as a result develops full-blown AIDS more quickly than he should have, jail medical staff can be held liable.

Similarly, jail officials other than doctors can be held liable for infringing on an inmate's rights if the official prevents an inmate from receiving treatment recommended by a doctor. For example, the 2nd Circuit Court of Appeals held that prison officials were deliberately indifferent to an inmate's medical needs when they removed him from a hospital without permission from the

doctors.[10] Jail officials without medical training do not have the right to second-guess the recommendations of doctors.

*Delay in Treatment or Delay in Access to Medical Attention:* Jail officials do not have to provide inmates with immediate access to non-emergent medical care. Generally speaking, jail officials can delay in providing medical care if they have a legitimate reason for doing so. For example, security concerns can justify delaying an inmate's access to medical care, as long as this delay does not make the medical problem significantly worse. On the other hand, unreasonable delays do violate the Constitution. A delay is considered to be unreasonable if it is medically unjustified and it is likely to make the medical problem worse or to result in permanent harm. For example, the 7th and 8th Circuit Courts of Appeals have ruled that 10-15 minute delays in responding to heart attacks constitute deliberate indifference.[11] Also, the 4th Circuit Court of Appeals held that prison officials were deliberately indifferent when they delayed 11 hours in examining an inmate's painfully swollen and obviously broken arm.[12]

*Denial of Access to Medical Personnel*: Jail officials cannot deny inmates' access to health care personnel. If an inmate requests health care attention, non-healthcare staff may not decide whether or not to allow the inmate to see health care personnel. For example, in Parrish v. Johnson, the 6th Circuit Court of Appeals ruled that a guard who failed to relay an inmate's request for health care was deliberately indifferent to the inmate's medical needs.[13] Similarly, the 11th Circuit Court of Appeals found a physician's assistant to be deliberately indifferent to an inmate's medical needs when the assistant refused to x-ray an inmate with a broken hip or to send him to a doctor for examination.[14]

*Grossly Inadequate Care*: Negligent medical care does not generally violate the Constitution. In jails, health care malpractice, generally speaking, does not constitute a violation of prisoners' rights. On the other hand, excessively bad medical care can violate a prisoner's eight Amendment rights. For example, a jury could find that a jail official acted with deliberate indifference if he treats a patient with a serious risk of appendicitis by simply giving him aspirin and an enema.[15]

Inadequate staffing levels have been determined by the United States Department of Justice as a direct and indirect cause for Civil Rights violations. Insufficient staff levels create serious access to care barriers resulting in medical neglect. Additionally, assigning unqualified staff to perform

---

[10] *Martinez v. Mancusi*, 443 F.2d 921, 924 (1970). In: JLM, p. 542.
[11] *Lewis v. Wallenstein*, 769 F.2d 1173, 1183 (7th Cir. 1985) and *Tlamka v. Serrell*, 244 F.3d 628, 633-34 (8th Cir. 2001). In: Toone, p. 81
[12] *Loe v. Armistead*, 582 F.2d 1291, 1296 (4th Cir. 1978). In: Toone, p. 81
[13] 800 F.2d 600, 605 (1986). In: Toone, p. 80.
[14] *Mandel v. Doe*, 888 f.2d 783, 789-90 (1989). In: Toone, p. 80
[15] *Sherrod v. Lingele*, 223 F.3d 605, 611-12 (7th Cir. 2000). In: Toone, p. 84.

medical or mental health care functions outside their scope of licensure or practice can be cause for inadequate care violations as noted in a 2012 DOJ jail Investigation Findings Letter[16]:

*"Our investigation found reasonable cause to believe that the Jail is denying necessary medical and mental health care, and consequently places prisoners at an unreasonable risk of serious harm, in violation of the Constitution...*

> *Many of the lapses we identify below are directly related to [the jail's] inadequate medical staffing. There is too little onsite coverage by properly licensed staff members, forcing certified nursing assistants (CNAs) to practice and provide medical care beyond their training and licensure. **The lack of sufficiently trained and available medical staff for the management and evaluation of serious medical conditions places prisoners at risk of unnecessary harm and is deliberately indifferent to prisoners' serious medical needs. Prison officials, including doctors, "violate the civil rights of inmates when they display 'deliberate indifference to serious medical needs.'"** Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976))...*

> *"Perhaps the most significant single concern we have with the provision of medical and mental health care at the Facility is that staff members routinely perform medical services beyond what they are trained and credentialed to do. A further concern involves "medical" security officers. We reviewed several incidents in which security staff were used to evaluate prisoner injuries, and cleared the prisoners without any medical input or consultation. **Any clinical support by corrections officers must be limited, must be overseen by the medical department, and must be guided by clear protocols. Corrections officials may, and in fact, should, respond to medical emergencies in acute, life-threatening situations and be properly trained to do so. They should never, however, evaluate prisoners for medical reasons, perform sick call, or provide any type of non-emergency care.** There are no protocols in place at [the jail] to guide corrections officers in the very limited medical tasks they may perform, and the current level of medical department oversight of officers is insufficient."*

## D. <u>Inmate Psychiatric Treatment and Mental Health Care</u>:

It is important that jail officials and local government leaders clearly recognize and acknowledge that adequate inmate psychiatric treatment and mental health care is a fundamental constitutional obligation of the jail and, therefore, a constitutional duty of local government. Such care should be looked at no differently than medical care when it comes to providing constitutionally adequate care and custody of inmates. The courts have consistently applied the same constitutional standard for inmate medical care to psychiatric and mental health services. These standards generally consist of these six (6) elements:

---

[16] http://www.justice.gov/crt/about/spl/documents/piedmont_findings_9-6-12.pdf

1) Timely and appropriate assessment, treatment and monitoring of inmate mental illness
2) Making appropriate provisions for an array of mental health services that is not limited to psychotropic medication only
3) Ensuring that administrative segregation and observation is used appropriately
4) Mental health records are accessible, complete and accurate
5) There is proper and adequate response to medical and laboratory orders in a timely manner
6) That adequate and ongoing quality assurance programs are in place

The Fourteenth Amendment mandates that jails must provide pre-trial inmates "at least those constitutional rights . . . enjoyed by convicted prisoners," including Eighth Amendment rights.[17] Under the Eighth Amendment, prison officials have an affirmative duty to ensure that inmates receive adequate food, clothing, shelter, and medical care.[18] The Constitution imposes a duty on jails to ensure an inmate's safety and general well-being.[19] This duty includes the duty to prevent the unreasonable risk of serious harm, even if such harm has not yet occurred.[20] Thus, jails must protect inmates not only from present and continuing harm, but also from future harm. This protection extends to the risk of suicide and self-harm.[21]

The Constitution also mandates that jails provide inmates adequate medical and **mental health care, including psychological and psychiatric services**.[22] Jail officials violate inmates' constitutional rights when the officials exhibit deliberate indifference to inmates' serious medical needs.[23]

---

[17] _Bell v. Wolfish_, 441 U.S. 520, 545 (1979).
[18] _Farmer v. Brennan_, 511 U.S. 825, 832 (1994).
[19] County of Sacramento v. Lewis, 523 U.S. 833, 851 (1998) (citing DeShaney v. Winnebago County Dep't of Soc.Servs., 489 U.S. 189, 199-200 (1989)).
[20] _Helling v. McKinney_, 509 U.S. 25, 33 (1993).
[21] _Matos v. O'Sullivan_, 335 F.3d 553, 557 (7th Cir. 2003); Hall v. Ryan, 957 F.2d 402, 406 (7th Cir. 1992)(noting that prisoners have a constitutional right "to be protected from self-destructive tendencies," including suicide)
[22] _See Farmer, 511 U.S. at 832_
[23] Estelle v. Gamble, 429 U.S. 97, 102 (1976).

## VI.    DESCRIPTION OF SNOHOMISH COUNTY CORRECTIONAL FACILITY

The Snohomish County Correctional Facility is managed by the Elected Snohomish County Sheriff and is located in Everett, Washington. SCCF operates under the Revised Code of Washington (RCW) Title 70, Public Health and Safety, City and County Jail Act (Chapter 70.48). Additionally, the SCCF is a function under the oversight of the Sheriff's Office pursuant to Snohomish County Code. SCCF

**The Facility**

SCCF consists of two adjoining structures, the Wall Street facility, and the Oakes Street facility. Wall Street facility, the oldest of the two structures, opened in 1986 as a direct supervision jail with a rated capacity of 477. By 2001, the average daily inmate population exceeded 1,000. Subsequently, construction of the Oakes Street facility, also direct supervision, began in 2003 and it opened in 2005, raising the combined bed capacity to 1196 beds excluding medical and intake beds. The combined facilities' current total capacity is 1233 beds.

**Housing Capacities**

SCCF has 26 inmate housing units totaling 1233 beds, excluding the booking area. The table below shows unit designations and capacities:

| Location | Unit Designation | Capacity | Location | Unit Designation | Capacity |
|---|---|---|---|---|---|
| 2-N | Male Intake | 79 | D-MHU | Medical Housing | 24 |
| 2-S | Male Minimum | 79 | D-MHO | Mental Health Observation | 10 |
| 3-N | Male Inmate Workers | 97 | E-1 | Female Special / Max | 32 |
| 3-S | Male Minimum | 79 | E-2 | Female Minimum | 64 |
| 4-NC | Segregation | 2 | E-3 | Female Intake | 64 |
| 4-NC | Male Max / Discipline | 18 | E-4 | Male Psych | 40 |
| 4-ND | Male Max / Discipline | 20 | F-1 | Male High/Medium | 64 |
| 4-SA | Segregation | 2 | F-2 | Male High/Medium | 64 |
| 4-SA | Male Max / Discipline | 18 | F-3 | Male Medium | 64 |
| 4-SB | Male Minimum | 36 | F-4 | Male Medium | 64 |
| 5-N | Male Psychiatric Housing | 17 | G-1 | Male Minimum | 64 |
| 5-S | Male Special Custody | 37 | G-2 | Male Minimum | 64 |
|  |  |  | G-3 | Male Minimum | 64 |
|  |  |  | G-4 | Male Minimum | 64 |

As a matter of practice, SCCF utilizes six (6) units for medical and mental health monitoring and care. In some cases, mentally ill inmates co-house with non-mentally ill inmates.

**Classification Capacity Standard**

The generally accepted standard for determining usable capacity is to determine what is known as "Classification Capacity." Classification capacity is usually 85 percent of a jail's maximum capacity. In this case, the maximum bed capacity is 1233. The classification capacity for the Snohomish County Jail, therefore, is 85 percent of 1233 beds or 1048 inmates. To rephrase, when the average daily population (ADP) reaches 1048 inmates, the jail is functionally full.

Classification capacity is a common and necessary tool that jails use to ensure that adequate capacity exists to implement needed separation of various inmate classifications, to handle temporary surges in occupancy, and to provide temporary housing for large arrest events. Maintaining average daily jail population at classification capacity is vital to the safety and security of the facility. Jail data provided for this assessment clearly show that the facility has exceeded its maximum and authorized capacity for most of time it has been in operation.

Crowded inmate conditions, combined with insufficient health care and custody staffing levels, present unique access to care concerns. The following are a few of these concerns:

1. Management of communicable disease;
2. Inmate injuries sustained in assaults and fights related to psychoemotional stress caused by crowding in housing units;
3. Successfully controlling chronic illness such as hypertension and diabetes;
4. Providing security during medication passes;
5. Moving inmates to and from sick call clinics;
6. Monitoring inmates on suicide watch and inmates recovering from illnesses;
7. Effective management of mentally ill inmates;
8. Temptation to authorize unqualified health care staff to provide assessment and care that exceeds their scope of practice/licensure.

## A. ADP, Classification Capacity, Population Management

Average daily inmate population (ADP) and capacity data provided by SCCF officials clearly suggest chronic long-term crowding. Although severe overcrowding was alleviated in 2005 with the opening of the Oakes Street facility, that was the only year since 2001 that the facility operated below its designated classification capacity of 1048 inmates. The figure below illustrates these findings.



Chronic crowding is further evidence by the fact that the maximum and classification capacity utilization averaged 95% and 112% respectively from 2005 – 2013. Simply stated, SCCF has daily operated well above its classification capacity, and at or near its maximum capacity, for almost 12 years as shown in the figure below.

| Year | Max Capacity Utilization | Classification Capacity Utilization |
|---|---|---|
| 2001 | 213% | 251% |
| 2002 | 209% | 246% |
| 2003 | 187% | 220% |
| 2004 | 173% | 203% |
| 2005 | 80% | 94% |
| 2006 | 98% | 115% |
| 2007 | 104% | 123% |
| 2008 | 99% | 117% |
| 2009 | 96% | 113% |
| 2010 | 94% | 111% |
| 2011 | 97% | 114% |
| 2012 | 96% | 112% |
| 2013 | 96% | 112% |
| Avg (since 2005) | 95% | 112% |

Jail crowding imposes many direct and indirect challenges and adverse impacts on inmate health care delivery and services. Meeting inmate health needs are especially challenged when the inmate census exceeds bed capacity and/or health care and custody staffing resources. Unfortunately, this assessment, combined with findings in a recent NIC Operational Assessment, finds that both of these conditions exist. Inmate crowding continues to exist, health care and custody staffing levels are insufficient to ensure consistent assessment of inmate health care needs and delivery of services care by qualified health care providers. Despite its best efforts, the SCCF is unable to provide adequate access to health care service to its inmates.

## RECOMMENDATION(S):

- *Officials should take immediate steps to reduce jail crowding.*
- *County should implement planning activities that project future jail needs, identify opportunities to reduce future jail use (or at least reduce the rate of growth) and explore facility options to prevent crowding in the future.*
- *Serious consideration should be given to exploring alternative housing options for inmates with serious medical and mental health needs.*

## B. SCCF Custody and Health Care Staffing Levels – The Critical Challenge

### Jail Staffing and the Federal Courts[24]

Court decisions define important parameters for jail operations by establishing minimum levels of service, performance objectives, prohibited practices, and specific required practices. We explore federal court decisions in this appendix, but we note that state and local courts also play an active role in evaluating and guiding jail operations. Decisions handed down by federal courts have required jails to:

- Protect inmates from themselves, other inmates, staff, and other threats
- Maintain communication with inmates and regularly visit occupied areas
- Respond to inmate calls for assistance
- Classify and separate inmates
- Ensure the safety of staff and inmates at all times
- Make special provisions for processing and supervising female inmates
- Deliver all required inmate activities, services, and programs (medical, exercise, visits, etc.)
- Provide properly trained staff

Federal court involvement with jails goes back more than 40 years. State and federal prisons were the focus of many landmark cases in this era, and local jails soon became targets as well.

---

[24] *See*: Excerpts from: Jail Staffing Analysis Third Edition, Jail Staffing and the Federal Courts Copyright 2009, Rod Miller, Dennis R. Liebert and John E. Wetzel. (An NIC project).

Early federal decisions tackled fundamental constitutional issues in jails. Many of these pioneering decisions are still cited in current litigation.

**Courts view staffing levels and practices as central to the constitutional duty to protect**

The United States Constitution imposes an extraordinary duty to protect on jails that has no counterpart in the public safety. While our duty is less visible to the public, and likely less appreciated, it rises above the constitutional responsibilities of our public safety colleagues. Even probation does not approach the duty to protect that is imposed on jails. Probation officials are not held responsible for the behavior of offenders under their supervision, nor for what happens to the offenders when they are not actually with a probation officer.

Do citizens have a *constitutional* right to be protected from crime or to have a fire extinguished? No, these are services that government *chooses* to provide. Whether or not to provide these services, and the level of services that are delivered, are discretionary decisions, from a constitutional perspective. To be sure, it is politically expedient to provide fire and police protection. Because such services are discretionary, officials may vary staffing levels in response to temporary or long term staff shortages.

But a jail's duty to protect is constant, beginning when an inmate is admitted and continuing until release. Case law clearly establishes the responsibility of jail officials to protect inmates from a "risk of serious harm" at all times, and from all types of harm-- from others, from themselves, from the jail setting, from disease, and more. Because our duty to protect is constant and mandated, we do not have the option to lower our level of care just because we do not have enough staff. If a shift supervisor leaves a needed post vacant because there are not enough employees to staff all posts, he/she increases risk and exposes the agency and government to higher levels of liability.

**Duty to Protect**

In an early federal district court case in Pulaski County, Arkansas, the court described the fundamental expectations that detainees have while confined:

> *...minimally, a detainee ought to have the reasonable expectation that he would survive his period of detainment with his life; that he would not be assaulted, abused or molested during his detainment; and that his physical and mental health would be reasonably protected during this period... Hamilton v. Love*, 328 F.Supp. 1182 (D.Ark. 1971).

In a Colorado case3, the federal appeals court held that a prisoner has a right to be reasonably protected from constant threats of violence and sexual assaults from other inmates, and that the failure to provide an adequate level of security staffing, which may significantly reduce the risk of such violence and assaults, constitutes deliberate indifference to the legitimate safety needs of prisoners.

**Staffing Levels**

The first Pulaski County case produced continuing federal court involvement with jail operations. When the county was brought back to court by inmates in 1973, the county asked the court to consider their plans to build a new jail. But the judge held that, while the plans are promising, current conditions must be addressed:

> *This Court can only deal with present realities....The most serious and patent defects in the present operation result directly from inadequate staffing. Hamilton v. Love*, 358 F.Supp. 338 (D.Ark. 1973). A federal district court judge linked Platte County (Missouri) Jail's duty to protect to staffing levels: *There shall be adequate correctional staff on duty to protect against assaults of all types by detainees upon other detainees. Ahrens v. Thomas*, 434 F.Supp. 873 (D.Mo. 1977).

In New Jersey, the federal district court required county officials to obtain an independent, professional staffing analysis addressing security staffing and training, classification, and inmate activities. The court set expectations for the plan and ordered the county to *implement* the plan:

> *The staffing analysis shall review current authorized staffing, vacancies, position descriptions, salaries, classification, and workload...[The county] must implement the plan... Essex County Jail Annex Inmates v. Treffinger*, 18 F.Supp.2d 445 (D.N.J. 1998).

**Liability**

Officials may be found to be "deliberately indifferent" if they fail to address a known risk of serious harm, or even if they *should* have known of the risk. Ignorance is not a defense.
Failure to protect inmates may result in liability. Usually court intervention takes the form of orders that restrict or direct jail practices. Sometimes the courts award compensatory damages to make reparations to the plaintiffs. In more extreme situations, defendant agencies may be ordered to pay punitive damages. A U.S. Supreme Court decision held that punitive damages may even be assessed against individual defendants when indifference is demonstrated:

> *A jury may be permitted to assess punitive damages in a § 1983 action when the defendant's conduct involves reckless or callous indifference to the plaintiff's federally protected rights. Smith v. Wade*, 103 S.Ct. 1625 (1983)

**Court Intervention**

Most court decisions produce changes in jail conditions, including operations. Continuing court involvement might be prompted by a consent agreement between the parties, or by failure of the defendants to comply with court orders. The nature of court involvement may even include the review of facility plans. In a New Mexico case, the court renewed its involvement when plans to

reduce staffing were challenged by the plaintiffs. The court prevented the state from reducing staffing levels at several correctional facilities:

> *..defendants will be enjoined from...reducing the authorized or approved complement of security staff...unless the minimal staffing levels identified as being necessary to provide a constitutional level of safety and security for prisoners have been achieved.. The Court also will enjoin defendants to fill existing vacancies and thus to employ at least the number of medical and mental health staff as well as the number of security staff authorized to be employed during fiscal Year... Duran v. Anaya, 642 F.Supp. 510 (D.N.M. 1986).*

## Connecting Staffing Practices to Other Conditions

In the New Mexico case, the court went on to draw links between staffing levels and other aspects of facility operations, ranging from overtime to inmate idleness:

**Overtime** "*...security staff will be adversely affected by excessive overtime work as a result of the understaffing of the institutions subject to the Court's orders in this litigation*"

**Out-of-Cell Opportunity** "*...In addition, prisoners will be required to remain in their housing units for longer periods of time, and inmate idleness will increase."*
**Idleness.** "*Prisoner idleness...will increase as a result of staff reductions..."*

**Programs and Activities**. "*There is a direct, inverse correlation between the incidence of acts and threats of violence by and between inmates, on the one hand, and the types and amounts of educational, recreational, work and other programs available to inmates, on the other--i.e., acts and threats of violence tend to decrease as program availability and activity increase."*

**Training.** "*Reduction in security staff positions will prevent...complying with staff training requirements of the Court's order..."*

The court noted concerns by a security expert that the "*security staff reductions that are contemplated will result in a 'scenario at this time...very similar to the scenario that occurred prior to the 1980 disturbance'*", referring to the deadly inmate riot at the New Mexico Penitentiary that claimed 33 inmate lives and injured more than 100 inmates and 7 officers.

## Lack of funds is not an excuse

Federal courts have made it clear that **lack of funds does not excuse violation of inmates' constitutional rights:**

> *Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations... Jackson v. Bishop, 404 F.2d 571 580 (8th Cir.1968)*

Courts may even restrict a jurisdiction's discretion with regard to where funds are found to make needed improvements. An appeals court held that it may restrict the sources from which monies are to be paid or transferred in order to protect the legal rights of those who have been victims of unconstitutional conduct.4 In a 1977 decision, Supreme Court Justice Powell observed:

> ...a federal court's order that a State pay unappropriated funds to a locality would raise the gravest constitutional issues... But here, in a finding no longer subject to review, the State has been adjudged a participant in the constitutional violations, and the State therefore may be ordered to participate prospectively in a remedy otherwise appropriate.

The case concluded:

> It is not the province of a federal court to instruct the legislature on how it should finance its obligations. The district court did not attempt to do so. The court did what was within its authority--order a wrongdoer to pay the cost of remedying its wrongdoing.

## Recent Federal Cases

Although the basic tenets of federal court involvement with jail staffing and operations were forged many years ago, the practice has not ended, as suggested in these more recent cases:

*Cavalieri v. Shepard*, 321 F.3d 616 (7th Cir. 2003). The court noted that the detainee's right to be free from deliberate indifference to the risk that he would attempt suicide was clearly established.

*Wever v. Lincoln County, Nebraska*, 388 F.3d 601 (8th Cir. 2004). The court held that the arrestee had a clearly established Fourteenth Amendment right to be protected from the known risks of suicide.

*Estate of Adbollahi v. County of Sacramento*, 405 F.Supp.2d 1194 (E.D.Cal.2005). The court held that summary judgment was precluded by material issues of fact as to whether the county knowingly established a policy of providing an inadequate number of cell inspections and of falsifying logs showing completion of cell inspections, creating a substantial risk of harm to suicide-prone cell occupants.

*Hearns v. Terhune*, 413 F.3d 1036 (9th Cir. 2005). The court held that the inmate's allegations stated a claim that prison officials failed to protect him from attacks by other inmates. The inmate alleged that an officer was not present when he was attacked even though inmates were not allowed in the chapel without supervision.

*Velez v. Johnson*, 395 F.3d 732 (7th Cir. 2005). The court held that the detainee had a clearly established Fourteenth Amendment right to be free from the officer's deliberate indifference to an assault by another inmate.

*Smith v. Brevard County*, 461 F.Supp.2d 1243 (M.D.Fla. 2006). Violation of the detainee's constitutional rights was the result of the sheriff's failure to provide adequate staffing and safe

housing for suicidal inmates, and in light of the sheriff's knowledge that inmate suicide was a problem, his failure to address any policies that were causing suicides constituted deliberate indifference to the constitutional rights of inmates.

**SCCF Custody Staffing Levels**

This assessment did not study in-depth SCCF custody staffing levels. However, based on the poor environmental conditions found during this and the previous assessment, chronic crowding, and a serious lack of adequate medical and mental health service levels (to be discussed further in this report), SCCF officials should complete a comprehensive custody staffing analysis as soon as possible.

**SCCF Health Care Staffing Levels**

Adequate jail health care staffing levels are considered by federal courts as equally important as officer levels for meeting constitutional levels of protection and care. Inadequate jail health staffing levels prevent reasonable access to necessary medical and mental health care. Inmates have a constitutional right to access to qualified health care services while incarcerated.

SCCF medical staffing is approximately 19.4 FTEs and includes a mixture of nurses who are county employees and staffing agency employees.

| Health Care Position | FTE |
|---|---|
| Physician | 0.6 |
| Nurse Practitioner | 2 |
| Registered Nurse | 15 |
| Licensed Practical Nurse | 1.8 |
| Total: | 19.4 |

SCCF mental health staffing consists primarily of three licensed mental health professionals (LMHC) who are county employees, and a psychiatric nurse practitioner (uncertain of hours per week).

Health care staffing levels at SCCF are inadequate to provide consistent access to care to approximately 20,000 annual admissions and an average daily population almost 1200. Based on this consultants experience as a professional corrections administrator, corrections consultant, and as a primary health care provider, as well as national jail health care standards,  it is unreasonable to expect current staffing levels to consistently provide timely or complete access to health care services.

## VII.   MEDICAL CARE ASSESSMENT, FINDINGS & RECOMMENDATIONS

The following jail health care assessment elements are based upon provisions found in previous and existing Federal Settlement Agreements, Consent Decrees, and national standards. These elements should not be considered health care standards per se, but used to compare assessment findings with what the U.S. Department of Justice has determined are adequate levels of services according to constitutional requirements and Federal case law. [25]

### A.  Health Care Intake Assessment:

> *1.  Qualified Medical Staff utilize an appropriate medical intake screening instrument to identify and record observable and non-observable medical needs, and seek the inmate's cooperation to provide information regarding:*

    (1)   medical, surgical, and mental health history, including current or recent medications;

    (2)   current injuries, illnesses, evidence of trauma, and vital signs, including recent alcohol and substance use;

    (3)   history of substance abuse and treatment;

    (4)   pregnancy;

    (5)   history and symptoms of communicable disease;

    (6)   suicide risk history; and

    (7)   history of mental illness and treatment, including medication and hospitalization. Inmates who screen positively for any of these items shall be referred for timely medical evaluation, as appropriate.

> *2.  Adequate and reasonably private intake health screening is conducted by qualified staff to determine the serious medical and mental health needs of all inmates before admission in to the facility.*

FINDING(S): Trained correctional staff performs all intake health screenings, generally at the time of booking at the open booking desk. The health screening form appears generally adequate. However, nursing and custody staff interviewed noted that this process is seriously inadequate because custody staff is not trained to adequately assess inmate health needs, and inmates with serious medical problems have gone days without seeing qualified medical staff at booking. A review of three inmate medical charts confirmed this serious concern. In one of these cases, an inmate with a serious cardiac illness went several days without required medication because the information was not appropriately communicated from booking to the medical department. Fortunately, medical staff was ultimately alerted to this medical

---

[25] http://www.justice.gov/crt/about/spl/findsettle.php

need days later when the inmate's parent called inquiring whether the inmate had received needed medication.

The booking desk is somewhat centrally located in the booking area. The intake health screening interview is within full view and hearing of other nearby staff, inmates, and arrestees in the booking area. The level of privacy for conducting an intake health screening interview is inadequate.

**RECOMMENDATION(S):**

- *The intake health screening process appears to collect adequate medical, mental health, and suicide risk prevention information.*

- *To ensure the reliability of intake health screens and timely access to qualified care, and to reduce liability, SCCF should completely remove custody staff from the intake health screening process. Appropriate levels of qualified nursing staff should conduct ALL intake health screens 24/7. The report booking volume suggests a minimum of 2-3 Registered Nurses.*

- *All intake health-screening interviews must be performed in a location that maximizes privacy.*

3. *Intake assessment and screening policies and procedures exist and are used to ensure that adequate medical and mental health intake screenings and health assessments are provided to all inmates within 14 days. A comprehensive assessment is performed for each inmate within 14 days of his or her arrival at SCCF and shall include a complete medical history, physical examination, mental health history, and current mental status examination. The physical examination shall be conducted by Qualified Medical Staff.*

FINDING(S): In general, SCCF operates with no approved health care policies and procedures. Interviews with nursing staff revealed that they *"...just do what we are trained to do and look at what few protocols we have..."* This is a serious concern of the overall health care program.

Additionally, medical staff reported that 14-day health assessments are not performed on inmates due to the very high workload and inmate population having serious and co-morbid health problems.

*RECOMMENDATION(S)*:

- *SCCF should immediately begin the process of promulgating an evidence-based jail health care policy and procedure manual.*

- *Because this deficiency is likely related to inadequate staffing levels, officials should complete a comprehensive staffing analysis to accurately define staffing levels required to adequately meet the health care needs of the inmate population.*

- *Immediately begin performing a formal comprehensive history and physical assessment by a qualified health care professional.*

- *Ensure that medical staff only work within their scope of license and practice.*

| |
|---|
| 4. *Basic medical care policies, procedures, and practices to address and guide all medical care and services including, but not limited to the following:* |

- access to medical care;
- sick call;
- continuity of medication;
- infection control;
- medication administration;
- intoxication and detoxification;
- documentation and record-keeping;
- disease control and prevention;
- medical triage and physician review;
- intake screening;
- infection prevention and control;
- comprehensive health assessments;
- mental health;
- women's health;
- quality management; and
- urgent/emergent response.

FINDING(S): As stated above, there is currently no written health care policy and procedure manual.

*RECOMMENDATION(S)*:

- *SCCF should immediately begin developing health care policies, procedures, and protocols into a single, comprehensive, and unified policy manual using a multidisciplinary team consisting of custody, medical, and mental health staff and qualified professionals. Final drafts should be forwarded to the sheriff, jail leadership, and the Commissioner's attorney for review and approval before implementation. The*

*manual should follow the outline and content recommended by the National Commission on Correctional Health Care (NCCHC). Below is a recommended table of contents to use to revise policies and procedures.*

| GOVERNANCE & ADMINISTRATION | SAFETY | PERSONNEL & TRAINING |
|---|---|---|
| • Access to Care<br>• Responsible Healthcare Authority<br>• Healthcare Autonomy<br>• Administrative Meetings and Reports<br>• Policies and Procedures<br>• Continuous Quality Improvement Program<br>• Emergency Response Plan<br>• Communications on Patients' Health Needs<br>• Privacy of Care<br>• Procedure in the Event of Inmate Death<br>• Grievance Mechanism for Health Complaints | • Infection Control Program<br>• Patient Safety<br>• Staff Safety<br>• Federal Sexual Assault Reporting Regulations<br>• Procedure in the Event of Sexual Assault | • Credentialing<br>• Clinical Performance Enhancement<br>• Professional Development<br>• Healthcare Training for Correctional Staff<br>• Medication Administration Training<br>• Inmate Workers<br>• Staffing<br>• Healthcare Liaison<br>• Orientation for Healthcare Staff |
| **HEALTHCARE SERVICES SUPPORT** | **INMATE CARE & TREATMENT** | **HEALTH PROMOTION** |
| • Pharmaceutical Operations<br>• Medical Services<br>• Clinic Space, Equipment and Supplies<br>• Diagnostic Services<br>• Hospital and Specialty Care | • Information on Health Services<br>• Admissions/Receiving Screenings<br>• Transfer Screening<br>• Initial Health Assessment<br>• Mental Health Screening and Evaluation<br>• Oral/Dental Care<br>• Nonemergency Healthcare Requests and Services<br>• Emergency Services<br>• Segregated Inmates<br>• Patient Escort<br>• Nursing Assessment Protocols<br>• Continuity of Care During Incarceration<br>• Discharge Planning | • Healthy Lifestyle Promotion<br>• Medical Diets<br>• Use of Tobacco |
| **SPECIAL NEEDS AND SERVICES** | **HEALTH RECORDS** | **MEDICAL LEGAL ISSUES** |
| • Chronic Disease Services<br>• Patients with Special Health Needs<br>• Infirmary Care<br>• Mental Health Services<br>• Suicide Prevention Program<br>• Intoxication and Withdrawal<br>• Care of Pregnant Inmates<br>• Pregnancy Counseling<br>• Inmates with Substance Abuse Problems<br>• Aids to Impairment<br>• Care for the Terminally Ill | • Health Record Formats and Contents<br>• Confidentiality of Health Information/HIPAA<br>• Access to Custody Information<br>• Management of Health Records<br>• Electronic Medical Records System | • Restraint and Seclusion<br>• Emergency Psychotropic Medication<br>• Forensic Evaluation<br>• End-of-life Decision Making<br>• Informed Consent and Right to Refuse Care<br>• Medical and Other Research |

> 5. *Records documenting the assessment and results shall become part of each inmate's medical record.*

FINDING(S): A review of several inmate health care charts found no 14-day assessments, very few intake health screens, and a plethora of various, disorganized health-care-related documents. The current health records system is inadequate to support an adequate health care delivery system.

*RECOMMENDATION(S):*

- *Ensure that all health-care-related records required for assessment and treatment of medical and/or mental health problems are filed in the inmate medical record/chart.*

- *Reorganize health care charts to provide a clear understanding about inmate health care needs, treatment regimens and outcomes, diagnostic assessment and testing, and medication information.*

> 6. *A readmitted inmate or an inmate transferred from another facility who has received a documented full health assessment within the previous three months, and whose receiving screening shows no change in the inmate's health status need not receive a new full physical health assessment. For such inmates, Qualified Medical Staff shall review prior records and update tests and examinations as needed.*

FINDING(S): As previously stated, a full health assessment is typically not completed on new or transferred inmates.

*RECOMMENDATION(S):*

- *A comprehensive health and physical examination must be completed on all inmates transferred from other facilities except as stated above.*

- *Full health care records must be obtained by SCCF within 72 hours of the inmate's admission to verify health needs and to determine what level of assessment will be required.*

- *A release of medical information for these purposes can be completed and signed by the inmate during the intake screening process.*

> 7. *Qualified Medical Staff should attempt to elicit the amount, frequency and time of the last dosage of medication from every inmate reporting that he or she is currently or recently on medication, including psychotropic medication. A medication continuity system so that incoming inmates' medication for serious medical needs can be obtained in a timely manner, as medically appropriate when medically indicated.*

FINDING(S): Newly booked inmates self-report current medications during the intake screening process performed by a custody officer. However, it is unreasonable to expect that this information is always reliable because: 1) a uniformed officer is asking for the information, and 2) the information is expected to be given openly with no privacy. This is why only qualified medical staff should perform all intake health screens in a private setting. Interviews with custody and medical staff, and a review of charts support this finding.

*RECOMMENDATION(S):*

- *Only qualified medical staff should complete the intake health screening process. This will help to ensure that medications for serious medical needs are continued during incarceration.*

- *SCCF should ensure that substituted medications, especially for mentally ill inmates, possess equivalent efficacy and are indicated for the diagnosed illness and/or are indicated for reported or presenting symptomology.*

- *SCCF should develop a standard formulary for jail medical care that is both cost effective and provides for the necessary treatment. Such a formulary should include exceptions for professional discretion to ensure that cost never outweigh appropriate care.*

- *Within 24 hours of an inmate's arrival at SCCF, or sooner if medically necessary, Qualified Medical Staff decide whether to continue the same or comparable medication for serious medical needs.*

- *If the inmate's reported medication is discontinued or changed, a Qualified Medical Professional shall evaluate the inmate face-to-face as soon as medically appropriate and document the reason for the change.*

> 8. *Incoming inmates who present with current risk of suicide or other acute mental health needs will be immediately referred for a mental health evaluation by a Qualified Mental Health Professional.*

FINDING(S): All incoming inmates are screened for suicide risk using a standard suicide assessment screening tool as previously discussed. Inmates who are screened for possible suicide risk are either transferred to the hospital for acute cases or placed in a safety cell under suicide precautions and regular monitoring. In some cases, and when available, the community mental health agency counselors respond to the jail to assess inmate status.

*RECOMMENDATION(S):*

- *Continue to use the current electronic and paper screening tools for assessing risk of suicide. Review other assessment instruments periodically to ensure the screening process remains contemporary and accurate.*

- *Continue the practice of transferring inmates presenting acute symptoms of active suicidal ideation and behavior to a local hospital. Ensure that all required discharge and aftercare documents accompany the inmate when returned to the jail.*

- *Establish a quality assurance process that ensures completeness and accuracy of safety cell monitoring records.*

- *Revise the monitoring record so that it shows the actual date, time, status of the inmate, and staff conducting safety check.*

- *Require an RN to assess each inmate placed on suicide precautions at least once per shift.*

- *Ensure an adequate number of qualified mental health professionals and staff to be onsite and on call who can respond as needed in a timely manner.*

- *Other recommendations will be provided in the Suicide Prevention section of this report.*

> 9. *Qualified staff constantly observes such inmates until they are seen by a Qualified Mental Health Professional. Incoming inmates reporting these conditions will be housed in safe conditions unless and until a Mental Health Professional clears them for housing in a medical unit, segregation, or with the general population.*

FINDING(S): SCCF is unable to constantly observe inmates placed on suicide precautions due to insufficient health care and custody staffing levels. The lack of timely access to qualified mental health professionals exacerbates this situation. Current SCCF practice allows for monitoring by cameras but monitoring is also intermittent due to current staffing shortages.

*RECOMMENDATION(S):*

- *Same as above*

- *ASAP hire additional custody staff and/or health care staff to ensure constant monitoring of these inmates.*

- *Current practice approves the use of camera monitoring to supplement direct observation. The policy should be revised to specifically prohibit using camera monitoring as a primary means for monitoring inmates placed on suicide prevention precautions.*

> **10. All inmates at risk for, or demonstrating signs and symptoms of drug and alcohol withdrawal are timely identified and provided appropriate treatment, housing, and medical supervision.**

FINDING(S): There were several inmates being treated for active and suspected drug and/or alcohol withdrawal at the time of this assessment. However, because qualified medical staff do not conduct intake health screens at booking, there is a high risk that some inmates who require withdrawal care could be left untreated for hours or days. Additionally, due to a lack of adequate housing for these inmates, several inmates in active withdrawal were housed in the booking area. This is an inappropriate practice and should cease due to high mortality risks associated with alcohol and opioid withdrawal complications.

*RECOMMENDATION(S):*

- *Ensure early detection of inmates who are or suspected of alcohol or drug withdrawal.*

- *Develop and implement evidence-based withdrawal intervention and treatment policies, procedures, and protocols.*

- *Do not use the booking for inmate housing for any reason and ensure that all inmates suspected of, or being treated for, drug or alcohol withdrawal are housed in medically appropriate housing areas.*

> **11. Incorporate the intake health screening information into the inmate's medical record in a timely manner.**

FINDING(S): As previously noted, health screens and other necessary medical documents are not maintained in the inmate's official medical record. An inspection of the medical records room showed that files and records are stacked on cabinets and tables in various stages before being filed. Many charts required review and signature of the physician. Other charts were in a "pulled" or "put-back" status. Although seemingly organized according to a specific process logic, it was clear that inmate health records upkeep was a "get to it when you can" activity, due largely to a lack of staffing and the absence of an electronic health records system (EMR/EHR).

*RECOMMENDATION(S):*

- *Hire or contract health records staff as soon as possible to organize, file, and maintain inmate health records consistently.*

- *Implement jail electronic medical/health records system that is compatible with the current jail information management system.*

- *Establish a quality assurance process that includes random sampling of a specified number of inmate medical records for accuracy and completeness.*

## B. Medical Chronic Care

> *12. A written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring, and continuity of care.*

FINDING(S): The lack of an organized medical records system and the limited time allowed for this assessment made it impossible to determine the adequacy of chronic disease management. A review of several medical charts involving chronic disease cases found limited information and few formal treatment plans. Treatment appeared to be "medication-driven." Additionally, the lack of an electronic records system made it impossible to estimate reliably the prevalence of chronic disease among the SCCF inmate population.

*RECOMMENDATION(S):*

- *Increase qualified medical staffing level to support the development and management of a formal chronic disease control program. This work should be assigned to a dedicated RN.*

- *Develop and implement a written chronic care disease management plan, which provides inmates with chronic diseases with timely and appropriate diagnosis, treatment, medication, monitoring, and continuity of care.*

- *Adopt and implement appropriate written clinical practice guidelines for chronic diseases consistent with nationally accepted guidelines.*

- *Maintain an updated and accurate log to track all inmates with chronic illnesses to ensure that these inmates receive necessary diagnosis, monitoring, and treatment.*

- *Maintain records of all care provided to inmates diagnosed with chronic illnesses in the inmates' individual medical records.*

- *Ensure that inmates with chronic conditions are timely seen by a qualified medical provider according to levels of disease control to evaluate health status and the effectiveness of the medication administered for their chronic conditions.*

- *Ensure inmates with disabilities or who need skilled nursing services or assistance with activities of daily living shall receive medically appropriate care.*

- *Ensure that the jail medical budget is adequately funded for lab tests and other assessments required for monitoring chronic disease control levels.*

## C.  Communicable Disease

> *13. Adequate testing, monitoring, and treatment programs exist for the management of communicable diseases, including tuberculosis ("TB"), skin infections, and sexually transmitted infections ("STIs").*

FINDING(S): Generally the same as chronic disease management findings.

All admitting inmates are questioned about history and treatment of TB, as well as other infectious disease or current open wounds. PPD plants and/or chest x-rays are performed on all admissions reporting a history or treatment of TB or who otherwise report positive indicators. These inmates are isolated from other inmates until conclusive test results determine that no risk exists or the inmate is transferred to the hospital for further assessment and treatment. Data were not available at the time of this assessment to determine timeliness of testing and results from the time of admission or the time condition was suspected. SCCF medical officials also stated that there is virtually no testing for MRSA or STDs but that presumed and observed infections are treated with prophylactic medications and monitored.

*RECOMMENDATION(S):*

- *SCCF should develop and implement a formalized communicable disease prevention and control plan that is consistent with CDC guidelines for either Minimal or Non-Minimal Risk Jails. Officials should consult with local health department officials to determine the population's risk level and develop the plan in collaboration with local public health officials.*

- *One FTE RN should be assigned to manage the infectious disease prevention program.*

- *Revise and/or develop and implement infection control policies and procedures that address contact, blood borne and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs. Such policies should provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates.*

- *Maintain statistical information regarding communicable disease screening programs and other relevant statistical data necessary to adequately identify, treat, and control infectious diseases.*

> *14. Infection control policies and procedures that address contact, blood-borne and airborne hazards, to prevent the spread of infections or communicable diseases, including TB, skin infections, and STIs. Such policies should provide guidelines for identification, treatment and containment to prevent transmission of infectious diseases to staff or inmates.*

FINDING(S): Generally the same as chronic and infectious disease findings.

***RECOMMENDATION(S): Same recommendation as above and those related to section on policy and procedure.***

> *15. Current CDC guidelines are followed for management of inmates with TB infection, including providing prophylactic medication when medically appropriate. If directed by a physician, inmates who exhibit signs or symptoms consistent with TB shall be isolated from other inmates, evaluated for contagious TB, and hospitalized or housed in an appropriate, respiratory isolation ("negative pressure") room on-site or off-site. SCCF provides for infection control and for the safe housing and transportation of such inmates.*

FINDING(S): Same as above.

***RECOMMENDATION(S): SCCF should be considered a "Non-Minimal Risk Facility" as defined by the CDC until otherwise verified by the local or state public health agency.***

## D. General Access to Care

> *16. Inmates have timely and adequate access to appropriate health care.*

FINDING(S): Access to care begins at the point of admission at SCCF and throughout incarceration. There is no doubt that SCCF staff is doing their best to identify, treat, and monitor inmate health needs. However, high numbers of inmates with serious medical and mental health problems, inadequate health care staffing levels, and unqualified intake health screens, absence of clear and formal policies and procedures, and lack of a functional records system make timely and consistent access to appropriate health care virtually impossible. This is addressed in more detail in the next section.

***RECOMMENDATION(S):***

- ***Refer to previous recommendations regarding:***
  - *Intake screening*

- *Staffing levels*
- *Records*
- *Housing of medically and/or mentally ill inmates*
- *Policies and procedures*
- *Facility sanitation*
- *Chronic and infectious disease management*

> **17. A medical request ("sick call") process for inmates should be adequate and provides inmates with adequate access to medical care. The sick call process shall include:**

(1)     written medical and mental health care slips available in English, Spanish, and other languages, as needed;

(2)     a confidential collection method in which the request slips are collected by Qualified Medical Staff seven days per week;

(3)     opportunity for illiterate inmates and inmates who have physical or cognitive disabilities to access medical and mental health care; and

(4)     opportunity for all inmates, irrespective of primary language, to access medical and mental health care.

FINDING(S): In general, SCCF inmates have reasonable access to a sick call process. Sick call forms (kites) are available to inmates upon request and there was no evidence found that indicated otherwise. However, examination of 84 recently submitted kites found several problems with the sick call process.

SCCF's standard practice is to collect these kites during medication pass, which is done by registered nurses, primarily. If time permits, the nurse will attempt to address the inmate's medical request during the medication pass. However, this is seldom the case due to the high volume of requests and nurse staffing levels according to nurses interviewed. In most cases, the kites are returned to the medical office, date stamped, and placed into a wall pocket for triaging within 24hrs if possible. However, an examination of 84 kites found most reporting medical and mental health symptoms with some of those showing a collection date well beyond 24 hours. Several kites were actually multiple requests with different dates from the same inmates. Some were not date stamped at all.

Despite the fact that registered nurses devote an enormous amount of time and energy this process, it is barely functional simply due to a lack of clear policies and procedures, and inadequate staffing levels.

*RECOMMENDATION(S):*

- *Written sick call requests from inmates should be collected daily and only by health care staff.*

- *Ensure that sick call slips are triaged within 24 hours of being received and prioritized according to acuity and need. Sick call slips involving current medical or mental health symptoms should trigger a same day face-to-face assessment by an RN. A written response to the inmate submitting a sick slip should be provided within 72 hours of receipt of the sick slip.*

- *A logging procedure should include documentation of the date and summary of each request for care, the date the inmate was seen, the name of the person who saw him or her, the disposition of the medical or mental health visit (e.g., referral; whether inmate scheduled for acute care visit), and if follow-up care is necessary, the date and time of the inmate's next appointment.*

- *Log information should be reviewed periodically for accuracy and completeness.*

- *Ensure that sick call assessment and treatment occurs in a reasonably private clinical setting.*

- *Continue scheduling inmates for physician clinic as indicated.*

- *Maximize RN scope of practice by hiring an adequate number of LPNs or Qualified Medication Assistants to perform the medical pass. This will free-up RNs for higher levels of assessment and care currently not being accomplished.*

> *18. There are an adequate number of correctional officers to escort inmates to and from medical units to ensure that inmates requiring treatment have timely access to appropriate medical care.*

FINDING(S): SCCF custody and medical staff reported that custody staffing levels has not interfered with inmate movement.

*RECOMMENDATION(S): Review clinic appointment schedules to verify this finding.*

> *19. SCCF ensures that Qualified Medical Staff make daily rounds in the isolation areas to giving inmates opportunities discuss medical and mental health concerns with Qualified Medical Staff in a setting that affords as much privacy as reasonable security precautions will allow. During rounds, Qualified Medical Staff will assess inmates for new clinical findings, such as deterioration of the inmate's condition.*

FINDING(S): Health care staff stated that they are inadequately staffed to make daily rounds in all isolation and/or segregation areas and rely heavily on custody staff to provide, monitor and report inmate needs. Custody staff interviewed stated that they feel unqualified to provide this level of monitoring by *"do the best [they] can…"*

SCCF maintains at least eight (8) special housing units where daily rounds should be conducted by qualified health care staff. Although all units are staffed with at least of custody officer under direct supervision model, this should not be considered an adequate substitute for daily monitoring by qualified health care staff, especially when those units are at maximum capacity as they were during the time of this visit.

On September 23, 2013, these "special needs" units were at 99% combined average capacity; half of the units were at or exceeded their maximum capacity as shown in the figure below:

| Location | Unit Designation | Capacity | 9/23/2013 | % Capacity |
|---|---|---|---|---|
| 4-NC | Segregation | 2 | 1 | 50% |
| 4-SA | Segregation | 2 | 1 | 50% |
| 5-N | Male Psychiatric Housing | 17 | 17 | 100% |
| 5-S | Male Special Custody | 37 | 28 | 76% |
| D-MHU | Medical Housing | 24 | 35 | 146% |
| D-MHO | Mental Health Observation | 10 | 10 | 100% |
| E-1 | Female Special / Max | 32 | 29 | 91% |
| E-4 | Male Psych | 40 | 42 | 105% |
| **TOTAL** | | **164** | **163** | **99%** |

*RECOMMENDATION(S):*

- *Increase staffing as previously recommended.*

- *Ensure qualified health care staff makes rounds a minimum of once per day to assess and document the health status of each inmate according to health care needs. Documentation should become a permanent entry in the inmate's medical chart.*

- *Develop methods to correct sight and sound privacy limitations in the infirmary and booking segregation cells.*

- *Alleviate crowding in special needs/isolation/segregation units.*

## E. Medical Follow-up Care

> **20. Adequate care and maintenance of completed records must be provided for inmates who return to SCCF following hospitalization or off-site medical services.**

FINDING(S): Health care officials stated that every attempt is made to obtain discharge records when an inmate returns from either a hospital or outside medical appointment but that the process is not consistent. Medical staff are often required to contact the outside provider for additional information. An examination of medical records for inmate recently discharged from a hospital to SCCF found that most possessed adequate discharge documentation.

*RECOMMENDATION(S):*

- *Meet with local hospital officials to develop a more consistent process of returning inmates to the jail with all necessary discharge records.*

- *Maintain a tracking log for each time these records are either not provided or are not completed. Meet with hospital officials as needed to improve compliance.*

- *Consider adopting a policy that prohibits reacceptance of an inmate until such records are provided.*

- *Ensure that inmates who receive specialty or hospital care are evaluated upon their return to SCCF and that, at a minimum, discharge instructions are obtained, appropriate Qualified Medical Staff reviews the information and documentation available from the visit. This review and the outside provider documentation are recorded in the inmate's medical record, and appropriate follow-up is provided.*

## F. Emergency Medical Care

> **21. Qualified Medical and Mental Health Staff are trained to recognize and respond appropriately to medical and mental health emergencies. All inmates with emergency medical or mental health needs receive timely and appropriate care, including prompt referrals and transports for outside care when medically necessary.**

FINDING(S): Time did not permit a comprehensive review of health care staff credentialing files.

*RECOMMENDATION(S):*

- *Increase medical, mental health, and custody staffing levels as previous recommended.*

- *Ensure that emergency first aid supplies are located at each satellite area, the infirmary, and other locations to ensure timely assessment and care. Emergency supply kits should be audited regularly to ensure they are properly stocked with necessary supplies in sufficient quantities.*

- *Ensure that all CPR/AED/First Responder certification of all staff are kept current.*

- *Ensure AED devices are located at each satellite area, in the infirmary, and other needed locations, and that the devices are tested regularly for functionality.*

> *22. Jail officers and other staffing having contract with inmates should be to recognize and respond appropriately to medical and mental health emergencies.*

FINDING(S): SCCF officials report staff are training prior to and during employment in recognizing and responding to medical and mental health emergencies. Time did not permit a review of training files.

*RECOMMENDATION(S):*

- *Continue current practice.*

- *Consider purchasing a subscription to an online training site, such as Essential Learning, to supplement current training program for all staff.*

> *23. All jail officers are provided with the necessary protective gear, including masks and gloves, to provide first line emergency response.*

FINDING(S): Protective gear as indicated was found accessible to all first responder staff.

*RECOMMENDATION(S): Continue current practice.*

**G. Medical Record Keeping**

> 24. *Medical and mental health records are adequate to assist in providing and managing the medical and mental health needs of inmate.*

FINDING(S): Refer to previous findings related to health care records issues and problems.

*RECOMMENDATION(S):*

- *Increase medical staff as previously recommended to ensure better maintenance of medical records.*

- *Invest in a jail electronic medical records system (EMR). Ensure that the system includes a medical records function and interfaces with the jail information management system.*

- *Develop a health record tracking system that documents who uses a health file, why, when, and for what reason. Any records added or removed from a health chart should be documented on the tracking log. Medical records should be periodically audited against the tracking log.*

**I.  Medication Administration**

> 25. *Inmates receive necessary medications in a timely manner.*

FINDING(S): Examination of inmate health records, medication administration records, kites, and interviews with nurses indicated that medications are administered as ordered with few exceptions. However, it was reported by one medical official that delays in obtaining medications from the contract pharmacy continues to cause problems in timely administration of ordered medications.

*RECOMMENDATION(S):*

- *Develop a tracking system to monitor compliance with medication orders by prescribers.*

- *Develop a tracking log to measure timeliness of medications received by the contract pharmacy, meet with contracting provider to correct deficiencies.*

- *Utilize LPNs instead of RNs for medication passes as previously recommended.*

> **26. Provide a systematic physician review of the use of medication to ensure that each inmate's prescribed regimen continues to be appropriate and effective for his or her condition.**

FINDING(S): No systematic review was found or reported to exist during this assessment.

**RECOMMENDATION(S):**

- **Develop and implement policies and procedures for a systematic review as described.**

> **27. Medicine administration is hygienic, appropriate for the needs of inmates, and is recorded concurrently with distribution.**

FINDING(S): All medications appeared to be in proper containers, in a secured and clean location.

**RECOMMENDATION(S): Continue current practice.**

> **28. Administration is performed by Qualified Nursing Staff who shall administer prescription medications on a directly-observed basis for each dose, (unless the physician's order notes that the inmate can self-administer the medication), shall not discontinue medications without a physician's order, and shall accurately document medication orders as being ordered via telephone. Qualified Nursing Staff shall practice within the scope of their licensures.**

FINDING(S): Med passes are performed primarily by Registered nurses who report direct observation of administration and only a licensed prescriber discontinues medications. Phone orders are documented in the inmate record as indicated and all nursing staff only practice within their scope of licensure.

**RECOMMENDATION(S):**

- **Implement an electronic medical records system that includes an electronic medication administration record interface.**

> **29. Maintain a formal mechanism, such as a Pharmacy and Therapeutics Committee, to assist in creating guidelines for the prescription of certain types of medications.**

FINDING(S): There is currently no formal P&T or CQI program.

*RECOMMENDATION(S):*

- *Implement formal P&T and CQI programs.*

> *30. SCCF ensures that Qualified Medical Staff counsel all patients who refuse medication.*

FINDING(S): Chart examination found no records indicating that qualified medical staff counsel inmates who refuse medications. However, nurse interviews found that nurses commonly counsel these inmates but do not always record that counseling.

*RECOMMENDATION(S):*

- *Ensure to counsel all inmates who refuse prescribed medication and document counseling in the medical record.*

- *Ensure inmates sign all refusal forms. Forms should include statement about possible health care problems resulting in refusal of medication. Refusal encounter should be charted.*

- *Seek assistance from qualified mental health staff where refusal involves psychotropic medications.*

> *31. Medication is secured, allowing no food to be stored in the medication refrigerator.*

FINDING(S): The medication rooms were secured but medications seem to be somewhat disorganized. No food or food containers were observed in or near medication rooms.

*RECOMMENDATION(S): continue current practice.*

> *32. Hand washing stations in medical areas are fully equipped, operational and accessible.*

FINDING(S): Hand washing stations were found in intake, medical, the kitchen. All were equipped and properly supplied; all were operational.

*RECOMMENDATION(S): Continue current practice.*

> **33. Appropriate containers are readily available to secure and dispose of medical waste (including syringes and sharp medical tools) and hazardous waste.**

FINDING(S): Medical waste and sharps containers were observed in the medical area. It appeared that waste was disposed of regularly; no overfilled containers were observed.

***RECOMMENDATION(S): Continue current practice.***

## K. Specialty Care

> **35. Inmates whose serious medical or mental health needs extend beyond the services available at SCCF shall receive timely referral for specialty care to appropriate medical or mental health care professionals qualified to meet their needs.**

FINDING(S): No policies and procedures exist for providing specialty care described in this element. Special care is provided by local providers, hospital, and community mental health. Charts reviewed showed encounters and documents indicating that inmates receive specialty care as medically determined.

***RECOMMENDATION(S):***

- ***Continue current practice.***

- ***Review and update current list of providers annually.***

> **36. Inmates who have been referred for outside specialty care by the medical staff or another specialty care provider are scheduled for timely outside care appointments and transported to their appointments.**

FINDING(S): Element not assessed.

***RECOMMENDATION(S):***

- ***SCCF should review this element and determine compliance.***

- ***Develop appropriate policy and procedure for this element.***

> **37. Inmates waiting on outside care shall be seen by Qualified Medical Staff as medically necessary, at intervals of no more than 30 days, to evaluate the current urgency of the problem and respond as medically appropriate.**

FINDING(S): Element not assessed.

*RECOMMENDATION(S):*

- **SCCF should review this element and determine compliance.**

- **Develop appropriate policy and procedure for this element.**

> **38. Pregnant inmates are provided adequate pre-natal care.**

FINDING(S): Element not assessed.

*RECOMMENDATION(S):*

- **SCCF should review this element and determine compliance.**

- **Develop appropriate policy and procedure for this element.**

# X.    MENTAL HEALTH CARE ASSESSMENT, FINDINGS & RECOMMENDATIONS

## Current National Perspective:

Growing numbers of mentally ill offenders have strained jails' fiscal and operational capacities, many to the point of costly federal intervention and judicial oversight involving the United States Department of Justice Civil Rights Division.[26] Thousands of people with mental illness are falling through the cracks of this country's social safety net and are landing in the criminal justice system at an alarming rate.  Each year, more than ten million people are booked into U.S. jails. Studies indicate that rates of mental illness among these individuals are at least three to four times higher than the rates of serious mental illness in the general population. [27]

The origins of the problem are complex and largely beyond the scope of this report.  During the last 35 years, the mental health system has undergone tremendous change.  Once based exclusively on institutional care and isolation, the system has shifted its emphasis almost entirely to the provision of community-based support for individuals with mental illness.  This public policy shift has benefited millions of people, effecting the successful integration of many people with active or past diagnoses of mental illness into the community.  Many clients of the mental health system, however, have difficulty obtaining access to mental health services.  Overlooked, turned away, or intimidated by the mental health system, many individuals with mental illness end up disconnected from community supports.  The absence of affordable housing and the crisis in public housing exacerbates the problem.  Most studies estimate that at least 20 to 25 percent of single adult homeless population has a serious mental illness.

Most troubling about the criminal justice system's response in many communities to people with mental illness is the toll it exacts on people's lives.  Law enforcement officers' encounters with people with mental illness can sometimes end in violence, including the use of lethal force.  Although rare, police shootings do more than end the life of one individual.  Such incidents also have a profound impact on the consumer's family, the police officer, and the general community.  When incarcerated, people with untreated mental illness are especially vulnerable to assault or other forms of intimidation by predatory inmates. In prisons and jails, which tend to be environments that exacerbate the symptoms of mental illness, inmates with mental illness are especially at risk of harming themselves or others.  Once they return to the community, people with mental illness learn that providers already overwhelmed with clientele are sometimes reluctant to treat someone with a criminal record.

---

[26] The United States Attorney is authorized by federal law to investigate and litigate v blations of Constitutional Civ ilRights under the Civ ilRights for Institutionalized Persons Act (CRIPA). There are currently more than 30 correctional facilities under federal order to comply with Constitutional requirements for the care and protection of inmates. Most of these cases involv ed medical and mental health v blations. *See: http://www.justice.gov/crt/about/spl/findsettle.php*
[27] *See*: http://consensusproject.org/the_report/executiv e summary

Given the dimensions and complexity of this issue, the demands upon the criminal justice system to respond to this problem are overwhelming. Police departments dedicate thousands of hours each year transporting people with mental illness to hospitals and community mental health centers where staff often have to turn away the individual or quickly return him or her to the streets. Jails and prisons are swollen with people suffering some form of mental illness. On any given day, the Los Angeles County Jail system and detention centers hold more people with mental illness than any state hospital or mental health institution in the United States.

Not surprisingly, the Snohomish County criminal justice system has encountered people with mental illness with increasing frequency. Calls for crackdowns on quality-of-life crimes and offenses such as the possession of illegal substances have netted many people with mental illness, especially those with co-occurring substance abuse disorders. Ill-equipped to provide the comprehensive array of services that these individuals need, corrections administrators often watch the health of people with mental illness deteriorate further, prompting behavior and disciplinary infractions that only prolong their involvement in the criminal justice system.

According to a study published in 2006, by the United States Bureau of Justice Statistics, at midyear 2005, more than half of all prison and jail inmates had a mental health problem, including 705,600 inmates in State prisons, 78,800 in Federal prisons, and 479,900 in local jails. These estimates represented 56% of State prisoners, 45% of Federal prisoners, and 64% of jail inmates. In addition, this research states that "people with mental illnesses are overrepresented in probation and parole populations at estimated rates ranging from two to four times the general population". These findings serve as a *clarion wake-up call* to local officials for taking immediate action, and to provide guidance for developing cogent response plans, not only to avoid expensive federal intervention, but also to rally community leaders and partners to address psychosocial and criminogenic characteristics among this inmate population. [28] Overall, jail inmates reportedly have higher mental health problems than those inmates in state or federal prisons (64.2%, 56.2%, and 44.8% respectively). This makes perfect sense when considering the fact that all state and federal inmates typically begin incarceration in a local jail. Simply stated, not all jail inmates go to prison but all state prison inmates are initially booked into a local jail.

## A. Psychosocial and Criminogenic Characteristics of Mentally Ill Inmates

Local government, criminal justice, and community leaders are best served by interpreting the needs of their mentally ill inmates as a reflection of the needs in the overall community. Mentally ill inmates are no less citizens or constituency than are the mentally well. Yet, the debilitating stigma of being labeled "mentally ill" worsens when the label "offender" or "inmate" is added.

---

[28] *See*: http://www.bjs.gov/content/pub/pdf/mhppji.pdf

Staggering moral and financial issues, added to the high liability risks surrounding the incarceration of this community population drives a salient and unending obligation for community leaders to focus special attention and dedicate resources toward adequate care and management. A good first step for this attention can be to focus resources on establishing a data-driven and compassionate understanding of factors that place the mentally ill at risk of criminal justice involvement and incarceration. Understanding the relevant psychosocial and criminogenic risk factors specific to Snohomish County's mentally ill population is a formative basis for good response planning.

Compared to non-mentally ill jail inmates, mentally ill inmates are more likely to have a current or past violent offense and three or more prior incarcerations. They are much more likely to have substance dependence or abuse issues and are more likely to report drug use a month before their arrest. Mentally ill inmates are almost twice as likely to be homeless and three times more likely to have a history of being victims of physical or sexual abuse. They are more likely to have parents who abused drugs or alcohol. Regarding jail behavior, mentally ill inmates are twice as likely to violate jail rules, engage in physical or verbal assaults at a rate of four times more often, are three times more likely to be injured in a fight during incarceration than non-mentally ill inmates are.



Snohomish County leaders should drill even deeper into these factors in order to target jail-based and community interventions so that resources are focused strategically. Homeless, employment, and family background information can provide a better understanding for this process.

As stated above, mentally ill jail inmates were found to be homeless at almost twice the rate of the non-mentally ill and less likely to be employed in the month of their arrest. They are four

times more likely to be victims of physical abuse and three times more likely to be victims of sexual abuse. While growing up, they are more likely to receive public assistance and twice as likely to live in foster care, an agency, or institution. Regarding family background, mentally ill inmates lived with both parents slightly less often than their counterparts but were more likely to live with one parent or someone else. Twice as many mentally ill inmates have parents who abused substances and less likely to have parents who do not. They are significantly more likely to have parents, siblings, and children who have been incarcerated.



Homelessness, Employment, and Family Background Characteristics

Snohomish County continues to look very closely at the clinical mental health and substance abuse and dependence characteristics of its mentally ill offender population to determine its

capacity for treatment and programming before, during, and after incarceration. The BJS study provides further insight into these issues.

Gender, race, and age are also important factors for targeting custody and community intervention services and program capacity to inmates with mental illness. This means that interventions must use evidence-based programming specific to the salient demographic characteristics. Programs should be qualified, culturally competent, gender sensitive, and age specific. Regarding these characteristics, the BJS study found several program development indicators.

> **39. Constitutional Right #1: There must be a systematic program for screening and evaluating inmates in order to identify those needing mental health services.**

FINDING(S): SCCF performs all initial intake and classification functions using adequate electronic and paper screening forms. The jail information management system appears to collect sufficient salient health care information for detecting mental health needs during the booking process. Additionally, all jails in the State of Washington are required to include a Transfer Medical Summary document for all inmates. This form includes mental health information about the inmate being transferred. Arrestees showing severely acute mental health problems at intake are transferred to the local hospital for assessment and treatment before being returned to the jail or local mental health crisis services respond to the jail when available.

Following intake, inmates with, or suspected of having, mental illness are referred to SCCF mental health staff for further assessment and follow-up. However, comprehensive evaluations are not always possible due to inadequate mental health staffing levels. The figure below was provided by the SCCF Coordinator to show **MHP Face-to-Face Contacts (Assessments and Evaluations with Inmates, 2001-2012).**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ I/Ms Seen | 1,920 | 2,160 | 1,860 | 2,532 | 2,700 | 2,795 | 2,672 | 2,570 | 1,647 | 2,623 | 2,613 | 2,790 |
| □ # of MHPs | 3 | 3 | 3...2 | 3 | 4...6 | 6...4 | 4...6 | 6...3 | 3...2 | 3 | 3 | 3...4 |

*RECOMMENDATION(S):*

- *Increase mental health staffing levels as indicated by needs of the population.*

- *Ensure qualified medical and/or mental health professionals conduct intake health screens for mental health needs.*

- *Develop and implement a formal program for ongoing screening and evaluation for and of inmates with mental illness that is linked to the intake screening process as soon as possible.*

- *Ensure that all care is directly linked to screenings and evaluations and documented accordingly in the medical record.*

- *Ensure that inmates presenting mental health symptoms or report a history of mental illness and/or attempted suicide receive a comprehensive mental health evaluation by a licensed qualified mental health profession within 72 hours as indicated by acuity and risk.*

- *SCCF reclassification policy should specifically address mental health conditions for making initial and permanent housing assignment changes; and the release policy should include a process for connecting or reconnecting inmates with mental illness to mental health service providers after release.*

- *Develop and implement a quality assurance program that routinely reviews intake screening assessment and evaluations for completeness and accuracy.*

> *40. Constitutional Requirement #2: There must be a mental health treatment program that involves more than segregation and close supervision.*

FINDING(S): As previously stated, SCCF's very limited level of mental health services prevents full development and maintenance of adequate mental health treatment programming. In general, mental health treatment is limited to medications, segregation, close supervision, and monitoring by licensed mental health professionals. There are no standard formal treatment plans and only sparse formal discharge plans as shown in the figure provided by SCCG mental health staff.



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ Release Plans | 108 | 96 | 72 | 198 | 234 | 295 | 446 | 323 | 176 | 204 | 187 | 261 |
| □ # of MHPs | 3 | 3 | 3...2 | 3 | 4...6 | 6...4 | 4...6 | 6...3 | 3...2 | 3 | 3 | 3...4 |

However, as stated, treatment for mental illness is very limited beyond medications, and treatment planning is inadequate for the number of inmates who have or who likely have a diagnosable mental illness. This should be reviewed. There is virtually no regular individual or group mental health treatment provided to the inmates. However, SCCF has as excellent team of qualified mental health professionals who have developed an active network of community mental health and criminal justice agencies, and family supports as shown in the figure provided below.

**SCCF Mental Health Agency Networking by MHPs: 2001-2012**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ MH Agencies | 204 | 204 | 174 | 204 | 210 | 303 | 341 | 191 | 168 | 209 | 203 | 158 |
| ■ # of MHPs | 3 | 3 | 3... | 3 | 4... | 6... | 4... | 6... | 3... | 3 | 3 | 3... |

**SCCF DMHP Networking by MHPs and total ITAs: 2001-2012**



| | 20 01 | 20 02 | 20 03 | 20 04 | 20 05 | 20 06 | 20 07 | 20 08 | 20 09 | 20 10 | 20 11 | 20 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ Consult | N/ | N/ | N/ | N/ | 66 | 78 | 70 | 64 | 51 | 63 | 72 | 58 |
| □ ITA Request | 72 | 78 | 72 | 78 | 48 | 82 | 78 | 94 | 99 | 76 | 10 | 12 |
| ■ ITAs | 15 | 12 | 9 | 18 | 24 | 39 | 33 | 34 | 29 | 28 | 41 | 52 |
| ■ # of MHPs | 3 | 3 | 3… | 3 | 4… | 6… | 4… | 6… | 3… | 3 | 3 | 3… |

**Criminal Justice Agency Networking by SCCF MHPs: 2001-2012**



| | 20 01 | 20 02 | 20 03 | 20 04 | 20 05 | 20 06 | 20 07 | 20 08 | 20 09 | 20 10 | 20 11 | 20 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ Crim Justice | 312 | 324 | 252 | 264 | 204 | 296 | 311 | 345 | 279 | 313 | 286 | 300 |
| ■ # of MHPs | 3 | 3 | 3… | 3 | 4… | 6… | 4… | 6… | 3… | 3 | 3 | 3… |

**Inmate Family/Friends Networking by MHPs: 2001-2012**



| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▪ Fam/Frds | 348 | 318 | 246 | 204 | 282 | 300 | 299 | 319 | 203 | 331 | 310 | 355 |
| ▪ # of MHPs | 3 | 3 | 3... | 3 | 4... | 6... | 4... | 6... | 3... | 3 | 3 | 3... |

*RECOMMENDATION(S):*

- *Develop and implement an integrated behavioral health program that includes medical, mental health, custody staff, and community providers.*

- *Hire or contract licensed mental health staff as previously recommended to conduct mental health assessments, comprehensive evaluations, individualized treatment plans, individual and group counseling.*

- *Hire additional mental health staff as previously indicated to ensure access to, during, and from points of care in the jail and to increase monitoring and supervision of inmates with mental illness.*

- *Develop individualized mental health treatment plans that include DSM IV (or V) multi-axial diagnoses, primary problem statements, goals, objects, interventions, and progress. All treatment should be charted using a standard medical SOAP note or similar documentation that includes the following elements at minimum:*

  - ✓ Date and time of service
  - ✓ Clinician/provider initials
  - ✓ Subjective presentations
  - ✓ Objective presentations
  - ✓ Assessment of condition/presentation
  - ✓ Intervention applied to resolve healthcare issue
  - ✓ Plan to improve and maintain health care issue

- *Treatment should involve an array of crisis and ongoing treatment utilizing evidence-based practices for jail settings and populations. Services should be delivered in reasonable privacy or in private settings involving other cohort groups.*

- *Develop and implement an ongoing process to identify mentally ill inmates within the SCCF. Conduct additional evaluations as needed to establish a diagnosis by history or provisional diagnosis and primary symptoms. Complete individual treatment plans that identify treatment goals, objectives and interventions. Medication should be included as an intervention on the plan if included in the treatment modality. Treatment services provided should be related to and charted according to plan elements.*

- *Develop a "step down" plan for all inmates placed in segregation/isolation using behavioral incentives and documented progress in an effort to remove these inmates to more social housing environments as soon as possible.*

- *Do not use isolation or segregation for permanent or primary housing for this population except when indicated by the needs of the inmate and safety of other inmates.*

- *Develop and implement a release plan that includes medical and mental health after-care connections, appointments, and services. Ensure sufficient amount of medication to maintain mental health stability until the inmate can connect with outside healthcare providers.*

- *Strengthen community linkages by working with community providers to design a method to track admissions of their clients into and release from jail. SCCF should involve community organization such as Washington NAMI, Washington Mental Health America, etc. in the development of a comprehensive jail mental health services program that includes wrap-around provisions. Collaborate closely with local community mental health agencies and providers to maintain continuity of care services and ongoing program support.*

> **41. Constitutional Requirement #3: There must be trained Mental Health Professionals in sufficient numbers to provide the identification and treatment services in an individualized manner to treatable inmates suffering a serious mental disorder.**

FINDING(S): As previously stated, there are only three full-time licensed mental health professionals working at SCCF.

There is no doubt that Snohomish County officials desire to provide the best possible care to inmates suffering with mental illness. Everyone involved in this assessment seemed both hopeful and very concerned about this issue. Snohomish County has developed and maintained exceptional intergovernmental and community collaborations that can provide assistance in meeting this standard.

*RECOMMENDATION(S):*

- *Hire additional mental health professionals as previously recommended.*

- *Continue to maintain and grow community connections.*

> **42. Constitutional Requirement #4: There must be maintenance of accurate, complete and confidential records.**

FINDING(S): As previously stated, mental health records are minimal beyond the electronic and paper intake screening forms. Overall, the mental health aspects of inmate medical records included only very basic information and there appeared minimal mental health-related charting, if any. Mental health care information is essentially limited to the medical administration records, sick call requests and responses, and what is handwritten in the charts by the physician and other medical staff. These records, however, appear accurate and complete.

*RECOMMENDATION(S):*

- *See recommendations related to medical record keeping.*

> **43. Constitutional Requirement #5: Treatment by prescription and administration of behavior-altering medications in dangerous amounts and by dangerous methods or without appropriate supervision and periodic evaluation is an unacceptable method of treatment and must not be present.**

FINDING(S): A review of the current medication administration record indicates that SCCF is frugal and cautious in prescribing psychotropic medication. Quantities and dosing documented in the record appeared consistent with this standard. However, inadequate medical and mental health staffing levels would seem to make regular monitoring sporadic at best.

*RECOMMENDATION(S):*

- *Increase medical and mental health staffing levels as previously recommended to ensure consistent, ongoing, and qualified administration and monitoring of mental health medications.*

- *Develop and implement comprehensive mental health evaluations and treatment plans as previously recommended. Ensure that medications prescribed are consistent with evaluation findings and indicated for the assessed diagnoses.*

- *Consultation and mental health records should be obtained from current and recent mental health providers as part of the mental health evaluation, diagnosing, treatment planning, and prescribing practices. Medications for newly admitted inmates should not be discontinued or changed except when substituted medications have equivalent treatment efficacy or to otherwise meet the care needs of the mentally ill inmate. SCCF is*

*discouraged from establishing any policy or practice that places medication cost above necessary treatment.*

- *Ensure that only qualified medical providers prescribe mental health medications.*

- *Develop and implement quality assurance metrics to conduct period performance compliance studies and revise practices and protocols as indicated.*

- *Ensure that medication management is included in the inmate mental health treatment plan and that inmates taking these medications are educated on the purpose and side effects.*

> **44. Constitutional Requirement #6: There must be a suicide identification, treatment and supervision program. There must be a basic program for identification, treatment and supervision of inmates who evidence suicidal tendencies (and mental health problems).**

FINDING(S):

SCCF has an adequate suicide risk identification intake screening process involving electronic and paper assessment forms. Inmates who screen positive for risk of suicide at intake, or who present suicidal ideation during incarceration are immediately placed on suicide precautions in an isolation cell near the booking area. Suicide precaution status typically involves removal of possessions, and clothing is routinely replaced with a suicide prevention smock. Policy requires staggered 15-minute observations by staff that is recorded on a paper monitoring log. The bulk monitoring is performed by custody staff that is trained in suicide prevention.

*RECOMMENDATION(S): Refer to the suicide prevention section below.*

## XI.    SUICIDE PREVENTION ASSESSMENT, FINDINGS, & RECOMMENDATIONS

### A. <u>Current National Perspective:</u>

A recently published national study on jail suicide reports that *"Suicide continues to be a leading cause of death in jails across the county; the rate of suicide in county jails is estimated to be several times greater than that in the general population."*[29] This study goes on to describe many of the salient factors and influences associated with jail suicides. Although it appears that the base-rate for jail suicides is decreasing, certain factors found 20 years ago have changed. The significant findings in this study are in bold and italics below:

Suicide Victims:
- 67% were white.
- 93% were male.
- The average age was 35.
- 42% were single.
- 43% were held on a personal and/or violent charge.
- 47% had a history of substance abuse.
- 28% had a history of medical problems.
- ***38% had a history of mental illness.***
- 20% had a history of taking psychotropic medication.
- ***34% had a history of suicidal behavior.***

Characteristics of Suicides:
- ***Deaths were evenly distributed throughout the year; certain seasons and/or holidays did not account for more suicides.***
- 32% occurred between 3:00pm and 9:00pm.
- ***24% occurred within the first 24 hours, 27% between 2 and 14 days, and 20% between 1 and 4 months.***
- 20% of the victims were intoxicated at the time of death.
- ***93% of the victims used hanging as the method.***
- 66% of the victims used bedding as the instrument.
- 30% of the victims used a bed or bunk as the anchoring device.
- 31% of the victims were found dead more than 1 hour after the last observation.
- ***CPR was not administered in 37% of incidents.***
- 38% of the victims were held in isolation.
- 8% of the victims were on suicide watch at the time of death.

---

[29] Lindsay Hayes, "National Study of Jail Suicide 20 Years Later", DOJ/NIC AN 024308, April 2010.

- No-harm contracts were used in 13% of cases.
- ***35% of deaths occurred close to the date of a court hearing, with 69% occurring in less than 2 days.***
- ***22% occurred close to the date of a telephone call or visit, with 67% occurring in less than 1 day.***

### Characteristics of the Jail Facilities:
- 84% percent were administered by county, 13% by municipal, 2% by private, and less than 2% by state or regional agencies.
- 77% provided intake screening to identify suicide risk, but only 27% verified the victim's suicide risk during prior confinement, and only 31% verified whether the arresting officer believed the victim was a suicide risk.
- 62% provided suicide prevention training, but 63% either did not provide training or did not provide it on an annual basis.
- 93% provided a protocol for suicide watch, but less than 2% had the option for constant observation; most (87%) used 15-minute observation periods.
- 32% maintained safe housing for suicidal inmates.
- 35% maintained a mortality review process.
- ***85% maintained a written suicide prevention policy, but as shown above, suicide prevention programming was not comprehensive.***

Finally, the suicide rate in detention facilities during 2006 was calculated to be *38* deaths per 100,000 inmates, a rate approximately three times greater than that of the general population. This rate, however, represents a dramatic decrease in the rate of suicide in detention facilities during the past 20 years. The almost three-fold decrease from a previously reported ***107*** suicides in 1986 is extraordinary. Absent in-depth scientific inquiry, there may be several explanations for the reduced suicide rate. During the past several years, prior national studies of jail suicide have given a face to this longstanding and often ignored public health issue within our nation's jails. Findings from the studies have been widely distributed throughout the country and eventually incorporated into suicide prevention training curricula. The increased awareness to inmate suicide is also reflected in national correctional standards that now require comprehensive suicide prevention programming, better training of jail staff, and more in-depth inquiry of suicide risk factors during the intake process. Finally, jail suicide litigation has persuaded (or forced) jurisdictions and facility administrators to take corrective actions in reducing the opportunity for future deaths. Therefore, the antiquated mindset that "inmate suicides cannot be prevented" should forever be put to rest.[30]

---

[30] Lindsay Hayes, "National Study of Jail Suicide 20 Years Later", DOJ/NIC AN 024308, April 2010.

Twenty years later, this national study of jail suicides found substantial changes in the demographic characteristics of inmates who committed suicide during 2005–06. Table 1 shows that some of these changes are stark. For example, suicide victims once characterized as being confined on "minor other" offenses were most recently confined on "personal and/or violent" charges. Intoxication was previously viewed as a leading precipitant to inmate suicide, yet recent data indicate that it is now found in far fewer cases. Previously, more than half of all jail suicide victims were dead within the first 24 hours of confinement; current data suggest that less than one-quarter of all victims commit suicide during this time period, with an equal number of deaths occurring between 2 and 14 days of confinement. In addition, it appears that inmates who committed suicide were far less likely to be housed in isolation than previously reported, yet for unknown reasons it was less likely that they would be found within 15 minutes of the last observation by staff. Finally, more jail facilities that experienced inmate suicides had both written suicide-prevention policies and an intake screening process to identify suicide risk than in previous years, although as noted above, the comprehensiveness of programming remains questionable.[31]

| Changing face of Jail Suicide Victims | | |
|---|---|---|
| **Variables** | **1985-1986** | **2005-2006** |
| Facility Type | 70% Detention | 88% Detention |
| Race | 72% White | 67% White |
| Sex | 94% Male | 93% Male |
| Age | 30 | 35 |
| Marital Status | 52% Single | 42% Single |
| Most Serious Charge | 29% Minor Other | 43% Violent/Personal |
| Jail Status | 89% Detained | 91% Detained |
| Intoxication at Death | 60% | 20% |
| Time of Suicide | 30% between 12:00am and 6:00am | 32% between 3:01pm and 9:00pm |
| Length of Confinement | 51% within 1st 24 hours | 23% within 1st 24 hours |
| Method | 94% Hanging | 93% Hanging |
| Instrument | 48% Bedding | 66% Bedding |
| Time Span (between last observation and finding victim) | 42% found within 15 minutes | 21% found within 15 minutes |
| Isolation | 67% | 38% |
| Known History of Suicidal Behavior | 16% | 34% |
| Known History of Mental Illness | 19% | 38% |
| Intake Screening of Suicide Risk | 30% | 77% |
| Written Suicide Prevention Policy | 51% | 85% |

The study concluded that *"findings… create a formidable challenge for both correctional and health care officials, as well as their respective staffs. While our knowledge base continues to increase, seemingly corresponding to a dramatic reduction in the rate of inmate suicide in detention facilities, much work lies ahead. The data indicates that inmate suicide is no longer centralized to the first 24 hours of confinement and can occur at any time during an inmate's confinement. As such, because roughly the same number of deaths occurred within the first few*

---

[31] Hayes Study

*hours of custody as in more than several months of confinement, information gathered regarding current suicide risk during intake screening should be viewed as time-limited. Instead, because inmates can be at risk at any point during confinement, the biggest challenge for those who work in the corrections system will be to conceptualize the issue as requiring a continuum of comprehensive suicide prevention services aimed at the collaborative identification, continued assessment, and safe management of inmates at risk for self-harm.*"[32]

## B.  SCCF Suicide Prevention Program

SCCF experienced three (3) successful inmate suicides and over 200 suicide attempts/self-harm events between 2001 and 2012 as shown in the figure provided below.

**Overview of Completed Suicides & Serious Suicide/Self Harm Attempts for 2001-2012: Monthly Totals**



| | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Attempts | 12 | 11 | 21 | 21 | 16 | 24 | 13 | 16 | 30 | 20 | 17 | 13 |
| Suicides | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |

The figure below compares suicide/self-harm events and ADP from 2001 – 2012.



---

[32] Hayes Study

Detailed below is the assessment of suicide prevention, intervention, and management practices at the SCCF. The department's suicide prevention-related policies and practices were reviewed and compared to eight critical components of a jail suicide prevention policy: staff training, intake screening/assessment, communication, housing, levels of supervision, intervention, reporting, and follow-up/mortality reviews.[33]

> ### 45. Critical Component #1: Staff Training

The key to any successful suicide prevention program is properly trained jail staff. Trained corrections officers are often the staff most likely to recognize signs and symptoms of suicidal behavior. Often the focus of suicide prevention plans is the initial 48 to 72 hours of incarceration, but it is important to stress that suicides can and do occur at any time during incarceration. Staff and other inmates often recognize inmates who have destabilized or are reacting with hopelessness to recent losses, problems at home, or the reality of the disposition of their legal situation. Simply stated, because jail deputies are generally the only staff in the jail 24 hours per day they form the front line of defense in suicide prevention. Jail staff cannot effectively or consistently detect, make an assessment, or prevent a suicide for which they have no training.

FINDING(S): All jail officers complete both orientation and in-service training on suicide prevention, as indicated above. However, not all staff who has contact with inmates receives this training.

*RECOMMENDATION(S):*

- *Develop comprehensive suicide prevention policies and procedures that include clear guidance and expectations about training. The following include essential elements of adequate training policies and procedures:*

  o *All staff (including correctional, medical, and mental health personnel) that have regular contact with inmates shall be initially trained in the identification and management of suicidal inmates, as well as in the eight components of a suicide prevention program. Initial training shall encompass eight (8) hours of instruction. New employees shall receive such instruction through the training academy. Current staff shall receive such instruction through scheduled training workshops.*

  o *The initial training should include inmate suicide research, why the environments of correctional facilities are conducive to suicidal behavior, staff attitudes about suicide, potential predisposing factors to suicide, high-risk suicide periods, warning signs and symptoms, identifying suicidal inmates despite their denial of risk, components of the*

---

[33] Lindsay B. Hayes, National Center on Institutions and Alternatives. Updated, Jail Suicide/Mental Health Update, Spring 2005, Volume 13, Number 4.

*suicide prevention policy, case studies of recent suicides and/or serious suicide attempts, and liability issues associated with inmate suicide.*

o *All staff who have regular contact with inmates shall receive two (2) hours of annual suicide prevention training. The two-hour training workshop shall include a review of predisposing risk factors, warning signs and symptoms, identifying suicidal inmates despite their denial of risk, and review of any changes to the suicide prevention program. The annual training shall also include general discussion of any recent suicides and/or serious suicide attempts in the Jail.*

o *All staff who have regular contact with inmates shall receive standard first aid and cardiopulmonary resuscitation (CPR) training. All staff shall be trained to use emergency equipment located in each for responding. In an effort to ensure an efficient emergency response to suicide attempts, "mock drills" shall be incorporated into both initial and refresher training for all staff.*

- *Consider a subscription to a web-based training program to supplement current training program, as previously recommended.*

- *Review orientation and in-service training lesson plans to ensure the training remains current and contemporary.*

- *It is also important to include information about mental health disorders and appropriate jail-based management interventions in both pre-service and refresher training for all who have regular contact with inmates.[34]*

- *SCCF should access the online Jail Suicide/Mental Health Update newsletter, a quarterly publication available at no charge and devoted to suicide prevention and mental health services within detention and correctional facilities.[35]*

- *Both medical and mental health staff should also consider subscribing to the newsletter mentioned above. In addition, they may seek further information from the NIC information center about providing suicide prevention practices in a jail facility.*

---

**46. Critical Component #2: Intake Screening/Assessment**

---

Identification is also critical to any effective jail suicide prevention program. Research in the area of jail suicides has identified a number of characteristics that are strongly related to suicide including: intoxication, emotional state, family history of suicide, recent significant loss, lack of social support, psychiatric history, and various "stressors of confinement". Most importantly,

---

[34] Instructors Materials, Behavioral Health Needs in Local Jails: A Cross Training Program, KY NAMI; Department of Mental Health and Retardation; Department of Corrections; and Commission on Services and Supports of Individuals with Mental Illness, Alcohol and other Drug Abuse Disorders and Dual Diagnosis.
[35] Funded by National Institute of Corrections; published by Lindsay M. Hayes, National Center on Institutions and Alternatives. Access at http://www.ncianet.org/suicideprevention/publications/update/index.asp

prior research has consistently reported that at least two-thirds of all suicide victims communicate their intent sometime prior to death, and that any individual with a history of one or more suicide attempts is at a much greater risk for suicide than most of those who have never made an attempt. The key to identifying potentially suicidal behavior in inmates is to inquire not only during admission to SCCF, but at other key risk periods during incarceration.

Screening should inquire about past suicidal ideation or attempts, current ideation, threat or plan, prior mental health treatment including hospitalizations, recent significant loss (job, relationship, death of family member/close other, suicide risk during prior confinement, and arresting/ transporting officer's belief that inmate is currently at risk. Given the strong association between inmate suicide and special management (i.e., disciplinary and/or administrative segregation) housing unit placement, any inmate assigned to such a special housing unit should receive a written assessment for suicide risk by mental health staff upon admission to the special housing placement. In addition, the inmate's healthcare records should be thoroughly reviewed to ensure that the placement is not contraindicated or requires special treatment.

FINDING(S): The SCCF intake suicide screening process appears basically adequate but that process should be performed primarily by qualified health care professionals as previously discussed. Electronic and paper screening and assessment forms appear adequate, as previously stated and booking staff seem to understand the importance of this screening process. A review of screening documents indicates that were consistently completed.

MHP suicide evaluation volume activity is shown in the figure provided below.



**SCCF MHP Suicide Evaluations: 2001-2012**

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ Sui Evals | 432 | 426 | 360 | 900 | 1,64 | 1,82 | 1,48 | 1,12 | 903 | 1,09 | 1,42 | 1,60 |
| □ # of MHPs | 3 | 3 | 3…2 | 3 | 4…6 | 6…4 | 4…6 | 6…3 | 3…2 | 3 | 3 | 3…4 |

MHP suicide evaluation volume seems quite high for a few MHP staff but unusually low compared to SCCF annual admissions, and considering the literature evidencing a much higher jail population at risk of suicide. The figure below compares SCCF admissions and MHP evaluations, 2001-2012.

| Year | Admissions | MHP Suicide Evaluations | Evaluation Rate | MHP Staffing |
|------|-----------|------------------------|-----------------|--------------|
| 2001 | 20,414 | 432 | 2.1% | 3 |
| 2002 | 19,092 | 426 | 2.2% | 3 |
| 2003 | 19,946 | 360 | 1.8% | 3...2 |
| 2004 | 19,986 | 900 | 4.5% | 3 |
| 2005 | 22,732 | 1,644 | 7.2% | 4...6 |
| 2006 | 25,558 | 1,825 | 7.1% | 6...4 |
| 2007 | 25,571 | 1,488 | 5.8% | 4...6 |
| 2008 | 24,297 | 1,128 | 4.6% | 6...3 |
| 2009 | 25,447 | 903 | 3.5% | 3...2 |
| 2010 | 25,109 | 1,097 | 4.4% | 3 |
| 2011 | 27,411 | 1,422 | 5.2% | 3 |
| 2012 | 27,120 | 1,607 | 5.9% | 3...4 |



SCCF MHP Suicide Evaluation Volume (2001-2012)

These presumed low evaluation rates could result from several factors. SCCF officials should review this process to ensure the validity and reliability of its intake screening tools, staff ability to detect and identify suicidal risk behavior, and ensure adequate levels of MHP staff to complete timely and comprehensive evaluations.

### RECOMMENDATION(S):

- *As previously stated, SCCF should develop related policies and procedures so that all necessary elements are integrated into a single, comprehensive document. Policies and procedures should be integrated so that they specifically direct an interdisciplinary approach to assessment and screening that involves custody, medical, and mental health services. See previous recommendations for policy elements. Minimum policy elements for the identification, referral, and assessment of suicidal risk are listed below:*

  - *All inmates should be administered the Mental Health/Suicide Risk Intake Screening upon entry in the jail and prior to placement in any housing unit. The form shall be administered during the admission and booking process by a Registered Nurse (RN) or other qualified and designated medical/mental health staff in their absence. Every effort shall be made to ensure this screening is conducted in a reasonably private and confidential location within the booking area.*

  - *The Mental Health/Suicide Risk Intake Screening Form includes inquiry regarding: past suicidal ideation and/or attempts; current ideation, threat, plan; prior mental health*

*treatment/hospitalization; prior/current psychotropic medication; recent significant loss (job, relationship, death of family member/close friend, etc.); history of suicidal behavior by family member/close friend; suicide risk during prior confinement; arresting/transporting officer(s) belief that the detainee is currently at risk; and brief mental status examination.*

o   *A Registered Nurse (RN) or other qualified staff in their absence shall question the arresting and/or transporting officer(s) regarding their assessment of the inmate's medical, mental health or suicide risk. Such information shall be documented on the Mental Health/Suicide Risk Intake Screening Form.*

o   *The a Registered Nurse (RN)  or other designated staff in their absence shall determine through the review of the electronic medical record (i.e., "Past Medical History Screen") whether the inmate was a medical, mental health or suicide risk during any prior confinement. Such information shall be documented on the Mental Health/Suicide Risk Intake Screening Form.*

o   *A Registered (RN) or other designated staff in their absence shall make all appropriate observations, and ask all questions and appropriate follow-up questions, as contained on the Mental Health/Suicide Risk Intake Screening Form.*

o   *Although an inmate's verbal responses during the intake screening process are critically important to assessing the risk of suicide, staff should not exclusively rely on an inmate's denial that they are suicidal and/or have a history of mental illness and suicidal behavior, particularly when their behavior and/or actions or even previous confinement suggest otherwise.*

o   *Following completion of the Mental Health/Suicide Risk Intake Screening Form, the Registered Nurse (RN) and only other qualified medical/mental health staff in their absence shall confer with the Corrections Shift Supervisor for appropriate disposition.*

o   *If identified as a risk for suicide, the inmate shall be immediately placed on "Suicide Precautions" and then referred to a qualified mental health professional for further assessment.*

o   *The assessment of suicide risk by mental health staff shall include, but not limited to the following: description of the antecedent events and precipitating factors; suicidal indicators; mental status examination; previous psychiatric and suicide risk history, level of lethality; current medication and diagnosis; and recommendations/treatment plan. Findings from the assessment shall be documented on the Suicide Risk Assessment of the electronic medical record.*

o   *Although any designated supervisory correctional, medical, or mental health staff may place an inmate on Suicide Precautions and/or upgrade those precautions, <u>only licensed qualified mental health professional staff may downgrade and/or discontinue Suicide</u>*

*Precautions following a comprehensive suicide risk assessment and following consultation jail medical and custody officials.*

o *A completed Mental Health/Suicide Risk Intake Screening Form shall be performed on all inmates prior to assignment to a housing unit, except under the following circumstances: a) Inmate refuses to comply with process; b) Inmate is severely intoxicated or otherwise incapacitated; or c) Inmate is violent or otherwise belligerent.*

o *For inmates listed in 11: a-c above, the a Registered Nurse (RN)   or other designated staff in their absence shall still complete all non-questionnaire sections of the Mental Health/Suicide Risk Intake Screening Form and make a notation on the Form regarding why the inmate was unable to answer the questionnaire section.  The Corrections Shift Supervisor shall then make the appropriate Disposition.  A continuing, but reasonable effort shall be made to complete the entire Mental Health/Suicide Risk Intake Screening Form on inmates listed on 11: a-c above at least every two (2) hours.*

o *The Mental Health Director or clinical supervisor shall review each completed Mental Health/Suicide Risk Intake Screening Form for accuracy and completeness within 24 business hours.*

o *All inmates shall be asked to sign a release of information form authorizing the disclosure of health records from outside providers.  Medical and mental health staff shall make a reasonable effort to obtain records of previous medical and mental health treatment, including both inpatient and outpatient treatment services.*

o *Any inmate who screens positive for mental illness or suicidal ideation during the intake screening process, or who is otherwise referred for mental health services, shall receive a comprehensive Mental Health Evaluation in a timely manner from a licensed qualified mental health professional according to the following timetable: immediate for an <u>Emergent</u> issue; within 24 hours for an <u>Urgent</u> issue; and within 72 hours for a <u>Routine</u> issue.  The comprehensive evaluation shall include a recorded diagnosis section, including a standard five-Axis diagnosis from DSM-IV-TR, or subsequent Diagnostic and Statistical Manual of the American Psychiatric Association. If the QMHP finds a serious mental illness, they shall refer the inmate for appropriate treatment. Findings from the assessment shall be documented on either the Mental Health Evaluation or Psychiatric Evaluation forms in the inmate's electronic medical record.*

o *Given the strong association between inmate suicide and segregation, Qualified Mental Health medical, and custody Staff shall make regular rounds in segregation at least once per week. Documentation of the rounds shall be made in the segregation log, with any significant findings documented in the inmate's electronic medical record. Inmates with serious mental illness who are placed in segregation shall be immediately and regularly evaluated by a QMHP to determine the inmate's mental health status, which shall include an assessment of the potential effect of segregation on the inmate's mental health. Following these regular assessments, qualified staff shall evaluate whether*

*continued segregation is appropriate for that inmate, considering the QMHP assessment, or whether the inmate would be appropriate for graduated alternatives.*

- *See previous recommendations on staffing increases.*

- *The assessment of suicide risk should not be viewed as a single event, but as an ongoing process. Because an inmate may become suicidal at any point during confinement, suicide prevention should begin at the point of arrest and continue until the inmate is released from SCCF. In addition, once an inmate has been successfully managed on and discharged from suicide precautions they should remain on a mental health caseload and assessed periodically until released from SCCF.*

- *Screening for suicide during the initial booking and intake process should be viewed as something similar to taking one's temperature – it can identify a current fever but not a future cold. The shelf life of behavior that is observed and/or self-reported during intake screening is time-limited, and we often place far too much weight upon this initial data collection stage. Following an inmate suicide, it is not unusual for the mortality review process to focus exclusively upon whether the victim threatened suicide during the booking and intake stage, a time period that could be far removed from the date of suicide. If the victim had answered in the negative to suicide risk during the booking stage, there is often a sense of relief expressed by participants of the mortality review process, as well as a misguided conclusion that the death was not preventable. Although the intake screening form remains a valuable prevention tool, the more important determination of suicide risk is the current behavior expressed and/or displayed by the inmate.*

- *Prior risk of suicide is strongly related to future risk. At a minimum, if an inmate had been placed on suicide precautions during a previous confinement in SCCF or agency, such information should be accessible to both correctional and health care personnel when determining whether the inmate might be at risk during their current confinement.*

- *SCCF should not rely exclusively on the direct statements of an inmate who denies that they are suicidal and/or have a prior history of suicidal behavior, particularly when their behavior, actions, and/or history suggest otherwise. Often, despite an inmate's denial of suicidal ideation, their behavior, actions, and/or history speak louder than their words.[36]*

- *Additionally, suicide and mental health policies should be reviewed regularly by staff and provided annual training on these policies as previously recommended.*

---

[36] Lindsey Hayes, www.ncianet.org/suicideprevention/publications/guidingprinciples.asp

**47. Critical Component #3: Communication**

The screening and assessment process, coupled with staff training, will only be successful if an effective method of communication is in place.

It is not enough to identify inmates who are at risk for suicide. It is essential that this information be communicated. There are essentially three levels of communication in preventing inmate suicides: 1) communication between the arresting or transporting officer and the jail receiving staff; 2) communication between and among facility staff including medical and mental health personnel; and 3) communication between facility staff and the suicidal inmate. It is also critically important for jail staff to maintain open lines of communication with family members who often have pertinent information regarding the mental health status of inmates. Officers should recognize that they are an integral part of the mental health team and often the key factor in preventing suicide.

Communication cannot stop at receiving or during the early hours and days of incarceration. There are a number of key risk periods/points including crisis precipitated by court services such as new/additional charges, separation, divorce, child removal or custody, or protection from abuse orders. Also sentencing, especially unexpected harsh or lengthy sentences can precipitate suicidal crises. A little explained but fairly common phenomenon is a suicide immediately prior to release.

FINDING(S): SCCF seems to place exceptionally high value on open communication among staff at all levels. This was very noticeable and quite impressive. Leadership provides ongoing training materials and coaching to subordinate leaders that further encourage open communication with and between line staff and other jail employees.

There appears to be good verbal and written communication at the intake process between intake officers and admitting law enforcement personnel. Overall communication between and among facility staff regarding this critical element seems equally appropriate and effective.

*RECOMMENDATION(S):*

- *Continue to grow current communication between all staff participating in inmate suicide detection, prevention, intervention, and aftercare services. Post information that explains the purpose for suicide watch placement, reasons for lengths of stay on suicide watch, and where and how to receive help following return to general population and before release from the jail.*

- *Updated training on effective communication with inmates, special needs offenders, and manipulative inmates should be provided at pre- and in-service intervals. Custody, medical*

*and mental health staff should train together on subjects of mutual interest and concern as a means to increase inter-function reliance, support and communication. The inmate handbook should clearly explain the signs and symptoms of suicide/mental health problems and how to access help while incarcerated. SCCF should post information in the visiting areas that encourage visitors to communicate any concerns about inmate suicide/ mental health to staff as soon as possible.*

- *Jail managers and supervisors should make regular rounds of all housing areas, and when so doing inquire about problems the inmates are experiencing, as well as invite suggestions for improving conditions of confinement. These rounds will demonstrate to both staff and inmates that jail administration is concerned about the well-being of the inmates and open improved dialogue between inmates and custody staff.*

- *Revise current policies and procedures to include comprehensive guidance and expectations for suicide prevention communication purposes. Minimum policy elements are listed below:*

  - *All staff shall maintain awareness, share information and make appropriate referrals regarding potentially suicidal inmates to mental health staff.*

  - *All staff shall use various communication skills with the suicidal inmate, including active listening, staying with the inmate if they suspect immediate danger, and maintaining contact through conversation, eye contact, and body language.*

  - *All incidents of suicidal behavior shall be documented on the Observation Sheet, which shall also be utilized to document all physical cell checks of suicidal inmates.*

  - *The Corrections Shift Supervisor shall maintain a suicide precaution monitoring log of all inmates on Suicide Precautions. The sheet shall be updated daily, designate each inmate's level of observation, and be distributed to appropriate correctional, medical, and mental health personnel.*

  - *The Corrections Shift Supervisor shall ensure that appropriate staff is properly informed of the status of each inmate placed on Suicide Precautions. The Corrections Shift Supervisor shall also be responsible for briefing the incoming Corrections Shift Supervisor regarding the status of all inmates on Suicide Precautions.*

  - *Should an inmate be returned to the facility following temporary transfer to the hospital or other facility for suicide risk assessment and/or treatment, the Corrections Shift Supervisor shall inquire of medical and/or mental health officials what further prevention measures, if any, are recommended for the housing and supervising the returning inmate.*

  - *Authorization for Suicide Precautions, reassessment and any changes in Suicide Precautions shall be documented on the precautions log and distributed to appropriate staff.*

   o  *Multidisciplinary case management team meetings (to include SCCF officials and available medical and mental health personnel) shall occur on a weekly basis to discuss the status of inmates on Suicide Precautions.*

| *48. Critical Component # 4: Housing* |
| --- |

It is essential that the least restrictive housing commensurate with classification and risk for suicide be assigned for all inmates. It is important to maintain inmates in a safe and secure housing unit that is maximally designed to eliminate suicide attempts and behaviors as long as their risk level requires special housing.  Regular assessment of inmates' suicide risk and movement to the least restrictive housing when the inmate is stabilized must be provided. Housing assignments should be based on the ability to maximize staff interaction with the inmate, avoiding assignments that heighten the depersonalizing aspects of incarceration. All cells designated to house suicidal inmates should be suicide-resistant, free of all obvious protrusions, and provide full visibility.

FINDING(S): SCCF staff currently makes intermittent direct physical observations of persons on suicide watch as part of their daily rounds. Camera monitoring is used only as a supplement to direct observation according to policy and practice.

SCCF inmate housing practices prohibit the use of disciplinary segregation for inmates presenting a credible risk of self-harm. This practice clearly acknowledges the mental and emotional well-being of inmates placed in disciplinary segregation and specifies segregation time limits. SCCF administrative segregation practices are applied to inmates presenting symptoms of suicidal risk and/or mental illness. This practice further prohibits any punitive restrictions to food, correspondence, attorney or clergy visits.

Cells used for this purpose appeared to be relatively free of protrusions but seemed unclean and somewhat ill kept.

*RECOMMENDATION(S):*

- *SCCF practice appears to embrace a least restrictive approach to managing such at-risk inmates.*

- *SCCF should develop policy to audit the written close supervision logs to the electronic logs to ensure compliance, accuracy, and consistency. This audit should be conducted no less than quarterly.*

- *Revise current policies and procedures to include comprehensive guidance and expectations for suicide prevention housing purposes. Minimum policy elements are listed below:*

  o *Any inmate placed on Suicide Precautions shall be housed in a designated suicide-resistant cell.*

  o *The decision to remove the clothing and mattress from a suicidal inmate and issuance of a safety smock shall only be done with the approval of a QMHP or Qualified Medical Professional in their absence, and only following a face-to-face direct assessment of the inmate by the qualified health care provider in-person or by telephone contact with the inmate, when said qualified staff are not on duty. A reliable and secure telemedicine system may be used for a face-to-face assessment in cases where no QMHP is available on-site. In most instances, the removal of clothing of an inmate on Constant Observation status should not be necessary. Documentation of the decision shall be in both the Suicide Risk Assessment and the Observation Sheet.*

  o *Unless contraindicated in writing by a QMHP or Qualified Medical Professional in their absence, each inmate on Suicide Precautions shall continue to receive regular privileges (e.g., showers, telephone, visiting, recreation, etc.) commensurate with their security level. Documentation of the decision shall be in both the Suicide Risk Assessment and the Observation Sheet. It is understood that such loss of such privileges, unless necessary for security and the personal safety of the inmate, can be counterproductive to the goals of suicide prevention efforts and should, therefore be avoided unless otherwise necessary.*

  o *The use of any physical restraints (e.g., restraint chairs or bunks, leather straps, etc.) shall be avoided whenever possible, and used only as a last resort when the inmate is physically engaging in self-injurious behavior. A Qualified Medical Professional shall be immediately notified to monitor and assess the need for further restraint. Metal handcuffs shall never be utilized for restraint.*

  o *Regardless of whether restraints are initiated by custody or health care personnel, the use of any restraints shall include adherence to the following minimal guidelines:*

    - *Restraints shall not be used for punitive purposes;*
    - *Restraints require an order by a Qualified Medical Professional (physician, nurse practitioner, or physician's assistant);*
    - *Only a Restraint Chair shall be authorized for restraints. The restrained inmate shall be immediately transported via the restraint chair to the 4th floor medical/mental health unit for further assessment and observation.*
    - *The restrained inmate shall be seen immediately by Qualified Medical Staff, as well as receive a face-to-face assessment by a physician or Licensed Independent Practitioner (LIP) within four (4) hours of initial restraint;*
    - *Inmates shall never be restrained in an unnatural position;*
    - *Restraint equipment must be medically appropriate;*

- *Inmates placed in restraints shall be under the constant observation of a Crisis Stabilization Technician or designated correctional staff in their absence;*
- *Vital signs of inmates placed in restraints shall be assessed every 2 hours by nursing staff;*
- *Each restrained limb shall be untied for at least 10 minutes every two hours to allow for proper circulation;*
- *Restrained inmates shall be allowed bathroom privileges as soon as practical;*
- *Restrained inmates shall be reassessed by a physician, LIP, or registered nurse every 2 hours after the initial assessment, and must be reduced as quickly as possible to the level of least restriction necessary to protect the inmate and others; and*
- *Restraint orders shall be automatically terminated after 12 hours and, if the inmate remains in a highly agitated state after 12 hours that they cannot be released because of physical danger to self or others, they shall be transferred to the hospital.*

o *Each Jail housing unit shall contain various emergency equipment, including a first aid kit; CPR pocket mask or Ambu-bag; and emergency rescue tool (to quickly cut through fibrous material). The Corrections Shift Supervisor staff should ensure that such equipment is in working order on a regular basis.*

> **49. Critical Component # 5: Levels of Supervision:**

Inmates who are at risk of suicide require increased levels of observation, communication, and interaction with custody and healthcare staff. These staff must be available and unencumbered by other assignments that would interfere with a suicide prevention priority. The incarceration experience is a very dehumanizing experience for all inmates and the inmate's primary contact with the outside world is through their access to correctional staff.

Differing levels of suicide risk, mental illness, and vulnerability requires different levels of observation and management. Experience shows that prompt, effective emergency medical and other health care services can save lives and mitigate the adverse impact of incarceration on suicidal and mentally ill inmates.

FINDING(S): There were three inmates on suicide watch at the time of this visit to observe the interaction between inmates placed on suicide watch and jail officers. However, these inmates were housed in a single cell near the booking, making it very difficult to maintain consistent monitoring due to inadequate staffing levels and the needs of several other inmates housed in that area. Although this may be an adequate location for temporary monitoring, staffing levels severely limit monitoring.

*RECOMMENDATION(S):*

- *SCCF staff is to be commended for their professional interactions with inmates and are encouraged to continue practicing such interactions.*

- *Increase custody, medical, and mental health staffing as previously recommended to ensure adequate supervision and monitoring of inmates placed on suicide precautions near the booking area.*

- *Develop a "step-down" housing unit that increases social interaction and privileges for inmates who have been as assessed as stable or stabilizing. Each inmate placed on suicide precautions should have an integrated treatment plan that involves a multi-disciplinary team in its development and implementation. The plan should specifically define "stabilized" in descriptive behavioral terms to help ensure that staff understands when an inmate may be eligible for the step-down environment. The plan should be behavior based with incentives, and it should be shared with the inmate.*

- *Revise current policies and procedures to include comprehensive guidance and expectations for suicide prevention levels of observation purposes. Minimum policy elements are listed below:*

  o "Suicide Precautions," defined as the level of observation and management of inmates identified as suicidal in the Jail, shall include two levels of observation:

    - *Close Observation*: Reserved for the inmate who is <u>not</u> actively suicidal, but expresses suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) and/or has a recent prior history of self-injurious behavior. In addition, an inmate who denies suicidal ideation or does not threaten suicide, but demonstrates other concerning behavior (through actions, current circumstances, or recent history) indicating the potential for self-injury, shall be placed under close observation. Staff shall observe the inmate at staggered intervals not to exceed every 15 minutes (e.g., 5, 15, 7 minutes).

    - *Constant Observation*: Reserved for the inmate who is actively suicidal, either threatening or engaging in self-injurious behavior. Staff shall observe such an inmate on a continuous, uninterrupted basis and have a clear non-obstructed view of the inmate at all times.

  o *The observation of inmates on either Close Observation or Constant Observation status shall be the primary responsibility of trained mental health technicians or trained jail officers.*

  o *The use of closed-circuit television monitoring shall be utilized as a supplement to, but never a substitute for, the physical observation checks provided by staff.*

o   *For each inmate placed on Suicide Precautions, MHTs or designated correctional staff in their absence shall document the Close Observation check as it occurs (but no more than staggered 15-minute intervals), and the Constant Observation check every 10 minutes, on an Observation Sheet.  The inmate's observed activity will also be recorded on the form.*

o   *The Corrections Shift Supervisor shall make periodic visits to suicide prevention housing areas each shift to ensure that Observation Sheets are complete and accurate and those inmates are being observed as required.*

o   *All inmates on Suicide Precautions shall be assessed by a QMHP within 24 hours of placement utilizing a Suicide Risk Assessment.  The assessment form includes a brief mental status examination, listing of chronic and acute risk factors, listing of any protective factors, level of suicide risk (e.g., low, medium, or high), current medication, diagnosis, and treatment plan. The Suicide Risk Assessment form shall be utilized during the initial assessment of risk that justifies an inmate's placement on Suicide Precautions, as well as when the QMHP determines that the inmate's behavior has stabilized and may be discharged from Suicide Precautions.*

o   *A QMHP or Qualified Mental Health Staff shall assess and interact with (not just observe) inmates on Suicide Precautions on a daily basis and enter quality progress note into the electronic medical record.  Each progress note should be SOAP-formatted, include a brief mental status examination, and provide a sufficient description of the current behavior and justification for a particular level of observation.*

o   *Unless contraindicated by safety/security concerns, every effort shall be made to ensure that these assessments are conducted in a reasonably private and confidential location. (e.g., the visiting booths, counseling office or room, etc.).*

o   *An inmate placed on Constant Observation shall always be downgraded to Close Observation for a reasonable period of time prior to being discharged from Suicide Precautions.*

o   *An inmate can only be downgraded or discharged from Suicide Precautions by a QMHP, and only after the QMHP has conducted a thorough assessment, reviewed the electronic medical record, conferred with CSTs or designed correctional staff, and consulted with the Psychiatrist.*

o   *Whenever an inmate is discharged from Suicide Precautions, the designated QMHP shall enter the information into the "Past Medical History Screen" (i.e. "Suicide Precautions, Date") of the electronic medical record.  This information shall <u>not</u> be deleted when the inmate is removed from Suicide Precautions or released from the Jail.*

o   *Any inmate placed on Suicide Precautions for more than 24 hours shall have an individualized treatment plan developed by a QMHP.  The treatment plan shall describe signs, symptoms, and the circumstances in which risk for suicide is likely to recur; how*

*recurrence of suicidal thoughts can be avoided, and the actions the inmate or staff can take if suicidal thoughts do occur.*

o *In order to ensure the continuity of care for suicidal inmates, all inmates discharged from Suicide Precautions (following minimum placement of 24 hours) shall remain on the mental health caseload and receive regularly scheduled follow-up assessment by Qualified Mental Health Staff. Unless their individual treatment plan directs otherwise, the reassessment schedule shall be as follows: within 24 hours, then again within 72 hours, then again within 1 week, and then periodically, as needed.*

---

**50. Critical Component #6: Intervention**

---

Following a suicide attempt, the degree and promptness of intervention provided by staff often foretells whether the victim will survive. It is essential to balance the safety of officers and the inmates. It is also imperative that all officers understand that brain injury can occur within four minutes and that death can occur within five to six minutes from asphyxiation by hanging. Crime scene protection should not outweigh saving lives.

Provided below is a listing of the applicable national correctional standards relating to emergency response within correctional facilities. Unless otherwise indicated, these standards apply to adult correctional facilities.[37]

**American Correctional Association**
*Performance-Based Standards for Adult Local Detention Facilities*, 4th Edition, June 2004,
*Performance-Based Standards for Correctional Health Care in Adult Correctional Institutions*, 1st Edition, January 2002

**Emergency Response**

Correctional and health care personnel are trained to respond to health-related situations within a *four-minute response time* (emphasis added). The training program is conducted on an annual basis and is established by the responsible health authority in cooperation with SCCF or program administrator and includes instruction on the following:

- recognition of signs and symptoms and knowledge of action that is required in potential emergency situations.
- administration of basic first aid certification in cardiopulmonary resuscitation (CPR) in accordance with the recommendations of the certifying health organization.
- methods of obtaining assistance
- signs and symptoms of mental illness, violent behavior, and acute chemical

---

[37] http://www.ncianet.org/suicideprevention/publications/update/Winter%202008.pdf

intoxication and withdrawal
- procedures for patient transfers to appropriate medical facilities or health care providers
- suicide intervention

**Comment:** SCCF administrator and the health care authority may designate those correctional officers who have responsibility for responding to health care emergencies. Staff not physically able to perform CPR is exempt from the expected practice.

**National Commission on Correctional Health Care**
*Standards for Health Services in Jails*, 7th Edition, 2003, *Standards for Health Services in Prisons*, 5th Edition, 2003

**Training for Correctional Officers**

A training program, established or approved by the responsible health authority in cooperation with SCCF administrator, guides the health-related training of all correctional officers who work with inmates.

***Compliance Indicators***

All aspects of the standard are addressed by written policy and defined procedures. Correctional officers who work with inmates receive health-related training at least every 2 years, which includes a minimum:

- administration of first aid;
- recognizing the need for emergency care and intervention in life-threatening situations (e.g., heart attack);
- recognizing acute manifestations of certain chronic illnesses (e.g., asthma, seizures), intoxication and withdrawal, and adverse reaction to medication);
- recognizing signs and symptoms of mental illness;
- procedures for suicide prevention;
- procedures for appropriate referral of inmates with health complaints to health staff;
- precautions and procedures with respect to infectious and communicable diseases; and
- cardiopulmonary resuscitation.

The appropriateness of the health-related training is verified by an outline of the course content and the length of the course.

A certificate or other evidence of attendance is kept on site for each employee.
While it is expected that 100% of the correctional staff who work with inmates are trained in all of these areas, compliance with the standard requires that at least 75% of the staff present on each shift are current in their health related training.

*Discussion:* This standard intends to promote the training of correctional officers to recognize when the need to refer an inmate to a qualified health care professional occurs and to provide emergency care until he/she arrives. Because correctional personnel are often the first to respond to problems, they must be aware of the potential for emergencies that may arise, know the proper response to life-threatening situations, and understand their part in the early detection of illness and injury.

### Emergency Services

SCCF provides 24-hour emergency medical, mental health, and dental services.

### *Compliance Indicators*

A written plan includes arrangements for the following, which are carried out when necessary:

- emergency transport of the patient from SCCF;
- use of an emergency medical vehicle; use of one or more designated hospital emergency departments or other appropriate facilities;
- emergency on-call physician, mental health, and dental services when the emergency healthcare facility is not located nearby;
- security procedures for the immediate transfer of patients for emergency medical care and notification to the person legally responsible for SCCF.
- Emergency drugs, supplies, and medical equipment are regularly maintained.

*Discussion:* This standard intends that sufficient emergency health planning occurs and is put into effect when necessary. Planning ahead for emergencies can help minimize bad outcomes. Policy and procedures address, for example, of which facility on-call staff need to be notified, arranging for an ambulance, and alerting the community emergency room. The choice of basic emergency equipment depends on the size of SCCF, its distance from the nearest emergency department, and the level of staff training.

FINDING(S):

SCCF are provided training for intervening in suicidal ideation and attempts. Training is also provided in CPR and first response techniques. A review of all medical staff files indicated that all CPR/First Aid certifications are current.

### *RECOMMENDATION(S):*

- ***Ensure that all staff are provided ongoing and updated training on these policies. Also ensure that all CPR certifications are kept up-to-date.***

- *Increase custody, medical, and mental health staffing levels as previously recommended to help insure timely detection, intervention, monitoring, stabilization, and aftercare for inmates presenting suicidal ideation and who attempt suicide.*

- *Establish a multidisciplinary morbidity review process to review all serious suicide attempts. The review process should include officials from custody, medical, and mental health.*

- *Revise current policies and procedures to include comprehensive guidance and expectations for suicide prevention intervention purposes. Minimum policy elements are listed below:*

  o **All correctional and medical staff shall be trained (and maintain certification) in standard first aid and cardiopulmonary resuscitation (CPR).**

  o **All correctional and medical staff shall participate in annual "mock drill" training to ensure a prompt emergency response to all suicide attempts.**

  o **All housing units shall contain an emergency response bag that includes a first aid kit; CPR pocket mask or Ambu bag, latex gloves, and emergency rescue tool. All staff who come into regular contact with inmates shall know the location of this emergency response bag and be trained in its use.**

  o **Any staff member who discovers an inmate attempting suicide will immediately respond, survey the scene to ensure the emergency is genuine, alert other staff to call for the facility's medical personnel, and bring the emergency response bag to the cell. If the suicide attempt is life-threatening, Central Control personnel will be instructed to immediately notify outside ("911") Emergency Medical Services (EMS). The exact nature (e.g., "hanging attempt") and location of the emergency will be communicated to both facility medical staff and EMS personnel.**

  o **Following appropriate notification of the emergency, the First Responding Officer shall use his/her professional discretion in regard to entering the cell without waiting for backup staff to arrive. With no exceptions, if cell entry is not immediate, it shall occur no later than four (4) minutes from initial notification of the emergency. Correctional staff will *never* wait for medical personnel to arrive before entering a cell or before initiating appropriate lifesaving measures (e.g., first aid and CPR).**

  o **Upon entering the cell, correctional staff shall *never* presume that the victim is dead, rather lifesaving measures shall be initiated immediately. In hanging attempts, the victim shall first be released from the ligature (using the emergency rescue tool, if necessary). Staff shall assume a neck/spinal cord injury and carefully place the victim on the floor. Should the victim lack vital signs, CPR will be initiated immediately. All lifesaving measures shall be continued by correctional staff until relieved by medical personnel.**

- The Corrections Shift Supervisor shall ensure that both arriving jail medical staff and EMS personnel have unimpeded access to the scene in order to provide prompt medical services to, and evacuation of, the victim.

- Although the scene of the emergency shall be preserved as much as possible, the first priority shall always be to provide immediate lifesaving measures to the victim. Scene preservation shall receive secondary priority.

- Automated External Defibrillators (AEDs) are positioned in various locations within the jail. All medical and correctional staff shall be trained in their use. The jail Medical Director or Designee shall provide direct oversight of AED use and maintenance.

- The Medical Director or Designee shall ensure that all equipment utilized in the response to medical emergencies (e.g., emergency response bag, crash cart, oxygen tank, AED, etc.) is inspected and in proper working order on a regular basis.

- All affected staff and inmates involved in the incident shall be offered critical incident stress debriefing (see Section H).

- Although not all suicide attempts require emergency medical intervention, all suicide attempts shall result in the inmate receiving immediate intervention and assessment by a QMHP.

### 51. Critical Component #7: Reporting and Notification

In the event of a suicide attempt or suicide, all appropriate correctional officials should be notified through the chain of command. Following the incident, the victim's family should be immediately notified, as well as appropriate outside authorities. All staff that came into contact with the victim prior to the incident should be required to submit a statement including their full knowledge of the inmate and incident.

FINDING(S): The active suicide prevention policy does not include statements or procedures for reporting. That said, SCCF officials described their reporting practices as including all elements of an effective reporting system.

*RECOMMENDATION(S):*

- *Revise current policies and procedures to include comprehensive guidance and expectations for suicide prevention intervention purposes. Minimum policy elements are listed below:*

- o *In the event of a suicide or serious suicide attempt (i.e., requiring medical treatment and/or hospitalization), all appropriate officials shall be notified through the chain of command.*

- o *Following the incident, the victim's family shall be immediately notified, as well as appropriate outside authorities.*

- o *All staff that came into contact with the victim before the incident shall be required to submit a statement including their full knowledge of the inmate and incident*

---

**52. Critical Component #8: Follow-up/Mortality Review**

---

Experience has demonstrated that jail systems that carefully review suicides and serious suicide attempts will reduce the likelihood of future suicides.

FINDING(S): SCCF conducts thorough investigations for inmate death incidents and involves outside law enforcement in those investigations. However, there are no active policies and procedures that provide guidance for mortality or morbidity reviews (for serious suicide attempts).

*RECOMMENDATION(S):*

- *A full mortality review should include key members of administration and department heads, and key medical and mental health staff. Additionally, regular (monthly) reviews of inmate self-harm and suicide attempts should be conducted to learn from this information how to improve prevention and management efforts. A review of policy and protocol is indicated.*

- *Revise current policies and procedures to include comprehensive guidance and expectations for suicide prevention intervention purposes. Minimum policy elements are listed below.*

- *An effective and complete mortality/morbidity review process should include the following elements:*

  - o *Every completed suicide, as well as serious suicide attempt, shall be examined by a multidisciplinary Morbidity-Mortality Review Team that includes representatives of both line and management level staff from the corrections, medical and mental health divisions. The Mental Health Director shall chair the committee.*

  - o *The Morbidity-Mortality Review process shall comprise a critical inquiry of: a) circumstances surrounding the incident; b) facility procedures relevant to the incident; c) all relevant training received by involved staff; d) pertinent medical and mental health services/reports involving the victim; e) possible precipitating factors leading to the*

*suicide; and f) recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.  The inquiry shall follow the outline described in the Morbidity-Mortality Review Checklist.*

o   *The mortality review report should include the following minimum components:*

–   *day, date and time of incarceration*
–   *arrest reports*
–   *intake and assessment documents*
–   *date, time, and location of death*
–   *inmate personal information and demographics*
–   *apparent and actual cause of death*
–   *death modality*
–   *review of staff interactions previous to death*
–   *inmate healthcare records*
–   *current medications and administration activity*
–   *inmate medical and mental status during incarceration and preceding death*
–   *food service records relevant to inmate diet and eating habits*
–   *autopsy report, if applicable*
–   *interviews with cellmates*
–   *review of any and all documentation associated with inmate's incarceration*
–   *visitation logs*
–   *inmate mail*
–   *photographs of inmate cell and location of death*
–   *review of health care and suicide protocols*
–   *other information needed to provide a clear understanding of the inmate's activities while incarcerated*

## 53. Critical Component #9: Critical Incident Debriefing

A shift from rehabilitation to a more custodial approach, an increase in long-term sentences, overcrowding, and more violent and mentally ill offenders led Cheek and Miller (1979) to examine the effects of stress in staff and inmates in the New Jersey Department of Corrections. Cheek & Miller (1982) also investigated the strategies that the Department implemented to reduce those stressors. Brodsky (1982) conducted one of the earlier analyses of correctional stress from an organizational and cultural perspective. The evidence indicated that correctional employees experience a significant amount of stress in their work, which may lead to high job turnover, high rates of sick leave and troubled relationships with inmates, other staff, and family members. Lindquist and Whitehead (1986) investigated burnout, job stress and job satisfaction among southern correctional officers. They found that 20% to 39% experienced burnout and

stress but that only 16% expressed job dissatisfaction. It was suggested that correctional officers mask their dissatisfaction to prevent facing job changes. There was no analysis or implication regarding the effect this could have on families.

Stohr (1994) and associates studied stress in contemporary jails by examining jails in five areas across the U.S. They found that stress in workers was a serious problem and approaching dangerous levels in some facilities. The contributing factors were primarily related to management and organizational methods. There was less stress when fair compensation, investment in employee development and participatory management practices were employed. Similarly, Wright, Saylor, Gilman and Camp (1997), in a study of U.S. Federal Bureau of Prisons' employees, found lower job-related stress a factor when workers were involved in decision making.

Although not new to correctional employees on the front line, workplace violence was identified as having a negative impact on employees' wellness in the 1990s. The National Crime Victimization Survey (NCVS) report for 1992-1996 (U.S. Dept. of Justice, 1998) revealed that the field of Law Enforcement was the second largest group in the nation to experience workplace violence. Prison guards experienced non-fatal workplace violence at the rate of 117.3 per 1,000 workers. Additional investigations of staff victimization have been cited in the literature (Andring, 1993; Dowd, 1996; Seymour & English, 1996; VandenBlos & Bulatao, 1996).

From November 21 through December 4, 1987, prisoners rioted and took hostages in Federal Prisons in Oakdale, Louisiana and Atlanta, Georgia (National Victim Center [NVC], 1997). Bales (1988) reported about the stressors and follow-up for the hostages including a family resource center. There was no indication of pre-incident stress inoculation or family support planning. Additional hostage situations that reached national media attention were Attica, New York, 1971, Wyoming State Penitentiary, 1988, and Pennsylvania State Correctional Institution, Camp Hill, 1989 (NVC, 1997).

Throughout the 1980s and 1990s, the recognition of the need for crisis intervention after a critical incident became apparent. The earliest crisis intervention programs for correctional employees were conducted post-incident. Bergman and Queen (1987) credited the retention of employees after the riot at Kirkland Correctional Institution Columbia, South Carolina to the "critical incident debriefing" (Mitchell, 1983; Mitchell & Everly, 1993) conducted immediately after the incident. Van Fleet (1991) also referred to debriefing traumatized correctional staff to mitigate stress that could lead to posttraumatic stress disorder (PTSD). Training workshops and training guides/manuals became available (Concerns of Police Survivors [COPS], 1996; Finn & Tomz, 1997; NVC, 1997; U.S. Office of Personnel Management, 1998). Directly or indirectly, the resources referred to Critical Incident Stress Management (CISM) (Everly & Mitchell, 1997). Traditionally, in the correctional field any type of assistance offered to employees' and their

families was post-incident, usually at the employees or families' request and in the form of referrals to the agency's Employees Assistance Program or private contractors. Little mention is made of preventive or stress inoculation programs for employees and families at the front end or when entering correctional employment. On the other hand, police (COPS, 1996; National Institute of Justice [NIJ], 1997) and firefighting agencies have initiated family awareness and educational programs, which range from a few hours to several weeks.

---

### An Introduction to Critical Incident Stress Management[38]

A critical incident is defined as "any event which has a stressful impact sufficient enough to overwhelm the usually effective coping skills of either an individual or a group are typically sudden, powerful events outside of the range of ordinary human experiences" (Mitchell & Everly, 1993). Most employees entering the criminal justice system recognize that verbal and minimal physical abuse from those in their care, custody, and control is a reality of the job. Critical incidents and stressors experienced by employees in correctional, prison, and forensic settings include: held hostage, riot, physical/sexual assault, death or serious injury in line of duty, suicide of inmate or employee, use of lethal force on inmate, participation in execution and witness to any of the above.

Historically, the approaches to help staff deal with critical incidents and stressors fall into three broad categories including:

(1) Employee Assistance Program (EAP), a contracted service with the state, agency or facility. Traditionally, the EAP provider is typically an individual mental health clinician (i.e., counselor, social worker, and psychologist). Since employees in these settings tend to be cautious and somewhat suspicious of mental health providers and outsiders, a few EAP programs include clinician-trained peer support personnel selected from the employees likely to be represented in an event.

(2) Peer Support Program (PSP) which consists of non-clinician employees, who are representative of the workforce, and trained in crisis intervention.

(3) Critical Incident Stress Management (CISM) Program, the International Critical Incident Stress Foundation (ICISF) model. The CISM Team is "described as a partnership between professional support personnel (mental health professionals and clergy) and peer support personnel (employees) who have received training to intervene in stress reactions" (Mitchell & Everly, 1993). Professional support personnel are required to have academic training at the master's degree or higher level and/or recognition of their training and skills through certification or licensure. They must also have education, training and experience in critical incident stress intervention.

---

[38] http://www.aaets.org/article88.htm

## Components of a Comprehensive CISM Program

A comprehensive CISM program is multi-faceted (Mitchell & Everly, 1993; PDOC, 1992). Pre-incident prevention and stress inoculation are essential. All employees receive education and training in everyday and work-related stress awareness and stress management techniques as well as how to access the EAP program and CISM team when necessary, while attending Basic Training Academy. Employees whose job requires direct contact with inmates/patients attend biannual refresher stress management classes. Managers receive training in recognition of employee stress and referral procedures. Families and significant others are provided similar stress awareness and coping skills and how to access referral services at the Family Academy.

CISM team development, member selection and training needs to be well-planned and foster a partnership between employees, management and labor relations. A CISM Program policy/standards and procedures manual, applicable to the agency, must be established. Best results are achieved if team membership is voluntary. A selection committee comprised of management and employees/ labor representatives should develop an application form and include an interview in the selection process. Team members, professional and peer, must be trusted and accepted by their fellow employees. Peer members must be representative of the employee population including custody, maintenance, counseling, education, medical, clerical, etc. It is recommended that each facility have a team available for rapid deployment. In order to respond to major events, in large systems, regional teams composed of members from various facilities are also suggested.

Although there are similarities in the training programs available, this article and model adheres closely to the ICISF standards. All team members should be required to complete ICISF Basic Critical Incident Stress Debriefing Training. Peer Support/Crisis Intervention Strategies is also recommended. All members should also have an understanding of Incident Command system, if used in their setting, and specialized units such as Emergency Response, Hostage Recovery and Hostage Negotiation Teams. The CISM team and specialty teams should participate in joint training exercises at least once annually.

### The CISM Program services should include:

1. On-scene support (usually provided by peer support members during a major/prolonged event).

2. Demobilization or de-escalation (brief intervention to assist employees in making the transition from the traumatic event back to routine or stand-by duty, formal debriefing to follow in several days).

3.  Defusing (a three-phase group crisis intervention provided immediately or within twelve hours after the event to mitigate the effects of the stressors and promote recovery, usually twenty to forty-five minutes in duration).

4.  Debriefing (a seven-phase group crisis intervention process to help employees work through their thoughts, reactions, and symptoms followed by training in coping techniques, usually lasting one and one-half to two hours).

5.  One-on-one support (individual intervention if a single or small event and a group intervention is not possible or additional individual assistance is deemed necessary after a group process).

6.  Significant other/family defusing/debriefing (services may be provided separately from traumatized employees).

7.  Line-of-duty death support (defusing provided immediately after event for staff, team assists family, and a debriefing provided for staff after the funeral).

8.  Referrals (team member recommends and instructs employee to access additional support/treatment through EAP or other resources).

9.  Follow-up (team leader or designated member contacts employee(s) and/or employee(s) supervisor a few days after team services).

## Records and Program Evaluation

Client(s) confidentiality must be maintained. However, in order to maintain service continuity and program quality improvement minimal record keeping is necessary. A request for service form including time of event, nature of incident, number of personnel involved, contact person and contact number will assist the team leader in selecting team members and establishing meeting location and time. The service provided form should include information from the request form and a summary or themes of reactions, thoughts, and symptoms presented, educational material provided, and coping techniques recommended and if referrals were made. Individual(s) names and comments are not recorded.

The team leader may, with the majority consensus and participants' permission, provide administrative staff with a report of recommendations to improve conditions or remedy situations that led to the critical event. In most situations consumer satisfaction will be determined informally through follow-up with the participants and from supervisory staff. However, after major events, a participant's satisfaction questionnaire is recommended. A combination of checklist, multiple choice and general comment format works best in this employment setting.

**Interagency and Community Support**

Traditionally correctional facilities are scattered through the state and many times located in rural areas. Correctional CISM Teams can be a resource for smaller counties and municipalities and provide services for jails, probation and parole agencies, police and community emergency responders. The Correctional CISM Team professionals may act as consultants or supplement communities volunteer peer teams. The CISM teams can, along with other correctional special response teams, assist communities affected by a disaster. The Correctional CISM Teams may also work very effectively with other State agencies such as state police and probation and parole.

FINDING(S): There does not appear to be a formal policy or practice for CISM, in part due to very few jail deaths within the past five years. Additionally, there does not appear to be a coordinated policy with local community mental health services to provide CISM services.

*RECOMMENDATION(S):*

- *Develop and implement comprehensive CISM policies and procedures.*

- *This procedure is not the same as mortality review debriefing. Instead, this refers to a formalized opportunity for involved or affected staff members to talk about their thoughts and feelings about a possibly difficult critical incident, such as a death or suicide attempt, so as to try to deal more effectively with their difficult or troubling feelings. Policy should indicate that this opportunity is available and should indicate who has the responsibility for planning and implementing it. Policies and procedures should be developed to coordinate both internal and external CISM services.*

- *Traditionally, a critical incident debriefing focuses on the experiences and needs of staff involved in the stressful event. Inmates can also experience post-event trauma. It is important to recognize that inmates who are exposed to suicides or other serious trauma while incarcerated may suffer temporary and/or long term psycho-emotional harm. It is therefore important that a comprehensive critical incident debriefing policy and action plan includes providing similar services to appropriate inmates. Again, policies and procedures should be developed to coordinate both internal and external CISM services and include services for inmates.*

## XII.    RELATED ISSUES & RECOMMENDATIONS

### A. <u>Data Collection and Information Management</u>:

Effective jail management requires accurate and easily accessible data[39]

In the past, managing jails was considered to be so basic that there was nothing to it. However, with increased court intervention in correctional matters, demands for better management of correctional facilities increased in the 1970s. The courts discovered that often the difference between a "constitutional jail" and an "unconstitutional jail" was the way in which they were managed. Since good management relies strongly on good information, sheriffs and jail administrators found that their organizational world had become a much more complex environments. As a result, "professional management" arrived in correctional facilities. Sheriffs and jail administrators were introduced to a number of techniques, such as cost benefit analysis, Total Quality Management, and organizational development that were designed to help them improve organizational performance. Sometimes these techniques were very helpful, and sometimes they were not. In analyzing their relative successes and failures, the ability of the organization to generate good, valid information about its problems emerged as a critical variable. So what is management?

Management is mostly about mobilizing an organization's resources, in this case the jail's, to solve or avoid problems. In many cases, problems are not solved in the sense that they go away, but the organization finds a way to manage them more effectively. Regardless of the complexity of the problem, a basic management formula applies to analyzing a situation. It consists of five steps:
1. Facts are gathered.
2. Facts are interpreted in light of the organization's mission and values.
3. Alternative solutions are developed.
4. A decision is made.
5. Action is taken.

Easy and timely access to good jail data is pivotal to effective jail management. Valid data are absolutely needed to safely and effectively operate the jail at all levels and can significantly improve jail performance in all functional areas.

FINDING(S): The current SCCF data management system appears to collect the necessary jail data elements to develop a useful set of jail operational reports. The system appears easy to extract data from and should afford SCCF the opportunity to become more "data driven". In doing so, SCCF may find fiscal and operational decision making more efficient and effective.

---

[39] Gail Elias, http://nicic.gov/Library/021826

Additionally, SCCF regularly collects and reviews population and healthcare related data relevant to jail services and management.

***RECOMMENDATION(S):***

- ***Consider the creation of a jail information and reporting team to determine exactly what data are needed to better support decision making at all levels of the jail. The teams should decide specifically how the various functions of the jail can use better data and consult with those areas to clarify and document needs. Outside professional consultation should be considered.***

- ***Once the data team determines what data elements are needed, they should consult with current jail management system provide for assistance. It is likely that much of the information desired already exists in the jail management system data base and accessing may be as simple as being trained by the provider on how to most efficiently query the data. The data may then be reformatted into workable spreadsheets for simple, clear and ongoing review and analysis.***

## B.    Cross-Discipline Staff Meetings :

Regular meetings among staff who work with the inmates can greatly improve communication and build a team-based response to working with the inmates who require mental health services.

FINDING(S): SCCF currently holds regular health care meetings involving only jail administration and health care staff. Although this is a great opportunity to discuss issues and resolve problems, the topics and discussions are limited to the scope of information brought to the meeting.

***RECOMMENDATION(S):***

- ***SCCF leadership is to be commended for its open communication philosophy. SCCF is encouraged to continue this process.***

## C.    Involve Advocates[40]:

Numerous advocacy groups throughout the greater Snohomish County area and region may be able to assist the jail in securing the mental health resources that are needed and for informing the public about the problems of inmates with mental illnesses in the jail. Many jails that have found little to no public or financial support for jail mental health services have discovered that advocates have the interest, mission and power to force changes and support that benefits the jail.

---

[40] Op Cit: La Crosse County NIC TA # 06B5007

Mental health advocacy groups and coalitions are interested in supporting appropriate mental health services in the jail. There is a view within the mental health community, the advocates, and the families, that the jail should be more treatment oriented.  As in many communities, the public is often confused about the discrete role of the jail in the criminal justice system. The jailer is often "blamed" for much of the perceived "unfairness" of incarceration as well as other components of the criminal justice system. There are paradoxical perceptions that criminals "should be locked away in harsh punitive correctional environments" until that "criminal" is someone that you know or is related. When a friend of relative is incarcerated there is recognition that much of the jail population is pre-trial and not convicted criminals. The perception shifts to "he/she is still a human being and the jail environment should be humane." These conflicting perceptions can result in a confused correctional philosophy that impacts funding for jail design, staffing, and programming. Even among the advocates (both family and agency) there are mixed perceptions of the jail and a willingness to believe that "jailers do not care." Unfortunately, jailers are stigmatized by public perception based on media stereotypes. I would encourage Snohomish County advocates to consider whether their perceptions are based on reality or media-driven stereotypes that stigmatize the very difficult jobs of jail personnel. If they are based on stereotypes, what can be done to further understanding and advocacy for jail personnel and inmates?

***RECOMMENDATION(S)***: Engage or develop a mental health coalition to become a voice to advocate for an appropriate level of mental health services at the jail. Current services cannot meet basic mental health needs; however, more could be done particularly in the programming area which will be discussed next. The mental health coalition could become a strong force to ensure that programs are put into place in the jail. Build stronger relationships with the members of an existing mental health coalition, with NAMI of Snohomish County, and other consumer advocacy groups. Contact the advocacy groups that provide services in the Snohomish County area. These would include local/regional chapters of National Alliance for Mentally Ill (NAMI) and other consumer groups. Each of the advocacy groups, whether they advocate for families or consumers, has their own mission. Study their missions, and contact the appropriate advocacy group(s) for each problem to be solved. Using the expertise of advocates often goes far in educating the public, the mental health system, and county funders about the problems providing services to the vast and growing numbers of inmates who have mental illnesses who are arrested and incarcerated in county jails. While there is public acknowledgment that mental health has lost funding across the country, there is minimal understanding that those funds were not transferred to the criminal justice system to treat the growing numbers of people with mental illnesses in jails. Advocates, once informed, are often an active voice that educates the public and mental health service providers about the limitations of jails. Jails are not and were never intended to be a treatment facility for people who have mental illnesses. These advocacy groups can stress the importance of diversion and alternatives to incarceration for people who have serious mental illnesses.

## XIII.  CONCLUSION

Based on this assessment, this consultant is convinced that the Snohomish County jail is, overall, a well-managed and professional correctional facility. Despite several opportunities to improve jail health care services, jail officials and staff continue to focus on doing the very best they possibly can within limited fiscal realities and crowded conditions. It is hoped that this document will be of meaningful assistance to Snohomish County officials in their continuing efforts to ensure constitutional and quality inmate health care services.

Special thanks are extended to Sheriff Trenary, Chief Miller and Major Baird, the jail staff, and County officials who participated in this short-term technical assistance study.

In conclusion, I want to take this opportunity to thank the National Institute of Corrections for providing this professional assistance to the Snohomish County, Washington Sheriff's Office.

# EXHIBIT B



# GONE BUT NOT FORGOTTEN
The Untold Stories of Jail Deaths
in Washington





May 2019

**Columbia Legal Services** advocates for laws that advance social, economic, and racial equity for people living in poverty. **www.columbialegal.org**

For more information about this report, please contact:

Nick Straley
101 Yesler Way, Suite 300
Seattle, WA 98104
(206) 464-1122 Ext. 144
nick.straley@columbialegal.org

Or visit:
https://columbialegal.org/policy_reforms/gone-but-not-forgotten/



www.columbialegal.org

 /ColumbiaLegalServices     @columbialegal    /columbialegal

## Dedication

This report is dedicated to the men and women who have died in Washington's jails and the family and friends who continue to grieve for them.

It contains graphic descriptions of terrible suffering and death. It includes statistics and numbers that chronicle those deaths in arithmetical terms. We have struggled with how to present this information in an informative and compelling way that also properly respects the real men and women who died while in custody. They were too often people whom society had ignored and thrown away, people fighting addiction, homelessness, mental illness, ill health, and poverty.

Yet each was also a husband, wife, father, mother, son, daughter, brother, sister, aunt or uncle, who ended up behind bars. Each of their lives was unique and special, but collectively their deaths demonstrate serious flaws in our carceral system: A punitive and inequitable model that holds people who have not been convicted of any crime simply because they cannot afford bail; a model that condemns people fighting mental illness and cognitive disabilities to serve days, weeks, or months for behaviors associated with their disabilities; a model compounded by chronically inadequate health care both in the community and in jails; a model that only provides housing to people when they finally end up behind bars; and a model deeply infected with systemic racism and classism. We hope that we honor the people whose lives were lost by shining a light on the institutions and systems that led to their deaths.

## Acknowledgements

The authors would like to acknowledge the tremendous efforts of so many people who assisted in researching, writing and publishing this report. They include Emina Dacic, Pamela Lyons, Maddie Flood, and Alexa Sinclair, who spent countless hours reviewing records and chronicling the terrible facts that those records memorialize. Alex Bergstrom assisted with research and drafting of the report, particularly sections related to suicides in jail. His help was essential. Staff at Columbia Legal Services, Maureen Janega, Maria Quintero, Odile Valenzuela, Julia Bladin, and Charlie McAteer all played vital roles in making sure that the report was grounded in fact, well written, and visually compelling. Adriana Hernandez particularly went above and beyond the call of duty by accommodating last minute changes and transforming half-baked ideas into readable text and persuasive charts. Other Columbia Legal Services staff, including Nick Allen, Kim Gunning, Hillary Madsen, Janet Chung, and Merf Ehman reviewed drafts, provided invaluable edits, and encouragement. Rachael Seevers and Disability Rights Washington provided pictures and access to other essential materials. Any errors are the authors' alone.

# Table of Contents

**EXECUTIVE SUMMARY** ....................................................................................................1

**LACK OF TRANSPARENCY LIMITS AVAILABLE INFORMATION ON JAIL DEATHS AND KEEPS MAJOR PROBLEMS HIDDEN FROM VIEW**....................................................4

**INFORMATION ABOUT WASHINGTON'S JAILS AND THE PEOPLE LOCKED UP INSIDE THEM** ..........................................................................................................................5
    Demographics of the people locked up in Washington's jails................................5
    Demographics of people who died in Washington's jails......................................6

**SUICIDE** .....................................................................................................................8
    General Risk Factors.........................................................................................9
    Individual Risk Factors....................................................................................10

**OVERDOSE AND WITHDRAWAL** ...............................................................................13
    Overdose.......................................................................................................13
    Withdrawal.....................................................................................................15
    Other Serious Medical Conditions Left Untreated...........................................17

**USE OF FORCE AND NEGLECT** .................................................................................18

**RECOMMENDATIONS** ...............................................................................................21
    Reduce the number of people living with mental illness or substance use disorders in jails..22
    Increase oversight and transparency of what happens inside jails..........................22
    Every jail must have an adequate and timely medical, mental health, and substance use intake process..........................................................................................22
    Every jail must have overdose and withdrawal protocols and provide medications when appropriate......................................................................................23
    Jails must change how they care for people who have expressed suicidal thoughts or may be actively suicidal..........................................................................23
    Staff must be trained to manage people in crises, utilize effective de-escalation techniques, and use force only when absolutely necessary...................................24
    Each jail must have enough staff to ensure that all people receive appropriate supervision and care......................................................................................25
    Every jail should be required to engage in a full serious incident administrative review and provide that report to appropriate third parties......................................26

**CONCLUSION** ..........................................................................................................26

# Executive Summary

Only 22 years-old, Lindsay Kronberger, a four-sport athlete while in high school, battled drug addiction and ended up in jail, booked into the Snohomish County jail on January 3, 2014.[1] Upon booking, she admitted to having recently taken heroin and that she was feeling the early stages of withdrawal. Over the next several days, Lindsay suffered terribly from severe nausea, vomiting and diarrhea.

Weighing only 95 pounds at booking and appearing "emaciated," Lindsay proceeded to lose another eight pounds while locked up. Medical professionals in the jail noted that her blood pressure



Source: https://www.seattlepi.com/local/crime/article/Claim-Jailers-mocked-dying-young-woman-during-9121704.php

fluctuated dramatically during the nine days she spent there. Desperate because of the severity of her symptoms, she begged to be taken to the hospital, but reports indicate that the jail's staff did not feel it was necessary and so she remained in the Snohomish County jail. At one point, Lindsay was so weak that she was not able to walk even a few feet from her cell. A federal judge would later note that "more intensive therapies could have been initiated to improve her hydration and reverse the deadly spiral of vomiting and diarrhea that resulted in severe dehydration and electrolyte imbalance."[2] Nine days after being booked into jail, Lindsay was found face down in her cell's toilet - dead from dehydration-triggered cardiac arrest.

Lindsay's untimely death is unfortunately not an isolated incident. Every day many people suffering like her are booked into jails throughout Washington. Some, like Lindsay, die there. Many of these deaths are entirely avoidable, caused in part by society's failure to properly care for the many people with mental illness, traumatic brain injuries, cognitive disabilities, and substance use disorders who end up behind bars. Faced with the chronic failure of federal, state, and local governments to properly fund essential services, jails struggle to maintain order and treat all people humanely, respectfully, and safely.

On any given night, roughly 12,500 men and women sleep behind the walls of county and local jails in Washington. Most of them have not been convicted of a crime and are there simply because they cannot afford the bail that a court has set.[3] Those who have been convicted are generally serving short sentences for low-level crimes or minor probation violations. The majority are indigent, and many battle substance use disorders and symptoms of severe mental illness, traumatic brain injuries or cognitive disabilities.[4] Others come to jail suffering from complicated, chronic, and poorly managed medical conditions, such as diabetes, coronary heart disease, high blood pressure, and asthma. People locked up in jails are our friends and family members. Over half of all adults in the United States have an immediate family member who has been incarcerated.[5]

Unfortunately, society has abdicated its responsibility to provide humane, cost-effective, community-based housing and treatment services for people with serious medical, mental, and behavioral health needs. Instead we spend millions of dollars a year warehousing people in our jails - institutions ill-equipped to provide appropriate and adequate care.[6] Far too many die behind bars as a result.

> *Jails operate without public transparency or outside supervision. As a result, policy makers and the public are largely unaware of the true costs of incarceration.*

Jail deaths are merely the most egregious examples of the systemic failures that injure thousands of people locked up in Washington every year. The misdirection of resources to Washington's jails and away from other more effective and humane, community-based alternatives has caused unnecessary suffering and death. In this report we review deaths in Washington jails in the hope of spurring reform to ensure that no person needlessly dies behind bars.

Locking people up in jail is not cheap. Washington counties and localities spend hundreds of millions of dollars a year holding people in jail. King County will spend over $320 million in the next two years to operate its jails.[7] Spokane County spends over $43,000 per detainee per year in its jails.[8] By comparison, Spokane Public Schools spends under $12,000 per student each year.[9]

> *Each year Spokane County spends **$43,000 per detainee**. By contrast, the Spokane Public Schools spends under **$11,700 per student**.*

Moreover, the allocation of millions of dollars to jails is not effective, as medical and mental health care remain seriously deficient in many jails.[10] As Disability Rights Washington has noted: "while mental health treatment may prevent inmate deterioration and enhance protection from self-harm and suicidal or homicidal ideation, jails are ill-equipped to respond appropriately to the needs of individuals with mental illness seeking mental treatment."[11]

This report takes a deep look at available information regarding deaths that occurred in Washington jails between January 2005 and June 2016.[12] On average, 17 people died every year while locked up during this period. Though a small percentage of the total population, these events highlight larger issues within the jail system, as many other people suffer severe non-deadly harms as a result of our carceral system.

Our analysis of the available data on jail deaths reveals the following:

- Most jail deaths occur within the first days following booking.
- Drugs or alcohol played a significant role in many of the deaths, and these deaths are by and large avoidable.
- Few jails appear to have effective policies and practices in place to avoid deaths caused by overdose or withdrawal from drugs or alcohol.

- Suicide, particularly suicide by hanging, makes up a large percentage of deaths, and current practices in many jails may be increasing the likelihood of suicide.
- Use of force or neglect by jail officers played a contributing role in a significant number of deaths.

People will continue to needlessly die in jails until adequate resources are put into cheaper, community-based programs and treatment. A few relatively inexpensive reforms can reduce or eliminate deaths in Washington's jails. These reforms include:

1. Reducing the number of people living with mental illness, cognitive disabilities, or substance use disorders in jails by increasing diversion programs, eliminating the use of cash bail, and improving community-based treatment and housing options.

2. Increasing oversight and transparency by establishing reporting requirements and introducing statewide standards and monitoring of jails.

3. Implementing an adequate and timely medical, mental health, and substance use intake process in every jail that includes a thorough health examination of each person detained for more than a few days.

4. Using evidence-based overdose and withdrawal protocols in every jail that include appropriate medications and other vital medical, mental health, and substance use disorder interventions.

5. Instituting comprehensive suicide prevention policies and practices that treat all people with dignity and eliminate isolation as a method of responding to people who threaten suicide.

6. Training all staff on how to manage people in crisis, utilize effective de-escalation techniques, and only use force when absolutely necessary.

7. Providing sufficient financial resources to ensure that all jails employ enough staff to properly supervise and care for every person locked behind bars.

8. Requiring that every jail perform a comprehensive and detailed, serious incident administrative review and prepare a written report which is shared with the Washington State Department of Health or another appropriate agency and the public.

Implementing these relatively few reforms will dramatically reduce the number of people injured, disabled, or killed in our jails.

# Lack of Transparency Limits Available Information on Jail Deaths and Keeps Major Problems Hidden from View

Washington is one of 17 states that lack any type of state oversight of jail operations or conditions.[13] Though jails house thousands of people every year and have become the primary health care provider for many Washingtonians, local governments have no obligation to provide information to any state agency or the public regarding conditions within their jails. Information that jails voluntarily provide to the federal government and the Washington Association of Sheriffs and Police Chiefs (WASPC) is extremely narrow in scope and divulges very little about what is actually happening behind jail walls.[14]

The information in this report comes from a review of documents we received from jails regarding any person who died while in custody between January 1, 2005, and June 15, 2016. We received thousands of pages of documents from 54 jails based on our Public Records Act requests to each of the 59 county, local, and joint-jurisdictional jails in Washington. While many jails provided significant documentation, several jails provided nothing or very little documentation. We supplemented the review of jail-provided documents with WASPC and federally published data, media reports, and other publicly available information to gain as complete a picture of each death as possible. However, in a number of cases we had difficulty determining the facts because of limited disclosures and severely redacted documents.

State law protects jails from having to disclose dangerous conditions or serious events to state government or the public. RCW 70.48.100 contains a broad exemption from Washington's otherwise expansive Public Records Act. This provision generally bans disclosure of "records of a person confined in a jail" to all parties but law enforcement.[15]

As we discovered during the investigation for this report, jails interpret the bounds of this exemption differently. A number refused to provide any information at all - not even the names of people who died in their custody. Others provided basic information regarding the death itself, but withheld information regarding contributing factors that may have played a role in the death.

Illustration 1, below, is an example of the heavily redacted documents that counties and cities typically provided in response to our Public Records Act requests.

Undoubtedly, it is important to protect the confidentiality of some jail records. However, a legitimate need to maintain the privacy of detainees should not allow jails to keep bad practices and unfortunate events hidden from view. Absent legislative changes to mandate some level of oversight and reporting, jails will continue to operate without transparency or real accountability.[16]



Photo Credit: Alex Bergstrom

# Information about Washington's Jails and the People Locked Up Inside Them

There are 59 county, local, and joint-jurisdictional jails in Washington. Combined, these jails are designed to hold 14,819 people.[17] The number of people locked up in each jail differs dramatically, from a reported average of seven people per night in the Oak Harbor city jail to almost 2,000 people per night in the two King County jails. The top five largest jails in Washington house roughly half of all people detained in the state, while the 44 smallest jails hold less than a quarter of all people.

The cost to incarcerate people also varies by jurisdiction, from a low average daily bed rate of $31 per night per detainee in Adams County to more than $100 per night in a number of larger jails.[20] In 2017, Snohomish County spent almost $92,000 a day to keep people locked up every night inside its jail.[21]

*In total, Washington jails are designed to hold almost 15,000 people. Between 12,000 and 12,500 people sleep in jail on an average night, meaning that Washington has at least 2,500 more jail beds than it currently needs.[18] Nonetheless, some jails are significantly overcrowded, including Clark, Spokane, and Whatcom County jails.[19]*

## Demographics of the people locked up in Washington's jails.

The gender, racial, and ethnic breakdown of people held in jail between 2007 to 2015 is set out in Figure 1. Men made up more than 85% of the jail population during that period.[22] People of color are also disproportionately represented in Washington's jails. Black Washingtonians are just over 4% of the state population, but represent 16% of people incarcerated in our jails. Similarly, Native Americans make up less than 2% of the state population, but 4.5% of people in jail.



Figure 1: People in Washington's jails

| Washington State as a Whole[23] | VS | Total in Jail 2007-2015 |
|---|---|---|
| 50% | Men | 85% |
| 50% | Women | 15% |
| 80% | White | 70% |
| 4% | Black | 16% |
| 13% | Latinx | 6% |
| 2% | Native American | 5% |
| 10% | Asian | 3% |

The average jail stay is 16 days, but most people booked into jails stay for only a few days - 40% for fewer than 24 hours. However, many people remain in jail for months or even years.[24]

People entering into jail tend to have more significant behavioral health needs than the general public.[25] One study indicates that as many as 60% of people entering Washington jails may have either a substance use disorder or a mental health need, and over 40% have co-occurring disorder indicators.[26] These local numbers are similar to national averages.[27]

In addition, many people arrive with other complicated and poorly managed medical needs. People detained in jails are nearly two times more likely than the general public to experience high blood pressure, asthma, or diabetes.[28] Nationally, over half of jail detainees report having experienced a chronic medical or mental health condition at some point in their lives, and three-quarters were experiencing that condition upon admission to jail.[29] The incidence of chronic conditions is greater among women than men.[30] Not surprisingly, the older the person, the more likely she will suffer from a chronic medical condition.[31] Moreover, the rates of chronic medical conditions among people in jail are increasing at a dramatic clip.[32] Available data indicate that local conditions reflect these national trends.[33]

Roughly two thirds of people sitting in Washington jails are awaiting trial, none of whom have been found guilty of the crime with which they have been charged. Most languish there because they cannot afford the cash bail that courts routinely require. The remaining one-third of people in jail are serving low-level, mostly misdemeanor sentences of less than a year or are being held for short stays for violations of Department of Corrections community custody conditions.

# Demographics of people who died in Washington's jails.

We reviewed records of 210 people who died while in the custody of Washington jails between January 1, 2005, and June 15, 2016.[34] The gender and racial or ethnic breakdown of the people who died is set out in Figure 2.



Figure 2: People who died in Washington's jails

The ages of people who died ranged from the youngest, who was 18, to an 82-year-old man. The average age of people who died was 40.

Most deaths occurred within days of booking. Over 72% of all deaths occurred within 14 days, and most occurred within the first seven days.[36] The numbers are particularly stark for women. 82% of all women who died did so within 14 days of booking, with 73% dying in the first seven days. *See* Figure 3.



Figure 3: Length of stay before deaths

■ Died within 14 days of admission  ■ Died within 7 days of admission

The vast majority of early deaths involved alcohol, drugs, or suicide. Substance use-related deaths and suicides made up 85% of the deaths that occurred within the first 72 hours of admission.[37] Figure 4 identifies the number and percentage of deaths that involved drugs or alcohol within the first week and after eight days.

### Charge or conviction[38]

47% of the men who died were charged or convicted of a violent offense, including domestic violence, while 62% of women were charged or serving a sentence for a property, driving, or drug crime or were serving time on an outstanding warrant or DOC violation.



Figure 4: Deaths related to drugs or alcohol by time period

■ Number of deaths involving drugs or alcohol

■ Percentage of deaths involving drugs or alcohol

| Time period | Number | Percentage |
|---|---|---|
| < 72 Hours | 37 | 67% |
| 3 - 7 Days | 21 | 47% |
| 8+ Days | 14 | 27% |
| First week | 58 | 58% |



Figure 5: Type of charge

| Women | | Men |
|---|---|---|
| 16% | Violent | 36% |
| 22% | DV | 11% |
| 22% | Property | 18% |
| 5% | Drugs | 8% |
| 8% | Driving | 13% |
| 22% | Warrants | 11% |
| 5% | Other | 3% |

## Cause of death

Suicide is the leading cause of death among both women and men in Washington jails, causing over 42% of all deaths and over 45% of deaths of men. A disproportionately greater number of women - almost 20% - died as result of withdrawal from drugs or alcohol. Eleven men died as a result of homicide, accident, or use of force. Moreover, uses of force may have played a role in at least ten other deaths. No women died as a result of one of these three categories.

| Figure 6: Cause of death | | | | | |
|---|---|---|---|---|---|
| | Women | Percentage of women deaths | Men | Percentage of men deaths | Percentage of total deaths |
| Accident | 0 | 0% | 3 | 2% | 1% |
| Withdrawal | 8 | 18% | 5 | 3% | 6% |
| Cardiac event | 6 | 13% | 12 | 7% | 9% |
| Homicide | 0 | 0% | 2 | 1% | 1% |
| Illness | 10 | 22% | 40 | 24% | 24% |
| Overdose | 2 | 4% | 9 | 5% | 5% |
| Suicide | 15 | 33% | 74 | 45% | 42% |
| Unknown | 4 | 9% | 14 | 8% | 9% |
| Use of force | 0 | 0% | 6 | 4% | 3% |
| TOTALS | 45 | 100% | 165 | 100% | 100% |

## Information about individual jails

Larger jails experienced a higher rate of death than smaller jails. While some jails had no deaths during the period reviewed, a number of jails had multiple deaths.[39] For example, 22 people died, 16 by suicide, in the Clark County jail between January 2005 and June 2016. Other jails that have experienced disproportionately greater rates of death include the Cowlitz County, Okanogan County, Whatcom County, and Spokane County jails. A number of these jails also appear to house many more people than their facilities are designed to detain, indicating significant overcrowding. Specific information for deaths by jail is included in the Appendix at the end of this report.

# Suicide

Suicide is a leading cause of death in jails both nationally and in Washington. Recent high-profile incidents, including the deaths of Sandra Bland and Aaron Hernandez, have raised public awareness of the issue around the country, and at an important time. After falling steadily for two decades, suicide rates in jails have been rising nationally since 2009.[40] Yet despite the risk and the increased incidence of suicide in jails, nationally, only 20% of jails have written policies that encompass all the important components of suicide prevention.[41] A jail that fails to take active, appropriate, evidence-based steps to prevent suicides is operating illegally and faces significant risk of liability.[42] Factors that make jails a particularly high-risk environment include the large proportion of inmates who

have mental illness, the high rate of enforced withdrawal from alcohol and drugs, and the traumatic effect that criminal conviction and incarceration have on an inmate's personal life.[43]

Experts generally agree on the factors in a jail setting that increase the risk of death by suicide and on the contents of a "gold standard," comprehensive, suicide prevention program.

> *A comprehensive prevention policy must consider who is at risk, when they are at risk, and how that risk manifests into self-harm.*

## General Risk Factors

There are a collection of general and individual risk factors for suicide that converge uniquely in jail settings. Unfortunately, many Washington jails utilize suicide prevention practices or have design flaws that increase the likelihood of suicide and place people at risk. Inadequate staffing, protocols that provide for isolating potentially suicidal detainees and cells or other physical structures that enable hanging are particularly dangerous. Over 80% of jail suicides in Washington occurred as a result of hanging, many occurring in single occupancy cells or in other spaces where detainees were alone, like showers.[44] A few examples demonstrate how too few staff, isolation, and jail design are contributing factors in many suicides.

> *"[I]solation escalates a sense of alienation and further removes the individual from proper staff supervision. Whenever possible, suicidal inmates should be housed in the general population unit, mental health unit, or medical infirmary, and should be located close to facility staff."* [45]

- A.G.A. died as a result of suicide in the Chelan County jail after being isolated for "mental health problems" and violence toward jail staff. There were many indications that A.G.A. was at risk of suicide, including a history of attempts and concerns expressed by his wife. Unfortunately, instead of being monitored in a medical setting, A.G.A. was housed alone with two hours between wellness checks. He was found hanging in his cell and pronounced dead soon thereafter at a local hospital.

- After being booked into the Yakima County jail, S.K. was moved to solitary confinement for "anti-social behavior." She was placed in isolation even though her medical records indicate that she had previously attempted suicide and struggled with mental health issues. S.K. repeatedly activated the emergency button in her cell during the night and early morning before her death, imploring jail officers to let her out of solitary confinement. Later that morning, another inmate found her hanging from a sheet in her cell. Paramedics rushed her to the hospital, but she died there a few days later. S.K.

had been scheduled to see a mental health care provider the next day.

- C.S. died in the Franklin County jail from hanging. He had attempted suicide during his last admission at the jail, resulting in a days-long hospital stay. His booking intake indicated that he had a history of suicidality and might be currently suicidal. However, this information was not conveyed to the jail's mental health staff. C.S. was placed in isolation without constant observation and took his own life a few days later.



As a matter of general practice, many jails place people who describe suicidal thoughts or threaten self-harm in solitary confinement, usually without constant, direct observation by staff. This type of "suicide watch" is often humiliating and dehumanizing.

Photo Credit: Hamilton Medical Products

People are generally stripped of all of their clothes and placed naked in a "suicide smock," a tear-resistant bag with slots for arms and the head. They are often held in "dry" cells, concrete or padded cells without running water or other fixtures, the only toilet a grated hole in the floor. Some may be shackled for hours in a restraint chair or other device that severely limits body movements.

Not only can these practices increase the dangers that someone may take his own life, they also may deter potentially suicidal people from making their intentions known. A number



of people who died from suicide did so without expressing their thoughts because of terrible, dehumanizing experiences they had suffered during a prior placement in isolation as part of a "suicide watch."

- B.O. was booked into Clark County jail and was placed on suicide watch at one point. His solitary confinement continued after being released from suicide watch. Other detainees apparently informed jail staff that B.O. was not stable. However, no mental health staff was available to evaluate him at the time. B.O. was found hanging from a bed sheet tied to the crossbars of the window frame in his cell the next day. Officers found a suicide note he had written that said in part that he did not want to be forced into a suicide vest again.

## Individual Risk Factors

Individual risk factors such as age, length of stay, type of charge, and co-occurring mental health disorders also show strong correlation with the incidence of suicide. In absolute terms, most suicides in jails are committed by men. However, women are at greater risk of suicide than men relative to their numbers in jails.[46] There is very little research on suicide rates among transgender and gender non-conforming people in jails. Though it is likely

that they also face an increased risk of self-harm because of the unique hardships they face while incarcerated.[47]

At additional risk are the very young or very old; people who have a history of suicide attem pts; are intoxicated at the time of incarceration; have an ongoing substance use disorder; have experienced recent personal trauma; are experiencing one or more mental illnesses; or are facing sex offense charges.[48] These factors were present in a number of the deaths by suicide that we reviewed.

- B.C. was arrested after he drunkenly assaulted a bus driver. He resisted arrest and was clearly severely intoxicated during his arrest and subsequent booking into the Thurston County jail. Because of his condition he was placed alone in a cell and a nurse was called to evaluate him. The nurse decided that he was healthy enough to remain alone. Later that day, he dove head-first from the top bunk of his cell, killing himself.

Generally speaking, suicide attempts are most likely at certain points during a detention.

Most suicides take place within the first days of incarceration. Over half of suicides in Washington jails occurred in the first week of incarceration. However, suicides occur at any stage. 17% occurred after the person had spent more than three months behind bars.

Specific events can also increase the chances of suicide. Negative outcomes in a person's case (conviction or other bad news) and withdrawal from drugs or alcohol make suicide more likely. Other triggering events such as bad news from family on the outside, conflicts with cellmates, or ongoing substance abuse also increase the chances that someone may engage in self-harm.[49]

### Figure 7: Deaths by suicide by length of stay

Number of suicides

Percentage of total known suicides

| Length of stay | Number of suicides | Percentage |
|---|---|---|
| < 72 Hours | 19 | 25% |
| 3 - 7 Days | 25 | 33% |
| 8 - 14 Days | 5 | 7% |
| 15 - 90 Days | 15 | 20% |
| 91+ Days | 13 | 17% |
| Unknown | 12 | |

"[H]igh risk periods include immediately upon admission, following new legal problems (e.g., new charges, additional sentences…), after the receipt of bad news regarding self or family…, after suffering humiliation (e.g., sexual assault) or rejection[.]"[50]

| Figure 8: Charge faced by people who died from suicide | | | | | | |
|---|---|---|---|---|---|---|
| | Women | Men | Total | Percentage of women | Percentage of men | Percentage total |
| Violent | 4 | 26 | 30 | 33% | 46% | 45% |
| DV | 3 | 8 | 11 | 25% | 14% | 16% |
| Property | 0 | 10 | 10 | 0% | 18% | 15% |
| Drugs | 0 | 4 | 4 | 0% | 7% | 6% |
| Driving | 1 | 3 | 4 | 8% | 5% | 6% |
| Warrants | 3 | 4 | 7 | 25% | 7% | 10% |
| Other | 1 | 1 | 2 | 8% | 2% | 3% |

Most of these risk factors were apparent in the population of people who died as a result of suicide in Washington's jails. Substance use issues, including active withdrawal or a recent history of substance use disorders, appear to have contributed to many of the suicides. Moreover, at least 19 of the decedents had previous suicide attempts. Most of the men who died were awaiting trial for violent offenses, including domestic violence. Six men facing a sex offense charge died as a result of suicide. In every case but one, the underlying charge involved sexual conduct with a child. Women who died of suicide were more likely to be charged with a violent crime than women facing criminal charges generally.

Importantly, many people who took their own lives made their intentions clear to other people within a few days of their deaths. Records indicate that at least 22 people expressed suicidal intentions to someone, including jail staff, other detainees, or family members before their final suicide attempt. Others had been actively suicidal during their current admission, including at least 13 who had been on suicide watch at some point prior to the attempt that ended in their death. Records indicate the jail had notice of some sort that the person was likely suicidal in at least 30 instances.

- R.M.G. died as a result of suicide in the Skagit County jail, at age 59 following a recent 20-26 year sentence for multiple counts of child rape. After expressing suicidal thoughts to his lawyer and jail staff, he refused food, water, and diabetes medication for days. He died from complications related to his unmanaged diabetes, apparently without the jail taking active steps to intervene and provide him with necessary medical care.

- D.M. was booked into Clark County jail on March 29, 2015. He had a history of mental illness, including hospitalizations and previous suicide attempts. The jail's mental health intake indicated he had mental health needs. Prior to his death, D.M.'s fiancée called the jail to discuss his need for psychotropic medications. A mental health care provider met with D.M., who denied being suicidal or needing medication. However, D.M. spoke with his father on the telephone the day that he died. His father reported that D.M. had not been doing well emotionally when they last spoke. D.M. was in solitary confinement when he hung himself on March 30.

Among the records we compiled were stories of people misidentified, misplaced, and mishandled even when properly identified. The use of isolation cells, inattention to

the presentation of risky behavior, lack of communication and monitoring, and dangerous fixtures inside of cells all stand out as common threads through much of our data.

Although each case includes its own unique circumstances, as discussed below, there are comprehensive policies and practices that if implemented will save lives in the future.

# Overdose and Withdrawal

It's estimated that more than 47,000 people in Washington regularly use opioids (heroin or prescription pain medications) and over half of them will be incarcerated in a Washington jail at some point in 2019.[51]  Nationally, overdose from drugs, particularly opioids, has become the leading cause of death for Americans under 50.[52]  A recent report stressed the need for Washington jails to implement effective and appropriate treatment protocols to avoid needless overdoses or deaths caused by unmanaged withdrawal.[53]

> *"Failure to treat opioid use disorder during incarceration has serious consequences, including an extremely high risk of death of overdose death after release, [death or injury] from opioid withdrawal during incarceration, high rates of crime and recidivism, and social and medical consequences of untreated opioid use disorder after release."* [54]

Drugs or alcohol played some part in at least 38% of all of the jail deaths, the percentage being significantly higher for women than men.

Drugs or alcohol were likely at least a contributing factor in 54% of the deaths of women.[55] Irrespective of gender, most deaths that occurred within the first few days following booking were related to drugs or alcohol. As set out in Figure 4, 60% of the deaths within the first week of admission involved drugs or alcohol. The vast majority of deaths involving drugs or alcohol occurred within the first seven days after booking.

Drug- or alcohol-related deaths included overdoses and alcohol poisonings, deaths caused in part by poorly managed withdrawal, and deaths caused by other serious medical conditions whose symptoms jail staff mistakenly attributed to withdrawal. These deaths highlight what can occur without proper management and supervision of people suffering from substance use disorders or withdrawal from those substances.

## Overdose

Many people are arrested under the influence of drugs or alcohol and brought directly to jail. As a result, death or injury from overdose or alcohol toxicity is a significant danger within the first few hours after booking.

- Following his arrest on drug charges, D.D. was taken to the hospital by the arresting officer prior to booking because of concern that he had ingested heroin. He was cleared at the hospital and booked into the King

County jail. Though being monitored in a holding cell, because of concern about his high blood sugar, he died as a result of acute combined heroin and cocaine intoxication.

- T.S. was arrested for DUI and booked into the SCORE jail in Des Moines. During the booking process, jail officers observed him slumping forward in his chair with his eyes rolling back in his head. He was incontinent, had difficulty answering questions, and appeared to lose consciousness at points during the process. At one point, he required medical attention after suffering a seizure. He was placed in a cell and found unresponsive a few hours later on a mattress soaked with urine. Notes indicate that his death was caused by possible withdrawal from alcohol or benzodiazepines.

While most prevalent within the first hours after booking, overdoses can also occur later in a person's incarceration, either through drugs smuggled into the facility or from jail-provided medications that are stored over time and then taken in high doses.

- V.T., a man with serious mental illness, was booked into Clark County jail. During intake he made suicidal statements and was put on suicide watch. After a series of volatile and unpredictable outbursts, V.T. was sent to Western State Hospital for three months for observation and treatment. A week after his return to Clark County Jail, V.T. died of an overdose of the psychotropic medication, fluoxetine, also known as Prozac. Investigators believe that he stored his medications for a period of time and then took a massive amount that ended his life.

Deaths and injuries from overdose are largely



Photo Credit: Adapt Pharma

preventable. Simple medical interventions can mean the difference between life and death for someone experiencing an overdose. Naloxone and other similar medications immediately block the sedative effects of opioids and bring someone experiencing an overdose back from the brink of death.

These medications are easily administered, even in a non-clinical setting. NARCAN, a form of naloxone, can be given via a nasal spray, without the need for needles or any other significant medical procedure. There is no reason why every jail in the state should not have a ready supply of Naloxone and officers trained to administer it when necessary. Eliminating overdoses from opioids in Washington jails is readily attainable, provided jails do their part.

Treatments for severe alcohol poisoning involve more invasive medical procedures that are routinely done in emergency rooms across the country. With proper training, correctional officers can learn to identify when a person is in need of more intensive medical attention as a result of possible alcohol toxicity. Timely action is absolutely essential to avoid an otherwise entirely needless death. People will continue to die of overdoses inside jail walls if jails remain unprepared and their staff untrained.

# Withdrawal

A person with an active substance use disorder will likely suffer withdrawal symptoms upon being booked into jail. A range of awful and debilitating symptoms accompany withdrawal from opioids, including severe muscle aches, agitation, sweats, hypertension, fever, nausea, vomiting, diarrhea, abdominal cramps, depression, anxiety, severe drug cravings, and suicidal thoughts.[56] Symptoms can begin within a few hours of last use and continue for a week or more, depending on the substance and the severity of use.[57] These symptoms can kill people if not properly treated.

The withdrawal process for someone coming down from alcohol can also be very dangerous or even fatal. Similar to opioid withdrawal, alcohol withdrawal can cause anxiety, muscle aches, nausea, vomiting, high blood pressure, or insomnia. If not properly managed, alcohol withdrawal can also bring on serious hallucinations, and in severe cases, seizures, heart arrhythmias, and death.

> *"Contrary to commonly held notions, withdrawal is often not only uncomfortable or painful, but also may be harmful to health and even fatal."* [58]

The National Commission on Correctional Health Care (NCCHC) makes clear that "severe withdrawal symptoms must never be managed outside of a hospital. Deaths from acute intoxication or severe withdrawal have occurred in correctional institutions."[59] Cases in Washington demonstrate the dangers of poorly managed withdrawal inside of jails.

- S.D. was booked into Cowlitz County jail on August 3, 2013. The next day she sought medical attention for withdrawal from heroin and methamphetamines. She was placed on a withdrawal protocol and her symptoms, including severe "stomach problems," continued for the next several days. At times, she was unresponsive when contacted by staff. On August 10, a nurse found S.D. slurring her words, and she had difficulty finding her pulse. S.D. went into cardiac arrest and lost consciousness. She was rushed to the hospital, but died shortly after arrival.

- B.B. was taken to the hospital and cleared by staff there before being booked into the King County jail. The next day he was found unresponsive in his cell. Emergency measures were unsuccessful and B.B. died. Other detainees told investigators that B.B. had been seriously ill from vomiting and diarrhea and repeatedly sought the attention of jail staff by ringing the emergency bell for assistance, without success. The coroner's report found that he died as a result of dehydration from vomiting and diarrhea as a consequence of withdrawal from opioids.

Suffering withdrawal in jail can be incredibly dehumanizing, debilitating, and in some circumstances, fatal. During our work with people incarcerated in jails across the state we have heard numerous stories of people in the midst of severe opioid or alcohol withdrawal being left alone, unsupervised in solitary confinement; condemned to agonizing cramps, nausea and pain while sleeping in their own filth and vomit. Others have described sharing a tiny cell with someone in the grip of withdrawal, heaving into a shared toilet and moaning throughout night.[60]

- G.G. was booked into Okanogan County jail on October 18, 2014, for the delivery of controlled substances including heroin, methamphetamine, mushrooms, and oxycodone. Upon booking, G.G was severely nauseous and vomiting because of withdrawal. Though provided medications for nausea, he had on-going bouts of vomiting and refused to eat or drink because of his symptoms. On October 21, G.G. begged to be taken to the hospital because of his severe, ongoing withdrawal symptoms. Jail staff refused his request, and later that day, he was found dead in his cell.

- K.J.M. was booked into King County jail on September 15, 2007 after her arrest for selling narcotics. During booking K.J.M. apparently passed out and fell to the floor, injuring her head in the process. She was taken to Harborview Medical Center for evaluation. After being treated for her head injury, K.J.M. was transported back to the jail where she began exhibiting signs of "dope sickness." For the next several hours she suffered frequent vomiting and bouts of loose stool, but reportedly refused medical attention. K.J.M. placed her mattress pad on the floor of her cell to be closer to the toilet. The next morning K.J.M. was unresponsive. Resuscitative efforts failed and she died. King County implemented new protocols for monitoring people experiencing withdrawal after her death.

- D.G. died in custody in Pierce County jail due to severe alcohol withdrawal only a few days after being booked into jail. He had been experiencing extreme withdrawal symptoms, smelled toxic, and had not been eating prior to his death. Jail staff expressed concerns to nursing staff, but since he was able to hold down some water, no other efforts were made to help him. He died alone in his cell.

- M.M., an 18-year-old man battling bi-polar disorder and schizophrenia, was booked into the Benton County jail after becoming agitated at a Richland mental health facility. Reports indicate that jail staff provided him with water and food, but did not monitor whether he was actually eating or drinking. M.M. was found dead in his cell eleven days after he arrived. The coroner ruled that he died as a result of an irregular heartbeat and dehydration related to use of synthetic marijuana.



The need for humane medical care for people experiencing withdrawal in jails is particularly important because people admitted to jail are forced to go through withdrawal regardless of whether they are psychologically and emotionally prepared to do

so. Unlike people who seek treatment in the community, withdrawal behind bars occurs without the true consent of the person affected there by increasing the chances of depression, anxiety, and immediate relapse upon release from jail.

Medications and proper medical care can greatly reduce the terrible effects of withdrawal and eliminate the chances that someone may die as a result of unmanaged withdrawal.

Medications like methadone, buprenorphine, and naltrexone minimize the suffering that withdrawal causes and help people avoid relapse.[61] Other medications can assist with withdrawal from alcohol and other drugs. Experts therefore stress the need for appropriate medication management of people suffering withdrawal in jail.[62] All jails should have medications readily available for people who are struggling with substance use disorders.[63]

> *A recent report on withdrawal services in Washington jails recommends that jails "[c]losely monitor patients at risk for opioid withdrawal using a validated instrument, and treat withdrawal symptoms with buprenorphine, or methadone, if available."* [64]

A jail that fails to provide these essential medical services is operating in violation of its constitutional and other legal obligations.[65] Unfortunately, a recent study found that most Washington jails have no protocol for monitoring withdrawal, and fewer than half of the jails surveyed provided any medications to people suffering withdrawal.[66]

## Other Serious Medical Conditions Left Untreated

Withdrawal symptoms can also mask, multiply, or replicate symptoms caused by other medical conditions that if left untreated can also prove disabling or even fatal. Sepsis, pneumonia and staph infections, including MRSA infections, are regularly found in people who have been living unsheltered or recently using intravenous drugs. Unless medical professionals are knowledgeable and careful, symptoms of these illnesses can be easily mistaken for symptoms of withdrawal, or withdrawal can mask symptoms of these other potentially life-threatening conditions. Jail staff in a number of cases failed to properly diagnose and treat serious medical conditions because it appears they attributed reported symptoms to withdrawal.

- L.L. died from a severe lung infection after a stay in the Snohomish County jail. Reports indicate that she had sought treatment for severe breathing problems for a number of days, had a high temperature, elevated heart rate, and low oxygen saturation. Nonetheless, medical staff did not provide her with antibiotics or order a chest x-ray. They did, however, note that they believed that she was "drug seeking." She died when her chest filled with fluid, collapsing her lungs and suffocating her. Snohomish County agreed to pay L.L.'s estate $1.5 million in damages as a result of its negligence in her death.

- L.I. was booked into the King County jail on disorderly conduct and drug charges. Two days later, he complained of severe abdominal pain, reporting that it felt like his "liver exploded." He required a wheelchair to get from his cell to the infirmary because of the pain. Medical staff in the infirmary noted in

his records that he was coming down from heroin and alcohol. He asked to be taken to the hospital because of his pain, but instead medical staff placed him in the medical unit in the jail for observation. He was found unconscious and unresponsive the next morning. An autopsy showed that he died of acute peritonitis (burst appendix). His life could have been saved had he received appropriate treatment promptly upon reporting his symptoms.

People like Lindsay Kronberger have died from inadequately managed withdrawal, others from overdoses, and still others, because medical professionals mistook symptoms and failed to properly treat other serious medical conditions. These deaths demonstrate that medical professionals operating in jails must provide medications and other appropriate therapies to mitigate the symptoms of withdrawal, and also carefully evaluate the patient in order to determine whether some other serious condition may also be involved. Jails must take active steps to avoid any additional needless deaths from overdose, withdrawal, or other serious medical conditions.

## Use of Force and Neglect

A number of deaths have been caused in part or in whole by uses of force committed by jail officers or by outright neglect of the people under their care. A use of force appears to have played a factor in at least 16 deaths reviewed. Most of these deaths occurred following the use of Tasers, restraints, or direct physical takedowns of detainees.[67] Often they also involved the interplay of excessive alcohol or drug use, mental illness, and poor medical or mental health treatment. A few examples demonstrate how a number of variables including uses of force can come together with tragic consequences.

- B.W. died while being booked into the Snohomish County Jail for shoplifting beer and cigarettes. B.W., a man with a long history of alcoholism, drug dependency, and mental illness, became combative during the booking process, whereupon jail officers wrestled him to the ground and shocked him with a Taser. He began struggling to breathe and turned blue. When he appeared to recover, jail officers attempted to place him in an isolation cell, but he began to resist again. An officer shot him again with a Taser. Finally, four officers wrestled him into a cell and left him on his stomach with his hands cuffed behind his back. An officer estimated that about a minute later she saw B.W. take two deep breaths and then stop breathing. Officers flipped him onto his back, pulled him out of the cell and began



resuscitation efforts, which proved unsuccessful. B.W. died on the floor of the jail. It later came out that a local mental health provider had warned that B.W. was in the midst of a "psychiatric episode." However, this information was not conveyed to police or jail staff prior to his death.

- C.P. was a 33-year-old man with diabetes who died in Spokane County jail on February 24, 2013. Earlier that morning he had called 911 claiming he was paranoid, diabetic, and high on methamphetamine. Police officers arrived and discovered C.P. had a warrant for his arrest due to unpaid child support. Instead of taking him to the hospital, he was arrested. While in a holding cell, C.P. began swaying and grasping his head in his hands. He was asked to sit down in the cell, but he did not comply. Jail staff placed him in a headlock, shocked him twice with a Taser, and strapped him into a restraint chair. He lost consciousness, stopped breathing, and died in the hallway of the Spokane County jail. An autopsy ruled his death a homicide, with the cause of death being a methamphetamine overdose "with restraint stress." His blood sugar was over 2000 when he died, a blood sugar level sufficient to cause hallucinations, abnormal behavior, coma, or death.

- T.S. entered the Asotin County jail in November 2005 on assault charges. His family called and informed jail staff at least twice that he had bipolar disorder and that he had been hospitalized recently. Jail officers used force on T.S., including Tasers and a restraint chair, on at least three occasions before the episode that resulted in his death. On November 25, 2005, staff found him screaming incomprehensibly and beating his head against the walls of his cell. Officers shot him with a Taser in an effort to subdue him. When he continued to resist, an officer repeatedly hit T.S. with a baton. Other officers then Tased him three or four more times before they were able to handcuff him. They then put T.S. in a restraint chair, where he lost consciousness and subsequently died. An autopsy determined that he died of arrhythmia following multiple blunt force injuries and the use of Tasers. His death was ruled an "accident." Media reports indicate that a lack of adequate staffing may have contributed to T.S.'s death.

- M.A. was asphyxiated by jail staff during a use of force incident at the Clark County jail. M.A. who had been diagnosed with bi-polar disorder was awaiting transport to Western State Hospital for a mental competency evaluation at the time of his death. By his third day in jail, he reported being suicidal and was placed in a suicide smock in a solitary cell on suicide watch. Witnesses reported that M.A. banged his head almost constantly against his cell walls, the door and a metal grate in the floor used as a toilet. Jail officers placed him in a restraint chair several times before his death. He died during a struggle with the guards who were once again trying to force him into the restraint chair. He was Tased, and when guards couldn't get him into the chair, they pinned him on the floor where he suffocated. His death was ruled a "homicide by mechanical asphyxia."

Other deaths demonstrate how jail staff can neglect the needs of detainees by denying them essential medical care or failing to adequately monitor their food and water



restraint chair in his cell in response to a threat of self- harm. When medical staff arrived, they found him unresponsive and with blood on his face. He responded to ammonia after two attempts. On January 18, D.B. again complained to medical staff that he had chest pain and difficulty breathing when sitting up. He said his chest felt like "pins and needles." Later that night, he was found coughing up blood, sweating profusely and complaining of severe chest pain. The next morning jail staff found him screaming in his cell because of the pain he felt while inhaling. A clinician noted that he had blood in the back of his throat, but nonetheless recommended that staff just continue to monitor him. He was found dead in his cell early in the morning on January 20. The medical examiner determined that he died from bilateral pneumonia and a staph infection, which likely led to sepsis.

intake. A number of cases demonstrated problems with access to necessary medical care. In fact, in 62 of cases there was some indication that the jail's medical or mental health care was deficient. Health care-related inadequacies ranged from failing to conduct a thorough medical intake, failures of communication between staff members, and poor medical decisions or inappropriate treatments. In other instances, staff simply ignored the needs of detainees and failed to ensure that they received proper food, water or medical attention. Again, mental illness or substance use disorders were factors in many of these cases.

- D.B. informed an officer that he was suffering from back pain while being booked into the Cowlitz County jail on January 13, 2014. Two days later he again complained to medical staff of shortness of breath, achy bones, and a sharp pain in his back and was unable to move or lift his arms. On January 16, D.B. reported that he had a chest injury, depression, and anxiety. The clinician dismissed his complaints, recording that they were just manipulative behaviors and that D.B. was "okay." Later that day, jail staff placed him in a

- A.N. had been jailed in the Walla Walla County jail for over a week when she died from septic shock. She had complained of chest pain and seen a jail nurse on a couple of occasions. Her autopsy showed an extreme infection in her chest that had "marbled her" chest muscle wall and eaten a quarter size hole in her sternum. Her lungs also showed signs of severe infection.

- K.F., a young man suffering from severe bipolar disorder, was booked into Island County jail. Family members contacted the jail to inform them about his significant mental health needs. He refused food or water for many days due to his severely disturbed condition. Nonetheless, jail officials took no action to intervene, even though they were aware of his condition and his refusal to

eat or drink. K.F. died alone in his cell from dehydration and malnutrition a number of days after admission. Later, a jail officer admitted to falsifying safety check logs in an attempt to hide the horrendous treatment he had received. K.F.'s death has received much attention in the media and resulted in important reforms at the Island County jail.

- J.M. was incarcerated at Kittitas County jail in August 2012 to serve a 270-day sentence for a DUI. He became ill in early February 2013 and on February 8, was seen by a nurse who noted he was feeling sick, could barely talk, had a dry cough, and little appetite. Though it appears a doctor prescribed antibiotics, the medications were either never ordered or not given to him. Early in the morning a few days later, J.M. pressed the emergency button and explained through the intercom that he was having trouble breathing. Jail officers dismissed his concerns as an anxiety attack. He continued struggling for breath and again asked to be taken to the hospital. Staff refused his request. He continued to beg for assistance throughout the morning before his oxygen levels were finally checked. He was immediately sent to the hospital where he died later that evening. Other detainees who were later interviewed reported that staff repeatedly ignored his requests for assistance, telling him that he would have to wait until Monday to see the doctor. Investigators acknowledged that "all of the inmates who were interviewed expressed concern about [J.M.]'s condition and what they referred to as a lack of concern by jail staff for his care and well-being."

Abuse and neglect are unfortunate realities inside too many jails. Underpaid, overworked, and undertrained staff react in inappropriate ways or fail to properly monitor the people under their care. While better supervision and training are essential, more importantly, jails must reduce the number of people held within their walls and employ enough properly trained staff to ensure that all people who remain incarcerated are properly monitored and treated humanely. If governments continue to refuse to spend what is necessary to effectively treat these populations, more people will inevitably die.

## Recommendations

The medical and mental health needs of people living with these challenges can be much better served outside of jail walls. However, the criminalization of certain behaviors, the routine use of pre-trial incarceration, and the reduction in supports for community-based, mental health, chemical dependency, and medical services has placed the responsibility for care upon jail administrators and their staff. Unfortunately, jails are ill-equipped to meet the need, thereby injuring both the people locked up there and the professionals tasked with keeping them safe and secure.[68] Though it is likely inevitable that some people will die in jail, there are a number of steps that can be taken to limit the number of deaths and reduce or eliminate preventable deaths.

## Reduce the number of people living with mental illness or substance use disorders in jails.

Community-based treatment and supports are much more effective, inexpensive, and humane than are jails in treating people with mental illness or substance use disorders. With the expansion of Medicaid under the Affordable Care Act, many people are now newly eligible for medical, mental health, and substance use treatment. However, Medicaid is not available to people who are currently incarcerated. People must be kept in the community in order to receive the benefits of these significant federally provided health care dollars. In addition to being cost-effective, keeping people in their communities and out of jail is also the option most likely to result in positive health outcomes.[69] By dramatically increasing the use of pre-arrest and pre-trial diversion programs, eradicating the use of cash bail, and providing community-based alternatives to incarceration, counties and localities will reduce the number of people inside their jails, improve the outcomes that they achieve and save money.

## Increase oversight and transparency of what happens inside jails.

As detailed above, there currently exists no centralized oversight of Washington jails, and jails have no obligation to report information to any state agency after a major event such as a death, suicide attempt, or other serious injury. Laws should be changed to require reporting after serious incidents to a state agency, like the Department of Health, that is empowered to take action to review the incident and address any shortcomings. Mandated reporting following serious events will ensure accountability and provide a mechanism whereby proper reforms can be identified and initiated. Public disclosure laws should be amended to require jails to provide more information to the public regarding deaths and other serious events. Names and other identifying information can be redacted from relevant records to protect the privacy of the people involved.

## Every jail must have an adequate and timely medical, mental health, and substance use intake process.



Most jails have some form of intake process to gather some amount of medical, mental health, and substance use information from detainees. However, often the information gathered is insufficient to actually identify and understand the person's current needs. These intakes are generally taken by jail staff without proper health care expertise or training. Important information is missed or ignored. Inadequate intake

procedures and neglected care contributed to a number of the deaths that we investigated.

Thorough intake questionnaires filled out by trained staff and timely communication and follow up with health care staff are absolutely essential initial steps in increasing safety. Each inmate should then have a much more detailed medical, mental health, and substance use examination by a qualified health care professional within a few days of entry into jail.[70] The failure to identify medical conditions in a timely manner or provide appropriate mental health or withdrawal treatment contributed to a number of the deaths. Early evaluation and treatment would likely have changed the outcome in some of these cases.

## Every jail must have overdose and withdrawal protocols and provide medications when appropriate.

As detailed above, overdose and poorly managed withdrawal kill people. However, even when withdrawal does not lead to death, it causes unnecessary torment and trauma to people experiencing it. With proper identification and timely treatment, most, if not all deaths and suffering can be avoided.

The NCCHC has promulgated standards for withdrawal management that should be provided in every jail.[71] Essential practices include:

- Proper training for staff to identify people suffering withdrawal symptoms.
- Protocols that meet current, evidence based, treatment guidelines.
- Intake procedures that ensure that people under the influence of drugs or alcohol are identified immediately upon booking and properly supervised.
- Withdrawal management that is done under the supervision of qualified health care professionals who utilize recognized validated assessments to judge the severity of withdrawal symptoms.[72]
- Policies mandating the medication management of detainees suffering from withdrawal.

Every jail in Washington must adopt appropriate withdrawal protocols in order to ensure the humane treatment of all people under their care. Staff training and the ready availability of medications like Narcan and Suboxone, which temper the worst aspects of withdrawal and save lives, are essential elements.

## Jails must change how they care for people who have expressed suicidal thoughts or may be actively suicidal.

As with overdoses and deaths from withdrawal, jails can take active steps to significantly reduce the number of suicides inside their facilities. Isolation is not an appropriate management tool for someone who is suicidal. It exacerbates symptoms and increases the likelihood that a person considering suicide will take action. Terrible prior experiences with isolation also deter people who may be suicidal from reporting their condition to jail staff. Jails must ensure that people experiencing acute suicidal feelings are constantly and directly monitored by jail staff. To the extent that jails do not have the facilities or staffing to ensure such constant monitoring, detainees must

be transferred to outside facilities that can provide the necessary level of care.

Comprehensive written policies are foundational to a successful suicide prevention program. Jails should also abandon certain common practices that actually increase the likelihood of a suicide attempt, like isolation. Any comprehensive suicide prevention program should include:

> *"[T]he antiquated mindset that 'inmate suicides cannot be prevented' should forever be put to rest."* [73]

- Regular training for staff, regardless of tenure.
- Identification, referral, and evaluation protocols that properly assess the risk of self-harm and include review of prior incarcerations to identify any history of self-harm. Jails should revisit this risk assessment regularly throughout the person's incarceration.[74]
- Jails not simply accepting a person's word that he is not currently suicidal, particularly for a detainee with a history of self-harm.[75]
- Avoidance of solitary confinement or other dehumanizing conditions.
- Appropriate, safe housing in "suicide-proof" cells.
- Constant, direct observation of any person who is actively suicidal.
- An assessment for suicide risk of every person placed in solitary confinement at the outset of their placement and then regularly thereafter during their entire stay in solitary.
- Identification of likely stressors and communication between staff regarding upcoming events that may cause someone to engage in self-harm.
- Development of suicide "profiles" to quickly identify who might be most at risk, and when.[76]
- Jail policies and practices which do not deter a detainee, family, friends or other detainees from reporting suicidal thoughts or actions.
- Avenues of communication that detainees and people on the outside can use to report threats of self-harm.
- Ongoing observation and treatment plans for people identified as vulnerable to suicide.
- Access to emergency response services.
- Administrative review of any suicide attempts to identify opportunities for improvement.

## Staff must be trained to manage people in crisis, utilize effective de-escalation techniques, and use force only when absolutely necessary.

Newly passed Initiative 940 requires that all law enforcement officers in Washington complete approved violence de-escalation training and training on how to work with people with mental illness. The new law also requires such training on a regular, annual basis thereafter.[77] By contrast, current regulations governing mandatory training for jail officers do not include such requirements.[78] However, jail staff, like law enforcement, should be trained in "de-escalation... and interpersonal communication training, including tactical methods to use time, distance, cover, and concealment, to avoid escalating situations that lead to violence."[79] Other relevant requirements include training regarding "implicit and explicit bias, cultural competency, and the historical intersection between race and [the criminal justice system]"; "[s]kills including de-escalation techniques to effectively, safely, and respectfully interact with people with disabilities and/or behavioral health issues; and

"[a]lternatives to the use of physical or deadly force."[80] State law should be changed to require similar training for all jail staff.

Laws should also be enacted to limit the use of restraint chairs, Tasers, pepper spray, and other weapons deployed within jails. They should be utilized only in appropriate situations involving imminent threat of bodily injury, only after all other non-violent means have failed and then only to the extent necessary to eliminate the immediate danger. The steps that jails must take to ensure the health and safety of the person against whom force was used should also be set out in statute. Finally, each jail should be required to create and maintain records related to any use of force and make them available to an appropriate third party for review on a regular basis.

## Each jail must have enough staff to ensure that all people receive appropriate supervision and care.

Inadequate staffing is a perennial problem facing jails short on resources. Shortages of security, medical, and mental health staff lead to myriad problems, including the neglect of detainees, too frequent use of solitary confinement, and poor medical and mental health care. A number of the deaths studied indicated that had more staff been available to provide appropriate supervision for

people who were threatening self-harm, deaths would have been avoided. Other deaths we reviewed demonstrate a lack of appropriate attention from medical or mental health care professionals, either because they were not actually present in the jail at relevant periods or because they were inattentive because of the sheer number of other demands on their time.



Both the inability to provide full medical, mental health or substance abuse evaluations for all admitted detainees within a few days and a jail's failure to provide medically appropriate supervision of people suffering from withdrawal are the product of too many detainees and too few resources. Jails could provide the appropriate level of care set out in national standards promulgated by organizations like the NCCHC.[81] However, policy makers and the public have required them to house too many people and yet neglected to provide them the resources sufficient to do so. To the extent that society has forced jails to meet the needs of people combatting mental illness, traumatic brain injuries, or substance abuse, we must give them the resources necessary to provide that care in an adequate, safe, humane, and respectful manner. To continue to do less is to ensure that more people will needlessly die behind bars.

## Every jail should be required to engage in a full serious indident administrative review and provide that report to appropriate third parties.

The NCCHC standards require that "[a]ll deaths are reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study."[82] These reviews should include three components: an administrative review, a clinical mortality review, and a psychological autopsy that examines the individual's life "with an emphasis on factors that led up to and may have contributed to the individual's death."[83] The review's result should be summarized in a written report that lays out the cause of death, any precipitating factors, and recommendations regarding changes to policy, training, physical structures, medical and mental health services, or other operational practices.[84] Best practice is to do a review after every serious incident, even incidents that do not result in death.

Many jails appear to engage in some level of review following deaths. However, a number either do nothing, or their reviews are insufficient to identify causes and changes in policy and practice that may be required. Such reviews should be mandated following every serious incident and relevant information made available to appropriate state agencies and the public generally.[85]

## Conclusion

This report details deaths that occurred within Washington jails from January 2005 through June 2016. However, people continue to die in Washington's jails. Eight people have died in the Spokane County Jail alone since June 2016 from a variety of different causes.[86] In Snohomish County, another man died as a result of a use of force while in the custody of the jail, and a young woman died from meningitis after suffering terribly for days while locked away there.[87] None of these ten deaths are included in those discussed in this report, but they indicate that serious problems continue.

Without sufficient community-based services and alternative housing options, jails have become the primary medical, mental health, and substance use treatment providers for thousands of people in Washington. The lack of other adequate treatment and housing options means that people fighting mental health and substance use disorders cycle in and out of jails. These realities stress the systems and the people who live and work within them. People die as a result.

However, as detailed in this report, there are many actions that can be taken to reduce the number of deaths inside Washington's jails. Reducing the jail population, increasing the availability of community-based treatment and housing, requiring greater transparency, and giving jails the resources they need in order to properly care for our friends and family members, are absolutely essential steps that should be taken. Anything less will condemn other men and women to needless injury and death behind bars.

# Endnotes

1. We have identified Ms. Lindsay Kronberger by name in this report because her story has been covered extensively in the media. *See e.g.*, Levi Pulkkinen, *Claim: Jailers Mocked Dying Young Woman During Her Last Hours*, Seattle P.I. (August 3, 2016), http://www.seattlepi.com/local/crime/article/Claim-Jailers-mocked-dy-ing-young-woman-during-9121704.php; Scott North, *Lawsuit Contends Staff Ignored Inmate's Peril Before She Died*, Everett Herald (August 4, 2016), https://www.heraldnet.com/news/lawsuit-against-snohomish-county-focus-es-on-inmates-death/. Most of the other cases we discuss in this report did not receive similar public attention. In all other cases, we refer to people who died solely by their initials in the interest of preserving their identities.

2. *Gohranson v. Snohomish Cty.*, 2018 WL 2411756, at *6 (W.D. Wash. May 29, 2018).

3. "Roughly two-thirds of people sitting in Washington jails are awaiting trial; none of whom have been found guilty of the criminal charge with which they have been accused. Most languish there because they cannot afford the cash bail that courts routinely require." ACLU, *No Money, No Freedom: The Need For Bail Reform*, 7 (September 2016), https://www.aclu-wa.org/bail.

4. National statistics indicate that 60% of people in jails actively exhibit mental health symptoms and 30% of people in jails have a cognitive disability of some type. *See* Disability Rights Washington, *County Jails, Statewide Problems: A Look at How Our Friends, Family and Neighbors With Disabilities Are Treated in Washington's Jails*, 16 (April 2016), https://www.disabilityrightswa.org/wp-content/uploads/2016/04/CountyJailsStatewideProblems_April2016.pdf.

5. *See* FWD.us, *Every Second: The Impact of the Incarceration Crisis on America's Families,* 10 (December 2018), https://everysecond.fwd.us/downloads/EverySecond.fwd.us.pdf.

6. One study indicates that as many as 76% of people living with severe mental illness who are locked up in jails receive acute psychiatric in-patient treatment solely while in jail and not in community-based, mental health facilities. *See* H. Richard Lamb et al., *Treatment Prospects for Persons With Severe Mental Illness in an Urban County Jail*, 58 Psychiatr Serv. 782, 784-86 (June 2007), https://www.ncbi.nlm.nih.gov/pubmed/17535937.

7. King County Executive's Office, *2019-2020 King County Proposed Biennial Budget*, 409, https://kingcounty.gov/depts/executive/performance-strategy-budget/budget/2019-2020-Proposed-Budget/2019-2020-ProposedBudgetBook.aspx.

8. Spokane City, *Budget Presentation* (October 16, 2018), https://www.spokanecounty.org/DocumentCenter/View/23128/2019-Public-Safety-Justice-Presentation.

9. https://www.publicschoolreview.com/washington/spokane/5308250-school-district.

10. *See generally* Disability Rights Washington, *Lost and Forgotten: Conditions of Confinement While Waiting for Competency Evaluation and Restoration* (January 2013), https://www.disabilityrightswa.org/wp-content/uploads/2017/12/LostandForgotten_January2013.pdf.

11. *Id.* at 7.

12. The authors reviewed all available records for all deaths that occurred in jails between January 1, 2005 and June 15, 2016.

13. Keri-Anne Jetzer, *Jail Bookings in Washington State*, Washington State Statistical Analysis Center, 1 (June 2016), https://www.ofm.wa.gov/sites/default/files/public/legacy/researchbriefs/2016/brief078.pdf.

14. The Bureau of Justice Statistics, a division of the federal Department of Justice, does annual surveys of jails across the country. Those surveys ask jails to provide information about average daily populations, the demographics of jail population, and very limited information regarding any jail death that has occurred in the prior year. This information includes the person's gender and very basic information about the cause of death. Jails need not provide any additional explanation or supporting documentation. WASPC asks jails in Washington to provide demographic information about the people detained, but does not request information regarding jail deaths or other serious events. And the data jails provide is often faulty or incomplete. "[T]here is little standardization related to the input or coding of the [WASPC] data being entered by jail staff." *Id.* at 1.

15. RCW 70.48.100(2)

16. The threat of litigation is not sufficient to compel all jails to implement necessary reforms. Washington law significantly limits financial recoveries in wrongful death cases, particularly those involving people who have limited economic prospects or no dependents. *See, e.g., Otani ex rel. Shigaki v. Broudy*, 151 Wn.2d 750, 760 (2004) (loss of enjoyment of life damages not recoverable as part of wrongful death claim).

17. WASPC, *2015 Washington State Jail Statistics – County, Regional, City and Tribal*, https://www.waspc.org/crime-statistics-reports.

18. *Id.* Compare the aggregate average daily

populations for all jails with the design capacities for all jails.

19. *See* WASPC, *2017 Washington State Jail Statistics – County, Regional, City and Tribal*, https://www.waspc.org/crime-statistics-reports).

20. *Id.*

21. *Id.* Compare Average Daily Population for Snohomish County with its Average Daily Bed Rate.

22. This report identifies gender in a binary fashion, "men" and "women." The authors could not find information regarding people who are transgender, intersex or otherwise gender non-conforming in jails in Washington from any source. The information provided by jails did not include any gender markers other than traditional binary indicators. The authors hope that more precise records and analysis can be conducted in the future in order to understand the impacts that jail life has upon all people.

23. *See* U.S. Census Bureau, *Statistics for Washington*, https://www.census.gov/quickfacts/wa. The information regarding demographics of the jail population from 2005 to 2015 comes from aggregating data from WASPC, *Washington State Jail Statistics – County, Regional, City and Tribal*, https://www.waspc.org/crime-statistics-reports.

24. Jetzer Report, *supra* note 13, at 3.

25. A recent study of people in Washington indicates that 58% of people who both receive Medicaid and had at least one stay in jail have significant mental health treatment needs, compared to only 42% of all people who receive Medicaid. In addition, six in ten people entering jail had substance use disorder treatment needs and four in ten had co-occurring disorder indicators. *See* DSHS Research and Data Analysis Division, *Behavioral Health Needs of Jail Inmates in Washington State*, 1 (January 2016), https://www.dshs.wa.gov/sites/default/files/SESA/rda/documents/research-11-226a.pdf.

26. *Id.*

27. *See* Doris J. James & Lauren E. Glaze, *BJS Special Report Mental Health Problems of Prison and Jail Inmates*, 1 (September 2006), https://www.bjs.gov/content/pub/pdf/mhppji.pdf.

28. *Id.* at 3.

29. *Id.* at 10.

30. Roughly two-thirds of women detained in jails reported having had a chronic medical condition, while just under half of men in jail reported the same. *Id.* at 5.

31. *Id.*

32. For example, rates of high blood pressure among detainees increased by nearly 50%, and rates of diabetes doubled between 2004 and 2012. *Id.* at 6-7.

33. *See generally* DSHS Behavioral Health Needs Study, *supra* note 24; and Disability Rights Washington reports, *supra* notes 4 & 10.

34. We have had difficulty determining the actual number of deaths with precision given the limited information available in many cases. For example, the Bureau of Justice Statistics has reported data on jail deaths only through 2014. The authors attempted to be as precise as possible, but acknowledge that the actual number of deaths may be slightly greater or slightly fewer than 210. Counted deaths include deaths that occurred in a hospital following an event that occurred within a jail. They do not include deaths that occurred while a person was living in the community on work release, furlough, probation, or electronic home monitoring.

35. Our review indicates that jail deaths did not disproportionately impact any particular racial or ethnic group, with one exception: Native people died in jail at a higher rate than the population of Native people in jails. However, the small sample set of Native people who died makes it difficult to draw any conclusion with significant certainty.

36. These percentages are based solely upon those deaths for which a length of stay could be calculated. It was not possible to calculate how long the person had been incarcerated before her death in 48 circumstances because of incomplete available information.

37. Drug or alcohol-related deaths included those in which the person was under the influence at the time of her death, suffering from withdrawal or likely suffering withdrawal at the time of her death. Alcohol or drugs was involved in 67% of deaths within the first 72 hours, while ten suicides that appear unrelated to drugs or alcohol occurred during that same period.

38. The Jetzer Report includes data regarding the charging offenses that people booked into Washington jails face. However, the categories included in that report are not the same as identified here. Jetzer reports that 30% of detainees face gross misdemeanor charges, 21% other types of charges, including violent felonies, 10% other misdemeanors, 13% for violations of community custody or warrants for failure to appear. Jetzer Report, *supra* note 13, at 3.

39. During the period studied, 24 jails reported no deaths, nine reported one death, 17 reported between two and ten deaths and seven reported more than ten deaths. The 33 jails that reported no deaths or only one death are generally very small local or county jails that collectively house only 12% of the total statewide jail population. *See* Appendix.

40. National Institute of Corrections presentation, *Basics and Beyond: Suicide Prevention in Jails*, slide 6, https://s3.amazonaws.com/static.nicic.gov/Library/026251.pdf.

41. Linda Peckel, *Preventing Suicide in Prison Inmates*,

Psychiatry Advisor (December 2017), https://www.psychiatryadvisor.com/home/topics/suicide-and-self-harm/preventing-suicide-in-prison-inmates.

42. *See De Vincenzi v. City of Chico*, 592 F. App'x 632, 634 (9th Cir. 2015) ("the officers' duty to provide medical care, including suicide prevention, [is] clearly established") (citation omitted); *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1244-45 (9th Cir. 2010) (failure to follow appropriate suicide prevention practices can violate constitutional obligations).

43. J. Richard Goss et al., *Characteristics of Suicide Attempts in a Large Urban Jail System With an Established Suicide Prevention Program*, 53 Psychiatric Services 574, 574 (May 2002), https://ps.psychiatryonline.org/doi/pdf/10.1176/appi.ps.53.5.574.

44. Our review indicated that at least 40% of all suicides happened while in solitary confinement. However, the number is likely far greater, because limitations in the records did not allow us to determine the location of each suicide or whether it occurred during a period of isolation.

45. Lindsay M. Hayes, *National Study of Jail Suicide – 20 Years Later*, 50 (April 2010), https://s3.amazonaws.com/static.nicic.gov/Library/024308.pdf.

46. *See* Peckel article, *supra* note 41.

47. Transgender people who are incarcerated are at very high risk of sexual assault and other forms of violence. In addition, many jails place transgender people in solitary "protective custody". *See* National Center on Transgender Equality, *LGBTQ People Behind Bars: A Guide to Understanding the Issues Facing Trans- gender Prisoners and Their Legal Rights*, 13-14 (October 2018), https://transequality.org/transpeoplebehindbars. Being a victim of sexual assault and being placed in isolation are two significant risk factors for suicidal thoughts and actions.

48. *See* National Institute of Corrections presentation, *supra* note 40, at slides 13-14.

49. Suicide Prevention Resource Center, *What Corrections Professionals Can Do to Prevent Suicide*, 2 - 3 (October 2017), https://ubhc.rutgers.edu/tlc/docs/suicideAwareness/SPR/SPRC%20Corrections%20Professionals.pdf.

50. National Commission on Correctional Health Care (NCCHC), *Standards for Health Services in Jails, Standard J-G-05 Suicide Prevention Program*, 119 (2014).

51. Lucinda Grande & Marc Stern, *Providing Medication to Treat Opioid Use Disorder in Washington State Jails*, 5 (July 3, 2018), https://www.waspc.org/assets/docs/opioid%20treatment%20in%20jail%20-%20final%20pdf.pdf.

52. Center for Health & Justice at TASC, *Safe Withdrawal in Jail Settings: Preventing Deaths, Reducing Risks to Counties and States*, 1 (January 2018), http://www2.centerforhealthandjustice.org/sites/www2.centerforhealthandjustice.org/files/publications/Safe%20Withdrawal%20in%20Jail_010918.pdf.

53. Grande Report, *supra* note 51, at 5.

54. *Id.*

55. See Appendix.

56. TASC Report, *supra* note 52, at 2.

57. While variable between people, major withdrawal symptoms from opioids peak between 24–48 hours after the last dose and subside after about a week. https://www.drugabuse.gov/publications/research-reports/heroin/what-are-long-term-effects-heroin-use. Withdrawal from alcohol peaks with 48-72 hours and can last weeks. https://medlineplus.gov/ency/article/000764.htm.

58. TASC Report, *supra* note 52, at 1.

59. NCCHC Jail Standards, *supra* note 50, *Standard J-G-07 Intoxication and Withdrawal*, at 125.

60. The author of this report, Columbia Legal Services' Institutions Project, represents men and women locked up in jails and prisons throughout Washington. In that capacity, we have spoken with hundreds of prisoners from all over the state regarding the conditions they face. Many have shared terrible stories of suffering from withdrawal after being booked into jails.

61. Grande Report, *supra* note 51, at 5

62. *Id.*; TASC Report, *supra* note 52, at 2.

63. Grande Report, *supra* note 51, at 5.

64. *Id.* at 15.

65. *See e,g*, *Pesce v. Coppinger*, 355 F.Supp.3d 35, 45-48 (D. Mass. 2018) (correctional system's refusal to provide methadone treatment likely violates ADA and 8th Amendment prohibition on cruel and unusual punishment); *Villareal v. County of Monterey*, 254 F.Supp.3d 1168, 1183 (N.D. Cal. 2017) (county sheriff can be held liable for jail's failure to properly care for woman in withdrawal).

66. Grande Report, *supra* note 51, at 7 and 13.

67. One detainee was killed by a correctional officer who shot him during the course of an escape. Other deaths occurred as a result of "excited delirium," with few other details provided. "Excited delirium" is a condition that occurs suddenly, with symptoms of bizarre and/or aggressive behavior, shouting, paranoia, panic, violence toward others, unexpected physical strength and hyperthermia. Often times the use of stimulants, like methamphetamine or cocaine, and the use of restraints or physical control tactics by law enforcement or correctional officers are correlated with the on-set of fatal episodes of excited delirium. Asia Takeuchi, Terence L. Ahem, Sean O. Henderson, *Excited Delirium*, West J. Emerg. Med. (February 2011), https://www.ncbi.

nlm.nih.gov/pmc/articles/PMC3088378/. A death by excited delirium likely involves a number of different factors including "positional asphyxia, hyperthermia, drug toxicity, and/or catecholamine-induced fatal arrhythmias." Mohammad Otahbachi et al., *Excited Delirium, Restraints, and Unexpected Death: A Review of Pathogenesis,* Amer. J of Forensic Med. and Pathology (June 2010).

68.    "The physical and mental health needs of inmates can place significant stress on COs, particularly among treatment and medical staff." Jaime Brower, *Correctional Officer Wellness and Safety Literature Review,* 5 (July 13), https://s3.amazonaws.com/static.nicic.gov/Public/244831.pdf.

69.    Community based interventions for people living with mental illness leaving prisons and jails have been shown to reduce recidivism, substance use, suicidality, and psychiatric hospitalizations. *See generally* E. Fuller Torrey et al., *More Mentally Ill Persons Are in Jails and Prisons Than Hospitals: A Survey of the States,* Mental Illness Policy Org. (May 2010), https://mentalillnesspolicy.org/ngri/jails-vs-hospitals.html.

70.    The NCCHC recommends that every detainee receive a full medical and mental health evaluation within 14 days of admission. NCCHC Jail Health Standards, *supra* note 50, *Standard J-E-04 Initial Health Assessment,* at 76. However, waiting for 14 days  to conduct such evaluations would have had no impact on the vast majority of deaths, 73% of which occurred within the first 14 days of admission.

71.    NCCHC Jail Health Standards, *supra* note 50, *Standard J-G-07 Intoxication and Withdrawal,* at 124-25.

72.    Such validated assessments include the Clinical Opiate Withdrawal Scale or the Objective Opiate Withdrawal Scale and the Clinical Institute Withdrawal Assessment of Alcohol Scale. *See id.*

73.    Hayes Report, *supra* note 45, at xiii.

74.    Each jail must integrate questions regarding suicide risk into their initial intake questionnaires. The Hayes Report sets out a list of questions that all detainees should be asked. *Id.* at 48.

75.    Jails should utilize other available sources of information in order to make these determinations, including records of prior incarcerations that indicate a history of suicidal acts, information from relatives or friends, prior statements the person has made and records from community based health providers. However, care must be taken to ensure that jails do not make assumptions about suicidality based on gender identity or other characteristics that do not have any correlation to suicidal actions.

76.    *See* RCW 43.101.450 & .452

77.    *See* Department of Mental Health and Substance Abuse, World Health Organization, *Preventing Suicide In Jails and Prisons,* 14 (2007), https://www.who.int/mental_health/prevention/suicide/resource_jails_prisons.pdf. Such profiles must be based solely upon actions that indicate a potential likelihood for suicide and must be regularly updated to reflect current evidence based thinking. *Id.* at 14. Stereotypes based upon gender identity or other characteristics which do not correlate to suicidality should not be relied upon.

78.    RCW 43.101.455(2)(a)

79.    RCW 43.101.455(2)(b)-(f)

80.    *See* WAC 139-10-230 Basic Corrections Officer Academy Curriculum.

81.    *See* NCCHC, *Standards for Health Services in Jail* (2014); also NCCHC, *Standards for Mental Health Services in Correctional Facilities* (2015).

82.    NCCHC Jail Health Standards, *supra* note 50, *Standard J-A-10 Procedure in the Event of an Inmate Death,* at 22.

83.    *Id.*

84.    *See* Hayes Report, *supra* note 45, at 39. The NCCHC standards require that all deaths are reviewed within 30 days and that such reviews include an administrative review, a clinical mortality review and a psychological autopsy when suicide is the cause. NCCHC Jail Health Standards, *supra* note 50, at 22.

85.    Records from such serious incident reviews and discussions during these reviews could be protected from discovery during litigation. *See* for example, RCW 70.41.200, which allows hospitals to refuse to disclose certain documents created as part of internal examinations of negative health care outcomes.

86.    Jonathan Glover, *Spokane County Jail Records Eighth Inmate Death in 14 Months,* The Spokesman Review (August 26, 2018), http://www.spokesman.com/stories/2018/aug/26/spokane-county-jail-records-eighth-inmate-death-in/.

87.    Zachariah Bryan, *New Documents Shed Light on Fatal Struggle in County Jail,* The Everett Herald (October 18, 2018), https://www.heraldnet.com/news/new-documents-shed-light-on-fatal-struggle-in-county-jail/; Sidney Brownstone, *She Was Jailed for Shoplifting. A Month Later She Was Dead,* KUOW (February 7, 2019), https://www.kuow.org/stories/their-daughter-died-after-being-booked-into-the-snohomish-county-jail-they-want-to-know-why.

# Appendix

| | Percentage of Total Bed Space | Percentage of Total Bed Usage | Total Deaths | Total Suicides | Percentage of Total Deaths | Percentage of Suicides |
|---|---|---|---|---|---|---|
| Adams | 0.20% | 0.24% | 0 | 0 | 0.00% | 0.00% |
| Asotin | 0.16% | 0.57% | 1 | 0 | 0.48% | 0.00% |
| Benton | 5.28% | 4.95% | 13 | 4 | 6.19% | 4.49% |
| Chelan | 2.74% | 2.49% | 3 | 2 | 1.43% | 2.25% |
| Clallam | 0.86% | 1.01% | 1 | 1 | 0.48% | 1.12% |
| Clark | 5.86% | 6.52% | 22 | 16 | 10.48% | 17.98% |
| Columbia | 0.06% | 0.05% | 0 | 0 | 0.00% | 0.00% |
| Cowlitz | 2.55% | 2.33% | 7 | 2 | 3.33% | 2.25% |
| Enumclaw | 0.17% | 0.17% | 1 | 0 | 0.48% | 0.00% |
| Ferry | 0.32% | 0.23% | 0 | 0 | 0.00% | 0.00% |
| Fife | 0.24% | 0.20% | 1 | 0 | 0.48% | 0.00% |
| Franklin | 1.64% | 1.69% | 4 | 1 | 1.90% | 1.12% |
| Garfield | 0.11% | 0.06% | 0 | 0 | 0.00% | 0.00% |
| Grant | 1.32% | 1.57% | 1 | 1 | 0.48% | 1.12% |
| Grays Harbor | 0.59% | 1.33% | 1 | 0 | 0.48% | 0.00% |
| Island | 0.41% | 0.47% | 2 | 0 | 0.95% | 0.00% |
| Jefferson | 0.35% | 0.35% | 0 | 0 | 0.00% | 0.00% |
| Kent | 0.84% | 1.04% | 2 | 1 | 0.95% | 1.12% |
| King | 18.54% | 17.73% | 33 | 9 | 15.71% | 10.11% |
| Kirkland | 0.42% | 0.30% | 2 | 1 | 0.95% | 1.12% |
| Kitsap | 3.65% | 3.42% | 5 | 4 | 2.38% | 4.49% |
| Kittitas | 1.64% | 0.78% | 3 | 1 | 1.43% | 1.12% |
| Klickitat | 0.35% | 0.40% | 2 | 2 | 0.95% | 2.25% |
| Lewis | 2.47% | 1.59% | 3 | 3 | 1.43% | 3.37% |
| Lincoln | 0.18% | 0.21% | 0 | 0 | 0.00% | 0.00% |
| Mason | 0.74% | 1.12% | 2 | 2 | 0.95% | 2.25% |
| Nisqually | 0.02% | 0.02% | 1 | 0 | 0.48% | 0.00% |
| Okanogan | 1.31% | 1.53% | 4 | 2 | 1.90% | 2.25% |
| Other city jails | 3.95% | 4.45% | 0 | 0 | 0.00% | 0.00% |
| Pacific | 0.21% | 0.35% | 0 | 0 | 0.00% | 0.00% |
| Pend Oreille | 0.27% | 0.20% | 0 | 0 | 0.00% | 0.00% |
| Pierce | 12.88% | 9.89% | 22 | 9 | 10.48% | 10.11% |
| San Juan | 0.03% | 0.02% | 0 | 0 | 0.00% | 0.00% |
| SCORE | 5.74% | 5.15% | 5 | 0 | 2.38% | 0.00% |
| Skagit | 0.59% | 1.82% | 5 | 3 | 2.38% | 3.37% |
| Skamania | 0.34% | 0.24% | 0 | 0 | 0.00% | 0.00% |
| Snohomish | 8.82% | 8.60% | 15 | 5 | 7.14% | 5.62% |
| Spokane | 4.81% | 7.84% | 20 | 5 | 9.52% | 5.62% |
| Stevens | 0.29% | 0.37% | 1 | 0 | 0.48% | 0.00% |
| Thurston | 3.51% | 3.78% | 3 | 3 | 1.43% | 3.37% |
| Wahkiakum | 0.10% | 0.09% | 0 | 0 | 0.00% | 0.00% |
| Walla Walla | 0.82% | 0.62% | 2 | 0 | 0.95% | 0.00% |
| Whatcom | 2.13% | 3.18% | 7 | 4 | 3.33% | 4.49% |
| Whitman | 0.24% | 0.32% | 1 | 1 | 0.48% | 1.12% |
| Yakima | 7.88% | 6.90% | 15 | 7 | 7.14% | 7.87% |



## OUR MISSION

Columbia Legal Services advocates for laws that advance social,
economic, and racial equity for people living in poverty.

www.columbialegal.org

 /ColumbiaLegalServices     @columbialegal     /columbialegal

# EXHIBIT C

BUREAU OF JUSTICE ASSISTANCE

# MANAGING SUBSTANCE WITHDRAWAL IN JAILS: A LEGAL BRIEF

A disproportionate number of people in jails have substance use disorders (SUDs).[1] Incarceration provides a valuable opportunity for identifying SUD and addressing withdrawal.* Within the first few hours and days of detainment, individuals who have suddenly stopped using alcohol, opioids, or other drugs may experience withdrawal symptoms, particularly when they have used the substances heavily or long-term. Without its identification and timely subsequent medical attention, withdrawal can lead to serious injury or death.

Deaths from withdrawal are preventable, and jail administrators have a pressing responsibility to establish and implement withdrawal policy and protocols that will save lives and ensure legal compliance. This brief describes the scope of the challenge, provides an overview of constitutional rights and key legislation related to substance use withdrawal, and outlines steps for creating a comprehensive response to SUD.

## Scope of the Challenge

Among sentenced individuals in jail, 63 percent have an SUD, compared to 5 percent of adults who are not incarcerated.[3] From 2000 to 2019, the number of local jail inmates who died from all causes increased 33 percent; the number who died from drug/alcohol intoxication during the same period increased 397 percent.[4] Among women

> When Kelly Coltrain was booked for unpaid traffic violations in 2017, she told jail staff that she was drug dependent and had a history of seizures. Her request to go to the hospital for help with withdrawal symptoms was denied. She was placed in a cell that required 30-minute checks, but these checks rarely occurred. For the next 3 days, she was observed (by video camera) vomiting, sleeping often, and eating little. On her third night in jail, she started convulsing; then, all movement ceased. For at least the next 4 hours, no deputies or medical staff came to the cell to determine why she was still. Kelly's family filed a wrongful death suit, which was settled in 2019 for $2 million plus 4 years of federal district court monitoring of the jail during implementation of new policies and procedures to ensure proper care of inmates at risk of withdrawal.[2]

incarcerated in local jails, the average annual mortality rate due to drug/alcohol intoxication was nearly twice that of their male counterparts.[5] The median length of stay in jail before death from alcohol or drug intoxication was just 1 day,[6] indicating that individuals on short stays, including those who are detained in pretrial status, are equally at risk.

It is not uncommon for individuals to experience substance withdrawal at the time of entry into jail, when access to their drug of choice is abruptly stopped. Estimates within specific regions vary widely, from 17 percent of people entering New York City jails being in acute opioid withdrawal[7] to a record 81 percent of people entering a Pennsylvania county jail needing detoxification services—half of them for opioid use disorders.[8]

---

* As noted in the Substance Abuse and Mental Health Services Administration's *Use of Medication-Assisted Treatment for Opioid Use Disorder in Criminal Justice Settings* (2019), medically supported withdrawal (also referred to as medical detoxification) is "designed to alleviate acute physiological effects of opioids or other substances while minimizing withdrawal discomfort, cravings, and other symptoms."

This project was supported by Grant No. 2019-AR-BX-K061 to Advocates for Human Potential, Inc. awarded by the Bureau of Justice Assistance, a component of the Office of Justice Programs, which also includes the Bureau of Justice Statistics, the National Institute of Justice, the Office of Juvenile Justice and Delinquency Prevention, the Office for Victims of Crime, and the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking. Advocates for Human Potential, Inc. was supported by the Addiction and Public Policy Initiative of the O'Neill Institute for National and Global Health Law at Georgetown University Law Center. This project was developed in partnership with the National Institute of Corrections, an agency within the Department of Justice's Federal Bureau of Prisons.

   

Failing to manage withdrawal symptoms can lead to serious health complications, including anxiety, depression, seizures, vomiting, dehydration, hypernatremia (elevated blood sodium level), heart problems, hallucinations, tremors, and death.[9,10,11] Moreover, problematic substance use is a key factor contributing to suicide, and stimulant withdrawal is associated with suicidal ideas or attempts.[12,13] The U.S. Food and Drug Administration (FDA) issued a safety announcement in early 2019 advising on the risk of suicide among individuals addicted to opioid pain medications whose medication is abruptly discontinued.[14] From 2000 to 2019, suicide was the leading cause of death among jail inmates.[15]

Of note, deaths associated with alcohol or drug withdrawal are usually listed as "illness" or "other" in reporting to the Bureau of Justice Statistics' Mortality in Correctional Institutions* because no category specifies drug or alcohol withdrawal.[16] However, a study of deaths in U.S. jails revealed that alcohol was involved in 76 percent of withdrawal-related deaths, confirming longstanding research findings of the lethality of alcohol withdrawal.[17] Opioids were the drug most often involved in the other withdrawal deaths studied.[18]

The study also indicated that "physical and mental health comorbidity likely increases the risk of death from opioid withdrawal (e.g., acute cardiac stress or acute suicidal ideation)."[19] When compared to the general population, people who are incarcerated have higher rates of the following:

- Chronic health conditions (e.g., hypertension, diabetes, myocardial infarction, asthma, and arthritis).[20]

- Infectious diseases (e.g., COVID-19, human immunodeficiency virus [HIV], hepatitis, sexually transmitted infection, and tuberculosis).[21,22]

- Behavioral health conditions (e.g., three times as many people in jail have a serious mental illness as compared to those in the general community).[23]

In addition to the complexities generated by comorbidities,[24] recent trends in drug use and composition make effective withdrawal management even more difficult. More cases of overdose deaths involving co-occurring use of opioids with other depressants (benzodiazepines or alcohol) or with stimulants (methamphetamine or cocaine) are being reported.[25,26] There has also been a sharp rise in the use of fentanyl, which is an extremely potent synthetic opioid that is easily mixed with other drugs such as heroin and cocaine. Other synthetic drugs also are associated with severe withdrawal symptoms. For example, withdrawal from the "club drug" gamma hydroxybutyrate (GHB) is associated with rapid heart rate, hallucinations, elevated blood pressure, and seizures.[27] With little information currently available on rapidly evolving synthetic substances, jail administrators and staff may not recognize the symptoms of withdrawal.[28]

## Importance of Withdrawal Management in Jails

Jail administrators, public health officials, and other stakeholders recognize that jails have become the default health care system for individuals with complex behavioral health and chronic medical conditions.[29,30,31] Yet, among sentenced jail inmates with SUD, less than 20 percent participated in any form of drug treatment, and only 1 percent received detoxification services.[32]

A special report on core competencies and jail leadership states, "Jails are guided by Constitutional mandates and case law, and thus, can be a focus for litigation for liability lawsuits and civil rights claims."[33] Jails that do not offer withdrawal-related medical care face the risk of legal liability under both federal and state laws, as well as adverse health outcomes for those in custody.[34,35] In *Access to Medications for Opioid Use Disorder in U.S. Jails and Prisons*, the O'Neill Institute for National and Global Health Law at Georgetown University Law Center notes lawsuits involving deaths due to improperly managed withdrawal.[36]

Litigation stemming from inadequate medical care increases costs to local governments and jails through large financial settlements or judgments, attorneys' fees, court-enforced remediation, time, and resource use. In October 2018, a wrongful death lawsuit associated with drug withdrawal was settled for $4.75 million against a Pennsylvania county for a death in its jail.[37] In December of that same year, a $10 million judgment was ordered against a major for-profit medical provider for a death in an Oregon county jail.[38]

# Legal Claims and Liability Pertaining to Withdrawal Management

Counties, jail administrators, and jail staff have faced civil lawsuits seeking monetary awards and other relief for failure to provide withdrawal management services. Some civil lawsuits have claimed violations of civil rights granted under the U.S. Constitution and federal laws. Other lawsuits have been based on state tort law, which covers noncriminal harms. Individuals may also face criminal liability under state law for egregious violations.

---

* Formerly known as Deaths in Custody Reporting Program.

# Federal Civil Rights Claims

Individuals who are incarcerated may file claims in federal court alleging violations of their rights under the U.S. Constitution. The 8th Amendment prohibits "cruel and unusual punishments"[39] and is applicable to states through the Due Process Clause of the Fourteenth Amendment.[40] Equal or greater protections are afforded under the due process clauses of the 14th and 5th Amendments to individuals detained in pretrial status, who comprise large portions of the jail population.[41] Statutes provide for legal actions to enforce these constitutional rights, including the following:

- The **Civil Rights Act of 1871** enforces the 14th Amendment through the imposition of civil and criminal liability for violations of constitutionally protected rights. Under 42 U.S.C. § 1983, individuals have the right to sue state and local officials and governments acting under color of state law for civil rights violations.[42]

- The **Civil Rights of Institutionalized Persons Act (CRIPA) of 1980** also facilitates enforcement of the 14th Amendment. The Department of Justice may file a federal court action under CRIPA to address a pattern or practice of constitutional rights violations.[43,44]

Another law, the **Americans with Disabilities Act (ADA) of 1990**, protects people with disabilities from discrimination.* This protection is specifically extended to individuals with disabilities in jails, detention and correctional facilities, and community correctional facilities.[45] Individuals are generally not protected by ADA against discrimination on the basis of illegal drug use, but the law does prohibit denying health and drug rehabilitation services on the basis of illegal drug use.[46]

The legal standard for whether failure to provide adequate medical treatment violates an individual's rights depends on (a) whether the individual is detained in pretrial status or incarcerated after conviction and (b) which federal court of appeals has jurisdiction.

For individuals who have been convicted and are serving a sentence in jail or prison, the standard for constitutional violation was defined by the U.S. Supreme Court in *Estelle v. Gamble, 429 U.S. 97* (1976). The Court established "deliberate indifference to serious medical need," which incorporates a subjective standard showing

the defendant's state of mind.[47] A county, correctional facility, and staff can face liability under the standard established in *Estelle v. Gamble* if they knew of and consciously disregarded an excessive risk to an incarcerated person's health and safety.[48] The plaintiff must show that the responsible party was readily able to recognize the risk, acknowledged the risk, and failed to take reasonable measures to abate the harm.[49] The governmental body retains liability even if it contracts for and relies on outside medical care services.[50]

For individuals detained in pretrial status, the U.S. Supreme Court has not ruled on whether the "deliberate indifference" standard applies to inadequate medical care claims. Therefore, the 12 U.S. Courts of Appeals (just below the U.S. Supreme Court) must make their own rulings.

Most of the 12 circuits have applied the "deliberate indifference" test to medical claims of individuals detained in pretrial status.[51] However, some courts have found that a 2015 U.S. Supreme Court decision requires a different standard that is easier for plaintiffs to meet. The United States Court of Appeals for the Ninth Circuit, for example, held in *Gordon v. County of Orange, 888 F. 3d 1118* (9th Cir. 2018) that prior case law[52] requires an objective standard for determining whether failure to provide adequate medical treatment violates the due process rights of an individual detained in pretrial status. The *Gordon* case involved an individual who died in pretrial detention while withdrawing from heroin. The Ninth Circuit's objective standard is whether the defendant took reasonable measures to address the risk of serious harm.[53]

In most cases, public officials, such as sheriffs, cannot be held personally liable for their conduct when performing their duties, because they are covered by the doctrine of qualified immunity. In other words, their employer could be ordered to pay damages, but the public officials would not be ordered to pay those damages from their own funds. However, if they have violated a statutory or constitutional right that was clearly established at the time of the challenged conduct, they may be personally liable for a civil rights violation.[54] In such cases, the Monell doctrine may shield the county or jail from liability, because a local government entity can be liable only if the conduct in question was in keeping with official policy or a "persistent and widespread" practice.[55]

---

* Section 504 of the Rehabilitation Act provides similar protections as ADA.

## State Tort Liability

Medical providers, jail administrators, and staff may be liable for the death or injury of a person who is incarcerated based on state tort law claims, including wrongful death, medical malpractice, and/or intentional infliction of emotional distress.[56] A family member or dependent may also bring a cause of action for wrongful death against a jail or other relevant parties and seek damages for losses caused by the death of the individual while incarcerated.[57] Medical malpractice claims can be brought for injuries resulting from a deviation from the appropriate standard of care, which is the same standard of care that applies to people who are not incarcerated.[58]

# Preparing a Comprehensive and Proactive Response

Increasing and changing patterns of drug use demand that jails be prepared to provide immediate, lifesaving screening and requisite interventions to anticipate and prevent a medical crisis—a standard for all individuals entering custody. When a length of stay allows and circumstances dictate, withdrawal management should extend beyond addressing acute symptoms to include a continuum of interventions, such as medication-assisted treatment (MAT) with its inherent clinical/social supports and transition planning, to initiate and maintain long-term recovery upon reentry.

In the past 5 years, considerable litigation has been brought against jails and prisons (local, state, and federal) for failing to provide opioid use disorder treatment medications.[59] *Smith v. Aroostook County*, *Pesce v. Coppinger*, and other lawsuits have challenged the failure to initiate— and maintain—MAT, which is in violation of ADA and the Rehabilitation Act.[60,61] These decisions have had ripple effects. New Hampshire and Maryland have passed laws to implement treatment programs in correctional settings, and Connecticut has included funding in the state budget to expand jail-based MAT programs.[62,63,64] Chapter 208, Section 78 of Massachusetts' General Laws requires that all FDA-approved forms of MAT be provided to state detainees or prisoners at relevant state facilities.[65]

Failure to comply with legislation and precedent set by case law can leave jails, corrections staff, and medical staff open to public scrutiny and potential litigation. Minimally, jails should designate a compliance officer or other staff member to remain up to date on changes in laws and policy. Further, a more comprehensive and proactive approach involves facility-wide engagement in the following steps.[66]

## 1. Establish withdrawal management policy to comport with legal, regulatory, and clinical standards.

**Case in Point:** In 2014, Lindsay Kronberger died from severe electrolyte imbalance due to opiate withdrawal while in custody at Snohomish County Jail (Washington). Her family sued the county and several jail staff. The court denied the county's motion for summary judgment, holding that the existence of or adherence to a policy for treating incarcerated persons undergoing opioid withdrawal was a genuine issue of material fact.[67] Subsequently, the case was settled for $1 million.

To be effective, policies must be available to and understood by all staff at the correctional facility and by third-party medical providers. In addition to being aligned with legal, regulatory, and clinical standards, site-specific policies will facilitate uniform application of protocols. Periodic (e.g., annual) review of the withdrawal management policy by both jail and medical directors will ensure that the policy is current. This review also helps eliminate conflicts between correctional policies and health policies.

In establishing both policy and protocols, a comprehensive approach for supporting SUD recovery is encouraged. For instance, it is important to consider how screening for withdrawal potential at intake and assessment of potential withdrawal severity will interface with the length of the jail stay, continuation or initiation of MAT, and continuity of care upon release.

## 2. Create withdrawal management protocols and maintain fidelity in implementing them.

**Case in Point:** In 2016, Lisa Ostler exhibited profound physical distress and pleaded for medical attention from the time of her intake into the Salt Lake County Jail (Utah) until 3.5 days later, when she was found unresponsive and not breathing in her cell. Shortly after, she was pronounced dead at the hospital.[68] Ostler's family filed a wrongful death suit against Salt Lake County administrators, jailers, and medical personnel. Among many other findings, *The Expert Opinion Report In The Matter of Lisa Ostler v. Salt Lake City County Jail Staff* noted a failure "to perform required withdrawal protocol assessments for many inmates," as well as a "widespread cultural, customary, and accepted practice. . . to ignore health complaints and symptoms exhibited by inmates undergoing drug withdrawal."[69] The county settled for nearly $1 million.

Jails seeking to establish or update their protocols on withdrawal management can start the process by familiarizing themselves with general best practices such as those suggested in the American Society of Addiction Medicine's *Clinical Practice Guideline on Alcohol Withdrawal Management*, the Federal Bureau of Prisons' *Medically Supervised Withdrawal for Inmates with Substance Use Disorders Clinical Guidance*, or the Substance Abuse and Mental Health Services Administration's *TIP 63: Medications for Opioid Use Disorder for Healthcare and Addiction Professionals, Policymakers, Patients, and Families*. Of note, no comprehensive clinical guidelines specific to jail settings have yet been published, but jails that lay the groundwork now will be better prepared to recognize and address withdrawal and align their practices with such guidelines when they become available.

The more detailed the protocol, the less room for interpretation or confusion. Minimally, the protocol defines who does what by when and how. For example, who (medical director, nurse, corrections officer) decides when an individual's presenting symptoms warrant a trip to the hospital for additional medical support and based on what criteria? Documented processes for informing and training staff when a policy or protocol is revised will help ensure compliance.

## 3. Ensure proper staffing and resources are in place to implement policies and protocols.

**Case in Point:** Cynthia Mixon died 2.5 days after entering the Wilkinson County Jail (Georgia), during which time she was denied prescribed medications, including oxycodone. The cause of death was ruled as hypertensive cardiovascular disease, but the plaintiff's medical expert indicated that her symptoms (nausea, diarrhea, and fever) were consistent with acute benzodiazepine withdrawal. A lawsuit filed by Mixon's family alleged that, per jail policy, the on-duty jailer was authorized to decide whether emergency medical attention was warranted, yet said jailer was not provided with adequate medication training to make this decision.[70] The county settled the suit for $420,000.

Cases against correctional facilities related to improper staffing have involved failure to properly hire and train staff to tend to medical needs[71] and releasing individuals in withdrawal into the general jail population without appropriate monitoring.[72] The following actions can help facilities establish staffing and resources appropriate for safe and effective withdrawal management:

- **Designate a responsible health authority** to arrange and coordinate all aspects of health services and ensure the proper standard of care for all incarcerated individuals.

- **Ensure adequate medical staff coverage** to provide assessment and treatment planning services. Clinical support can be accomplished through any combination of on-site health staff, remote coverage, telemedicine services, and/or transfer to facilities that can provide a higher level of care.

- **Clarify roles and responsibilities** so staff understand the limits of their roles. Staff members who do not have adequate training, supplies, or equipment for the job must follow protocols for contacting staff members with the relevant role or expertise.

- **Proactively address staff vacancies** (temporary or permanent, short- or long-term) to avoid disruption or diminishment of health care services.

- **Review contracts with medical and behavioral health services** for withdrawal management practices. In cases where correctional health care is provided by a third party, counties and jail administrators are responsible for ensuring independent contractors meet the established standards of care delivery.[73]

## 4. Train staff to ensure their understanding of and readiness to implement policy and protocol.

**Case in Point:** During his detention at the Jefferson County Jail (Oregon), James Wippel reported not feeling well, vomited, and defecated blood. He died 2 days later from a perforated ulcer. Three corrections deputies were charged with criminally negligent homicide for failing to secure medical treatment.[74] Explaining her belief that Wippel's symptoms were typical of withdrawal, one deputy told investigators, "I'm not familiar with heroin, or how people detox, other than what I'd seen in the movies."[75]

Staff training is essential to providing consistent, appropriate, and adequate health care to people who are incarcerated. Both correctional and health care staff should receive (and be issued certificates upon completion of) training on withdrawal management policy and protocol during onboarding and through regular (annual) training sessions. Announcements at roll calls, staff emails, and signage throughout the facility are informal ways to incorporate training into daily work life. Cross-training of medical and correctional staff can improve communication between groups.

In addition to site-specific policy and protocol, suggested training topics include:

- Signs and symptoms of withdrawal, which is particularly important when individuals provide inaccurate information about their recent substance use.

- The science of addiction as a disease, to clarify the impact substances have on the brain and what the recovery process entails.

- Stigma, which may help staff understand why people are reluctant to disclose recent substance use or a diagnosed SUD.

- Implicit bias, to raise awareness about unconscious thought patterns that affect attitudes and actions toward different groups.

## 5. Engage in continuous quality improvement and implement corrective action in a timely manner.

**Case in Point:** After investigating a string of seven suicides by persons experiencing opioid withdrawal at the Cumberland County Jail (New Jersey), the U.S. Department of Justice warned the jail that its procedures for managing withdrawal were inadequate and violated the 8th and 14th Amendments. Among its findings were that the jail had a written continuous quality improvement (CQI) plan, but that it had not been followed to improve withdrawal management in response to inmate suicides.[76]

Specific to withdrawal management, CQI is a process for evaluating access to care, the intake process, adverse events, need for emergency care, deaths, and other internal and external factors affecting the medical care of confined persons with SUD.[77] CQI often involves regular review of data (e.g., number of individuals screened for SUD upon intake and in initial detention, with the percent who screen positive; number of individuals receiving withdrawal services, by type of substance), incidents, and quality improvement goals to identify where updates or additional training sessions are needed for medical and correctional staff. The following activities are inherent to a robust CQI process for achieving better outcomes:

- *Assign the responsibility of gathering and monitoring data* to a person who is appropriately trained on gathering and monitoring data for quality improvement purposes.

- **Regularly conduct and document meetings** of the correctional administrator, the responsible health authority, and other members of the medical, dental, behavioral health, and correctional staff, as appropriate.[78]

- *Gather statistical reports of health services* at least monthly to monitor and discuss trends in the delivery of health care.[79]

- *Maintain medical records* (using electronic health records when possible) separate from jail confinement records.

- In contracts with third-party providers, *specify software, data-gathering tools, and system management tools*, as well as any reporting or information needed for monitoring compliance and quality processes.

- **Draft a codebook** for the processes in which the health care provider identifies the data elements, categories, codes for each data element, and data location in the computer.[80]

An established corrective action plan enables timely responses to problems and corrections to errors resulting from noncompliance or underperformance.[81] For example, jails/counties that contract with a third-party health care provider should specify the corrective action that will occur when metrics and standards are not met in the request for proposal (RFP) and contract. The jail/county should also specify in the contract the conditions under which it may terminate the contract or negate any contract extension clauses if the provider fails to correct errors. A study of 81 RFPs for contracted jail health care services found that less than one-third specified performance requirements and penalties for failing to uphold the requirements specified in the RFP.[82]

# Conclusion

Perhaps at no other time has the need for withdrawal management policy and protocols in jails been more critical. The COVID-19 pandemic has prompted initiation or increased use of substances, particularly by racial/ethnic minorities—a population disproportionally represented in jails.[83,84] The percent of individuals in local jails who die from alcohol/drug intoxication continues to grow, and legislation, such as Massachusetts' Chapter 208, Section 78 noted above, is demanding greater attention to the health of individuals with SUDs in jails. Jail administrators, medical and correctional staff, public health officials, and other stakeholders must be prepared to carry out the law.

**For More Information**

- The *ASAM National Practice Guideline for the Treatment of Opioid Use Disorder - 2020 Focused Update* (2020), from the American Society of Addiction Medicine at https://www.asam.org/Quality-Science/quality/2020-national-practice-guideline.

- *Medically Supervised Withdrawal for Inmates with Substance Use Disorders: Federal Bureau of Prisons Clinical Guidance* (2020), from the Federal Bureau of Prisons at https://www.bop.gov/resources/pdfs/medically_supervised_withdrawal_cg.pdf.

- *TIP 63: Medications for Opioid Use Disorder for Healthcare and Addiction Professionals, Policymakers, Patients, and Families* (2021), from the Substance Abuse and Mental Health Services Administration at https://store.samhsa.gov/product/TIP-63-Medications-for-Opioid-Use-Disorder-Full-Document/PEP20-02-01-006.

- *Fact Sheet: Drug Addiction and Federal Disability Rights Laws* (2018), from the U.S. Department of Health and Human Services, Office for Civil Rights at https://www.hhs.gov/sites/default/files/drug-addiction-aand-federal-disability-rights-laws-fact-sheet.pdf.

- *Medication-Assisted Treatment for Opioid Use Disorder in Jails and Prisons: A Planning & Implementation Toolkit* (2020), from the National Council for Behavioral Health and Vital Strategies at https://www.thenationalcouncil.org/wp-content/uploads/2020/09/MAT_in_Jails_Prisons_Toolkit_Final_12_Feb_20.pdf?daf=375ateTbd56.

- *Use of Medication-Assisted Treatment for Opioid Use Disorder in Criminal Justice Settings* (2019), from the Substance Abuse and Mental Health Services Administration at https://store.samhsa.gov/product/Use-of-Medication-Assisted-Treatment-for-Opioid-Use-Disorder-in-Criminal-Justice-Settings/PEP19-MATUSECJS.

- *Jail-Based Medication-Assisted Treatment: Promising Practices, Guidelines, and Resources for the Field* (2018), from the National Sheriffs' Association and the National Commission on Correctional Health Care at https://www.sheriffs.org/publications/Jail-Based-MAT-PPG.pdf.

# Endnotes

1. Bronson, Jennifer, Jessica Stroop, Stephanie Zimmer, and Marcus Berzofsky, Revised 2020, *Drug Use, Dependence, and Abuse Among State Prisoners and Jail Confined Persons, 2007–2009*, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, retrieved March 26, 2021 from https://bjs.ojp.gov/content/pub/pdf/dudaspji0709.pdf.

2. *Coltrain et al. v. Mineral County et al.*, United States District Court District of Nevada 3:18-cv-00420-LRH-CLB.

3. See note 1, Bronson et al., *Drug Use, Dependence, and Abuse Among State Prisoners and Jail Confined Persons, 2007–2009*, p. 1.

4. E. Ann Carson, 2021, "Mortality in Local Jails, 2000-2019 - Statistical Tables," *Bureau of Justice Statistics Statistical Tables*, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, retrieved December 17, 2021 from https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf.

5. Ibid, p. 17.

6. Ibid, p. 18.

7. The City of New York Office of the Mayor, n.d., *Healing NYC: Preventing Overdoses, Saving Lives*, New York City: The City of New York Office of the Mayor, retrieved March 19, 2021 from https://www1.nyc.gov/assets/home/downloads/pdf/reports/2017/HealingNYC-Report.pdf.

8. Rich Cholodofsky, 2019, "Westmoreland Inmates Reach Record Detox Level in February," *Tribune-Review*, March 18, retrieved March 19, 2021 from https://triblive.com/local/westmoreland/westmoreland-inmates-reach-record-detox-level-in-february/.

9. American Psychiatric Association, 2013, *Diagnostic and Statistical Manual of Mental Disorders (DSM–5)*, Washington, DC: American Psychiatric Association.

10. Darke, Shane, Sarah Larney, and Michael Farrell, 2017, "Yes, People Can Die from Opiate Withdrawal," *Addiction* 112(2), 199–200, retrieved March 26, 2021 from https://doi.org/10.1111/add.13512.

11. American Society of Addiction Medicine, 2020, *The ASAM Clinical Practice Guideline on Alcohol Withdrawal Management*, Rockville, MD: American Society of Addiction Medicine, retrieved March 19, 2021 from https://www.asam.org/Quality-Science/quality/guideline-on-alcohol-withdrawal-management.

12. Centers for Disease Control and Prevention, 2015, *Suicide Rising Across the U.S.*, Atlanta, GA: Centers for Disease Control and Prevention, retrieved March 23, 2021 from https://www.cdc.gov/vitalsigns/suicide/infographic.html#graphic3.

13. Center for Substance Abuse Treatment, 2006, *Detoxification and Substance Abuse Treatment*, Treatment Improvement Protocol (TIP) Series, No. 45, HHS Publication No. (SMA) 15-4131, Rockville, MD: Substance Abuse and Mental Health Services Administration, retrieved March 19, 2021 from https://store.samhsa.gov/sites/default/files/d7/priv/sma15-4131.pdf.

14. U.S. Food and Drug Administration, 2019, *FDA identifies harm reported from sudden discontinuation of opioid pain medicines and requires label changes to guide prescribers on gradual, individualized tapering*, White Oak, MD: U.S. Food and Drug Administration, retrieved March 26, 2021 from https://www.fda.gov/drugs/drug-safety-and-availability/fda-identifies-harm-reported-sudden-discontinuation-opioid-pain-medicines-and-requires-label-changes.

15. See note 4 above, Carson, "Mortality in Local Jails, 2000-2019 - Statistical Tables," p. 8.

16. Fiscella, Kevin, Margaret Noonan, Susan H. Leonard, Subrina Farah, Mechelle Sanders, Sarah E. Wakeman, and Jukka Savolainen, April 2020, "Drug- and Alcohol-Associated Deaths in U.S. Jails," *Journal of Correctional Health Care* 26(2): 183–193, retrieved March 19, 2021 from http://doi.org/10.1177/1078345820917356.

17. Ibid, p. 188.

18. Ibid, p. 183.

19. Ibid, p. 190.

20. Binswanger, Ingrid A., Patrick M. Krueger, and J.F. Steiner, 2009, "Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the USA Compared with the General Population," *Journal of Epidemiology and Community Health* 63, retrieved March 19, 2021 from https://doi.org/10.1136/jech.2009.090662.

21. Jiménez, Monik, Tori Cowger, Lisa Simon, Maya Behn, Nicole Cassarino, and Mary Bassett, 2020, "Epidemiology of COVID-19 Among Incarcerated Individuals and Staff in Massachusetts Jails and Prisons," *JAMA Network Open* 3(8), retrieved December 16, 2021 from https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2769617.

22. Flanigan, Timothy, Nicklos Zaller, Lynn Taylor, Curt Beckwith, Landon Kuester, Josiah Rich, and Charles Carpenter, 2009, "HIV and Infectious Disease Care in Jails and Prisons: Breaking Down the Walls with the Help of Academic Medicine," *Transactions of the American Clinical and Climatological Association* 120, retrieved March 19, 2021 from https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2744543/.

23. Substance Abuse and Mental Health Services Administration, 2017, *Guidelines for Successful Transition of People with Mental or Substance Use Disorders from Jail and Prison: Implementation Guide*, (SMA) 16-4998, Rockville, MD: Substance Abuse and Mental Health Services Administration, retrieved March 19, 2021 from https://store.samhsa.gov/product/Guidelines-for-Successful-Transition-of-People-with-Mental-or-Substance-Use-Disorders-from-Jail-and-Prison-Implementation-Guide/SMA16-4998.

24. See note 13, Center for Substance Abuse Treatment, *Detoxification and Substance Abuse Treatment,* Treatment Improvement Protocol (TIP) Series, No. 45.

25. The Pew Charitable Trusts, 2020, *Opioid Overdose Crisis Compounded by Polysubstance Use*, retrieved March 19, 2021 from https://www.pewtrusts.org/en/research-and-analysis/fact-sheets/2020/10/opioid-overdose-crisis-compounded-by-polysubstance-use.

26. Nora Volkow, 2020, *Rising Stimulant Deaths Show that We Face More than Just an Opioid Crisis*, North Bethesda: MD: National Institute on Drug Abuse, retrieved March 19, 2021 from https://www.drugabuse.gov/about-nida/noras-blog/2020/11/rising-stimulant-deaths-show-we-face-more-than-just-opioid-crisis.

27. Busardò, Francesco, and Alan Jones, 2015, "GHB Pharmacology and Toxicology: Acute Intoxication, Concentrations in Blood and Urine in Forensic Cases and Treatment of the Withdrawal Syndrome," *Current Neuropharmacology* 13(1), 47–70, retrieved March 23, 2021 from https://doi.org/10.2174/157015 9X13666141210215423.

28. Jones, Christopher, Emily Einstein, and Wilson Compton, 2018, "Changes in Synthetic Opioid Involvement in Drug Overdose Deaths in the United States, 2010-2016," *JAMA* 319(17), 1819–1821, retrieved March 23, 2021 from https://doi.org/10.1001/jama.2018.2844.

29. Rachel Dissell, 2019, "Ohio jails accept role as state's busiest opioid detox centers," *The Plain Dealer*, January 11, retrieved March 15, 2021 from https://www.cleveland.com/metro/2017/10/ohio_jails_accept_role_as_states_busiest_opioid_detox_centers.html.

30. Huh, Kil, Alexander Boucher, Frances McGaffey, Matt McKillop, and Maria Schiff, 2018, *Jails: Inadvertent Health Care Providers*, The Pew Charitable Trusts, retrieved March 26, 2021 from https://www.pewtrusts.org/-/media/assets/2018/01/sfh_jails_inadvertent_health_care_providers.pdf.

31. Eric Westervelt, 2019, "County Jails Struggle With a New Role as America's Prime Centers for Opioid Detox," *NPR*, April 24, retrieved March 26, 2021 from https://www.npr.org/2019/04/24/716398909/county-jails-struggle-with-a-new-role-as-americas-prime-centers-for-opioid-detox.

32. See note 1, Bronson, et al., *Drug Use, Dependence, and Abuse Among State Prisoners and Jail Confined Persons, 2007–2009*, p. 13.

33. Susan W. McCampbell, 2019, "Core Competencies and Jail Leadership: Reduce Jail-related Liability Risks," *American Jails*, retrieved March 26, 2021 from http://www.cipp.org/uploads/3/7/5/7/37578255/21_reduce_jail-rel...%5b3525%5d.pdf.

34. See *Smith v. Aroostook Cnty.*, 376 F. Supp. 3d 146 (D. Me. 2019), aff'd, 922 F.3d 41 (1st Cir. 2019); *Kortlever et al. v. Whatcom Cnty.*, No. 2:18CV00823, Order (W.D. Wash. July 9, 2019); *Gohranson v. Snohomish Cnty.*, No. C16-1124RSL, U.S. Dist. LEXIS 193494 (W.D. Wash. Nov. 13, 2018); *Pesce v. Coppinger*, 355 F. Supp. 3d 35 (D. Mass. 2018); *Smith v. Fitzpatrick*, No. 1:2018cv00288, Order (D. Me. Oct. 1, 2018); *Moyer v. Lebanon Cnty.*, No. 3:16-CV-01424, 2017 U.S. Dist. LEXIS 213261, (M.D. Pa., Dec. 28, 2017), adopted by *Moyer v. Lebanon Cnty.*, No. 3:16-CV-01424, 2018 U.S. Dist. LEXIS 8126 (M.D. Pa., Jan. 18, 2018); *Estate of Moffitt v. Minor*, No. 15-CV-00071-WYD-MJW, U.S. Dist. LEXIS 222865 (D. Colo. Sept. 28, 2017); *Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929 (N.D. Ca. 2015); *Brummett v. Cnty. of San Diego*, No. 12-CV-1428-LAB (BGS), U.S. Dist. LEXIS 42991 (S.D. Cal. Mar. 25, 2013); *Estate of Johnson v. Miller*, No. 2:11-CV-00067, U.S. Dist. LEXIS 95322 (S.D. Ohio Aug. 25, 2011).

35. Legal Action Center, 2021, *Cases Involving Discrimination Based on Treatment with Medication for Opioid Use Disorder (MOUD)*, retrieved March 26, 2021 from https://www.lac.org/assets/files/Cases-involving-denial-of-access-to-MOUD.pdf.

36. Weizman, Shelly, Joanna Perez, Isaac Manoff, Melissa Baney, and Taleed El-Sabawi, 2021, *National Snapshot: Access to Medications for Opioid Use Disorder in U.S. Jails and Prisons*, O'Neill Institute for National and Global Health Law at Georgetown University Law Center, retrieved September 3, 2021 from https://oneill.law.georgetown.edu/wp-content/uploads/2021/07/National-Snapshot-Access-to-Medications-for-Opioid-Use-Disorder-in-U.S.-Jails-and-Prisons.pdf.

37. Center on Media, Crime and Justice at the John Jay College of Criminal Justice, 2018, "Pennsylvania County to Pay $4.75M in Inmate Death," *Crime and Justice News*, October 25, retrieved September 9, 2021 from https://thecrimereport.org/2018/10/25/pennsylvania-county-to-pay-4-75m-in-inmate-death/.

38. *Pitkin and Pitkin v. Corizon Health, Inc. et al*, United States District Court for the District of Oregon, Civ. No. 3:16-cv-02235-AA.

39. U.S. Const. amend. VIII.

40. *Wilson v. Seiter*, 501 U.S. 294, 296-97.

41. *Kingsley v. Hendrickson*, 576 U.S 389, 390 (2015) (holding that to make an excessive force claim, pretrial detainees must only prove excessive force under an objective analysis instead of under the objective and subjective analyses required for incarcerated individuals to make the same claim); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (holding that a pretrial detainee's right to medical care under the 14th Amendment is "at least as great" as an incarcerated person's right to medical care under the 8th Amendment).

42. Edward C. Dawson, 2018, "Replacing Monell Liability with Qualified Immunity for Municipal Defendants in 42 U.S.C. § 1983 Litigation," *University of Cincinnati Law Review* 86(2), retrieved March 17, 2021 from https://scholarship.law.uc.edu/uclr/vol86/iss2/2.

43. *Wilson*, 501 U.S. at 296-97 (1991).

44. The United States Department of Justice, 2020, *Rights of Persons Confined in Jails and Prisons*, Washington, DC: The United States Department of Justice, retrieved March 26, 2021 from https://www.justice.gov/crt/rights-persons-confined-jails-and-prisons.

45. 28 C.F.R. § 35.152.

46. 42 U.S.C. § 12210(c). This is an evolving area of law. *See Kortlever*, No. 2:18CV00823, Complaint, (W.D. Wash. June 6, 2018), ¶ 29.

47. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).

48. *Farmer v. Brennan*, 511 U.S. 825, 836-840 (1994).

49. Ibid. at 836-840, 848.

50. *King*, 680 F.3d 1013, 1020 (7th Cir. 2012).

51. Struve, C.T., March 2013, "The Conditions of Pretrial Detention," 161 *U. Pa. L. Rev.* 1009, 1027.

52. Kingsley, 576 U.S. 389.

53. *Gordon*, 888 F.3d 1118 (9th Cir. 2018).

54. *Davis v. Wessel*, 792 F.3d 793, 803 (7th Cir. 2015) (citing *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. (2015).

55. *Connick v. Thompson*, 563 U.S. 51 (2011) (citing *Monell v. Dep't. of Social Services of City of New York*, 436 U.S. 658, 694 (1978).

56. *See Becker v. Newman*, 646 Fed. Appx. 788 (11th Cir. 2016); *Moyer*, 2017 U.S. Dist. LEXIS 213261; *Estate of Johnson*, U.S. Dist. LEXIS 95322.

57. Schap, David, Victor A. Matheson, and David I. Rosenbaum, 2016, "Wrongful Death: Who Recovers What, Where, and How," *Journal of Legal Economics* 22(2), retrieved April 14, 2021 from https://jle.aaefe.org/jle-volume22.html?dir=desc&order=name.

58. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976).

59. See note 35, Legal Action Center, *Cases Involving Discrimination Based on Treatment with Medication for Opioid Use Disorder (MOUD)*.

60. *Aroostook Cnty.*, 376 F. Supp. 3d at 149.

61. American Civil Liberties Union of Massachusetts, 2018, *Pesce v. Coppinger*, retrieved April 14, 2021 from https://www.aclum.org/en/cases/pesce-v-coppinger.

62. Staff Report, 2020, "New law mandates medication assisted treatment in jails," *New Hampshire Union Leader*, August 5, retrieved March 25, 2021 from https://www.unionleader.com/news/health/new-law-mandates-medication-assisted-treatment-in-jails/article_bbb2728a-9a25-530e-bdf7-306de5f5b9b1.html.

63. Teddy Rosenbluth, 2020, "New law requires opioid treatment in county jails," *Concord Monitor*, August 6, retrieved March 25, 2021 from https://www.concordmonitor.com/Opioid-Treatment-New-Hampshire-Prisons-35593754.

64. Lisa Backus, 2019, "Funding to Help CT Prisons Improve Opioid Addiction Treatment Program," *The Middletown Press*, July 3, retrieved March 25, 2021 from https://www.middletownpress.com/middletown/article/Funding-to-help-CT-prisons-improve-opioid-14069347.php.

65. The 192nd General Court of the Commonwealth of Massachusetts, 2018, Chapter 208: An Act for Prevention and Access to Appropriate Care and Treatment of Addiction, at Section 78, retrieved April 9, 2021 from https://malegislature.gov/Laws/SessionLaws/Acts/2018/Chapter208.

66. Lauren McMenemy, 2019, "What Is Legal Compliance?," *Diligent Insights*, May 6, retrieved March 26, 2021 from https://insights.diligent.com/legal-compliance/steps-evaluating-legal-compliance.

67. *Gohranson*, U.S. Dist. LEXIS 193494 at 3.

68. Suzanne Ward, 2019, *Expert Opinion Report in The Matter of: Lisa Ostler v. Salt Lake City County Jail Staff*, retrieved March 26, 2021 from https://rockyanderson.org/wp-content/uploads/2020/03/expert-report-of-suzanne-l-ward-rn-ms-lnc.pdf.

69. Ibid.

70. *Brooks v. Wilkinson County, Georgia et al.*, United States District Court for the Middle District of Georgia, Macon Division Case 5:17-cv-00033-TES.

71. *Estate of Johnson*, U.S. Dist. LEXIS 95322, at 7, 11.

72. See *Brummett*, U.S. Dist. LEXIS 42991, at 12-13.

73. See *Aroostook*, 376 F. Supp. 3d 146; *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012); *Pesce*, 355 F. Supp. 3d 35; *Hernandez*, 110 F. Supp. 3d 929.

74. Clackamas County, 2018, *Jefferson County Corrections Deputies Acquitted of Criminally Negligent Homicide*, December 13, retrieved September 9, 2021 from https://www.clackamas.us/news/2018-12-13/jefferson-county-corrections-deputies-acquitted-of-criminally-negligent-homicide.

75. Conrad Wilson, 2018, "Jefferson County Death Raises Questions of Accountability," Oregon Public Broadcasting, December 30, retrieved March 26, 2021 from https://www.opb.org/news/article/jefferson-county-jail-death-questions-accountability-james-whippel-case/.

76. U.S. Department of Justice, Civil Rights Division, and U.S. Attorney's Office, District of New Jersey, 2021, *Investigation of the Cumberland County Jail (Bridgeton, New Jersey)*, retrieved April 1, 2021 from https://www.justice.gov/opa/press-release/file/1354646/download.

77. National Commission on Correctional Health Care, 2010, *Continuous Quality Improvement*, Chicago, IL: National Commission on Correctional Health Care, retrieved March 26, 2021 from https://www.ncchc.org/spotlight-on-the-standards-24-1.

78. National Commission on Correctional Health Care, 2018, *Standards for Health Services in Jails*, Chicago, IL: National Commission on Correctional Health Care, p. 8.

79. Ibid.

80. Gail Elias, 2007, *How to Collect and Analyze Data: A Manual for Sheriffs and Jail Administrators*, Washington, DC: U.S. Department of Justice, National Institute of Corrections, retrieved March 26, 2021 from https://s3.amazonaws.com/static.nicic.gov/Library/021826.pdf.

81. John Spacey, 2018, "3 Examples of a Corrective Action Plan," *Simplicable*, January 4, retrieved March 26, 2021 from https://simplicable.com/new/corrective-action-plan.

82. See note 30, Huh et al., *Jails: Inadvertent Health Care Providers*.

83. Czeisler, Mark É., Rashon I. Lane, Emiko Petrosky, Joshua F. Wiley, Aleta Christensen, Rashid Njai, Matthew D. Weaver, Rebecca Robbins, Elise R. Facer-Childs, Laura K. Barger, Charles A. Czeisler, Mark E. Howard, and Shantha M.W. Rajaratnam, 2020, "Mental Health, Substance Use, and Suicidal Ideation During the COVID-19 Pandemic - United States, June 24-30, 2020," *Morbidity and Mortality Weekly Report* 69(32), Atlanta, GA: Centers for Disease Control and Prevention, retrieved May 20, 2021 from https://doi.org/10.15585/mmwr.mm6932a1

84. Zhen Zeng, 2020, *Jail Inmates in 2018*, Bulletin, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, NCJ 253044, retrieved May 20, 2021 from https://www.bjs.gov/content/pub/pdf/ji18.pdf.

### About BJA

The Bureau of Justice Assistance (BJA) helps to make American communities safer by strengthening the nation's criminal justice system. BJA's grants, training and technical assistance, and policy development services provide government jurisdictions (state, local, tribal, and territorial) and public and private organizations with the cutting edge tools and best practices they need to support law enforcement, reduce violent and drug-related crime, and combat victimization.

To learn more about BJA, visit https://bja.ojp.gov, or follow us on Facebook (www.facebook.com/DOJBJA) and Twitter (@DOJBJA). BJA is part of the Department of Justice's Office of Justice Programs.

NCJ 304066

# EXHIBIT D

1

2

3

4

5

6                SUPERIOR COURT OF WASHINGTON FOR SNOHOMISH COUNTY

7   KATHLEEN KURU, as Personal Representative of the              No.  23-2-06296-31
    Estate of CHRISTOPHER HANKINS, decedent;

8                             Plaintiff,                          AMENDED COMPLAINT

9        v.

10  SNOHOMISH COUNTY, a governmental entity;

11                            Defendant.

12  COMES NOW, Plaintiff and alleges as follows:

13                        I.        PARTIES

14       1.1     Plaintiff, Kathleen Kuru, is the mother and duly-appointed Personal Representative

15  of the Estate of Christopher Hankins, deceased. Plaintiff Kathleen Kuru brings all claims available

16  to the Estate, and all statutory beneficiaries of the Estate.

17       1.2     Christopher Hankins, decedent, was incarcerated at the Snohomish County Jail

18  (SCJ) when he died an unnecessary and preventable death, his surviving claims are brought by

19  Kathleen Kuru, the Personal Representative of the Estate of Christopher Hankins.

20       1.3     Defendant Snohomish County is a governmental entity and is governed and

21  organized in accordance with the Washington State Constitution Article 11. Snohomish County

22  operated the Snohomish County Jail, which provides jail services for inmates confined in detention

23  facilities including but not limited to the Snohomish County Jail.

24  AMENDED COMPLAINT - 1                                STRITMATTER KESSLER KOEHLER MOORE
                                                        3600 15th Ave West, Suite 300
                                                        Seattle, WA  98119
                                                        Tel: 206-448-1777

1.4     Snohomish County is vicariously liable for all of its employees' acts and omissions, including but not limited to the acts and omissions of Snohomish County Corrections officers, medical providers, and other employees.

## II.     JURISDICTION, VENUE, AND STATUTORY COMPLIANCE

2.1     Jurisdiction and venue are proper in the Superior Court of Snohomish County because the incidents occurred in Snohomish County, Washington, and because Defendant Snohomish County is located there.

2.2     Plaintiff Kathleen Kuru served a Notice of Tort Claim on Snohomish County on March 14, 2022, pursuant to RCW 4.92 et seq., and more than the required sixty days have passed without resolution of the claim.

## III.     STATEMENT OF FACTS

3.1     On July 5, 2020, 34-year-old Christopher Hankins was arrested and booked at the SJC. At the time of his booking, Hankins self-reported he had used meth right before his arrest and that he took psychiatric medication for seizures, bipolar, depression, and mental health.

3.2     On July 6, 2020, he was taken to Providence Medical Center emergency room for unstable behavior and medical concerns. He was "actively suicidal" and in a "very vulnerable state of mind." After he returned, he attempted suicide and was placed on suicide watch.

3.3     On July 15, 2020, Hankins was placed in cell block F1 102A and records are routine until the early morning hours of September 16, 2020. That morning, around 2:00 AM, Deputy Bisson noticed Hankins sitting on his stool turned sideways with his head down on his bunk. Deputy Bisson attempted to wake him by shaking him and calling his name. Hankins did not respond.

3.4     Deputy Bisson then called for medical assistance. He continued to shake Hankins

AMENDED COMPLAINT - 2

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA  98119
Tel: 206-448-1777

until he awoke. Registered Nurse Mary Gough arrived and checked his vitals noticing that his pulse was "a little elevated" but that his other vitals "were fine."

3.5     Staff and medical left Hankins in the same position they saw him, sitting on his stool with his head on his bunk. Hankins was never re-assessed.

3.6     Three hours later, at 5:09 AM Deputy Bisson returned after headcount to Hankins' cell. He opened the cell and again tried to shake Hankins awake and call his name loudly. After no response, Deputy Bisson checked for signs of breathing and could not find any. He pulled Hankins to the floor and called a medical emergency.

3.7     Deputy Brown arrived and checked for a pulse and could not feel one. Deputies Bisson and Brown moved Hankins and began CPR. Registered Nurses Gough, Lopez, and medical assistant Mucciarone assisted in checking vitals and attaching the AED. Deputy Liang took over chest compressions for Deputy Brown. Sergeant Lewis arrived and noted that Hankins had started to become gray around his lips. Everett Fire Department arrived at 5:25 AM and took over CPR.

3.8     Life-saving efforts failed, and Christopher Hankins was declared dead at 5:53 AM.

3.9     The Snohomish County Medical Examiner determined Hankins' death was caused by "acute heroin intoxication."

3.10    Incarcerated individuals are not free to leave jails or prisons to obtain their own medical care. It has been long recognized that cities operating jails and prisons have a special relationship with inmates that gives rise to a nondelegable duty to provide for the mental and physical health and safety needs of those individuals within their custody.

3.11    Despite this duty, Christopher Hankins died a foreseeable and preventable death while at SCJ.

3.12    Snohomish County was unreasonable in its failure to observe, monitor, and provide

AMENDED COMPLAINT - 3

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

1    the care and treatment necessary to prevent Christopher Hankins' foreseeable death. Christopher

2    was unresponsive when staff assessed him initially and instead of helping him and fulfilling their

3    obligation to provide medical care, the SCJ staff simply ignored signs that Hankins was dying.

4        3.13    Snohomish County failed to properly train its staff to recognize and respond to

5    foreseeable medical emergencies like Hankins. They delayed in providing him life-saving medical

6    treatment until it was too late.

7        3.14    Defendant was on notice for over two months that Hankins had a history of drug

8    addiction and mental health conditions. Yet, when they took an abnormal pulse, they simply

9    ignored him and failed to re-assess him. His death was foreseeable and could have been prevented.

10       3.15    The acts and omissions by the county by and through its operators, correctional

11   officers, administrators, and agents, were unreasonable and constitute negligence and gross

12   negligence. These acts and omissions were a proximate cause of Christopher Hankins' unnecessary

13   and wrongful death.

14                          **CAUSE OF ACTION**

15                          IV.    **NEGLIGENCE**

16       4.1    Defendant Snohomish County has a non-delegable duty to exercise reasonable care

17   in the protection of jail inmates from reasonably foreseeable harms and to provide reasonable

18   medical care.

19       4.2    This duty exists because prisoners, by virtue of incarceration, are unable to obtain

20   medical care for themselves.

21       4.3    Defendant Snohomish County breached that duty, and was negligent when it failed

22   to have and follow proper training, policies, and procedures on the assessment of persons with

23   apparent medical needs.

24

AMENDED COMPLAINT - 4

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

1    4.4    Defendant Snohomish County breached that duty, and was negligent when it failed

2  to have and follow proper training, policies, and procedures on the provision of reasonable and

3  necessary medical care and treatment to inmates.

4    4.5    Defendant Snohomish County breached that duty, and was negligent when it failed

5  to have and follow proper training, policies, and procedures on the care of persons going through

6  overdose or withdrawal following use of controlled substances.

7    4.6    Defendant Snohomish County breached that duty, and was negligent when it failed

8  to address Christopher Hankins' obvious medical needs.

9    4.7    Defendant Snohomish County breached that duty, and was negligent when it

10  ignored the suffering and obvious necessity for medical care by Christopher Hankins.

11    4.8    Defendant Snohomish County breached its duties to Christopher Hankins and was

12  negligent in the above-described manners, among others.

13    4.9    As a direct and proximate result of the breaches, failures, negligence of Defendant

14  Snohomish County, as described above and in other respects as well, Christopher Hankins died a

15  slow and painful death. He also suffered unimaginable pre-death pain, suffering, and terror.

16    4.10    Christopher Hankins is survived by his son. As a direct and proximate result of the

17  breaches, failures, and negligence of Defendant Snohomish County, Christopher Hankins' son has

18  been deprived of his father.

19    4.11    As a direct and proximate result of the breaches, failures, and negligence of

20  Defendant Snohomish County, as described above and in other respects as well, Plaintiffs have

21  incurred and will continue to incur general and special damages in an amount to be proven at trial.

22                    **V.    PRAYER FOR RELIEF**

23    WHEREFORE, Plaintiff pray for judgment against Defendant as follows:

24

AMENDED COMPLAINT - 5

STRITMATTER KESSLER KOEHLER MOORE
3600 15th Ave West, Suite 300
Seattle, WA 98119
Tel: 206-448-1777

1      1.     For special and general damages in amounts to be proven at trial;

2      2.     Reasonable attorneys' fees and costs;

3      3.     For statutory interest on the judgment from the date judgment is entered until paid

4              in full;

5      4.     For prejudgment interest on the special damages;

6      5.     For prejudgment interest on liquidated damages;

7      6.     For such other and further relief as the Court may deem just and equitable.

8      DATED this 11th day of October, 2023.

9                     STRITMATTER KESSLER KOEHLER MOORE

*/s/ Melanie Nguyen*
Melanie Nguyen, WSBA#51724
Counsel for Plaintiff

AMENDED COMPLAINT - 6